# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELIZABETH CARMER,
  1441 Rhode Island Avenue NW, Unit 105
  Washington, D.C. 20005

      *Plaintiff*,

    v.

UNITED STATES OF AMERICA,

  <u>**Serve**</u>: Matthew M. Graves
        U.S. Attorney for the
        District of Columbia
        555 4th Street NW
        Washington, D.C. 20530

        and

        Merrick Garland
        Attorney General of the United States
        U.S. Department of Justice
        950 Pennsylvania Avenue NW
        Washington, D.C. 20530

MARK ADAMCHIK, in his individual capacity
  United States Park Police
  1100 Ohio Drive SW
  Washingtin, D.C. 20024

     and

JOHN DOE OFFICERS 1-2, in their
individual capacities,

      *Defendants*.

Civil Case No. _____

**COMPLAINT
AND JURY DEMAND**

## INTRODUCTION

1.      On June 1, 2020, thousands of Americans gathered in Lafayette Square, in downtown Washington, D.C., to speak out against police brutality and racial injustice.

2.      The plaintiff in this case, Elizabeth Carmer, was among those Americans. She had come to Lafayette Square to lend her voice to a cause that had taken on renewed urgency in the summer of 2020, as the country reeled from the latest in a long line of police abuses against Black people. Amid a crowd of like-minded demonstrators, who were peacefully exercising their First Amendment right of free speech, Ms. Carmer kneeled on the ground, raised her arms to the sky, and chanted words of solidarity and compassion.



*Ms. Carmer kneeling at the northern edge of Lafayette Park,*
*just seconds before the attack (approximately 6:38 p.m.)*

3.      What followed was emblematic of the senseless police violence the demonstrators had come together that day to decry. Law enforcement officers, led by members of the United

States Park Police, launched an unprovoked and unjustified attack on the crowd. Their stated reason: to clear space for a contractor to install a fence along the park's northern border.

4.    The officers showed no regard for the safety of the peaceably assembled crowd. Appallingly, they refused to pause the dispersal operation for a mere 25 minutes to allow a District-wide curfew to take effect.

5.    Instead, in a brazen violation of the protesters' constitutional rights, the officers charged at the demonstrators, bashed them with riot shields and batons, and loosed a barrage of tear gas, chemical grenades, and rubber bullets.

6.    Ms. Carmer was senselessly beaten by the police. Though she had committed no crime and posed no threat to anyone, the officers attacked her without warning. While Ms. Carmer remained kneeling with her hands in the air, a Park Police officer rammed into her with a shield, knocking her to the ground. One or more Park Police officers then bludgeoned her, twice, with a baton on her right thigh, causing her to suffer intense pain, severe bruising, permanent nerve damage, and extreme mental anguish.



*Still image from video that captured part of the attack on Plaintiff (approximately 6:38 p.m.)*

7.    The beating of innocent protesters in the heart of the nation's capital was a disgrace. For many people, the sight of heavily armed federal officers unleashing violence on law-abiding Americans in a public square was an unpardonable abuse of the executive branch's police powers. Understandably, many directed their ire at President Donald J. Trump, who, as the smoke cleared, eagerly seized the opportunity to present himself as a champion of "law and order." In what is widely remembered as one of the most ignominious moments of his presidency, Trump emerged from the White House roughly half an hour after the forcible removal of demonstrators. He then walked across H Street NW—the street on which Ms. Carmer was beaten—and posed for photographs with a bible outside of a church.

8.    This case, though, is not about the president. It is about the right to peacefully protest, free from government-sponsored violence. Ms. Carmer, like other members of the crowd, had a constitutionally protected right to air her views without fear of suppression or reprisal. The defendants in this suit—among them, the US Park Police incident commander who ordered the attack, as well as two of the officers under his command—trampled on that right. Through this action, Ms. Carmer seeks to hold Defendants accountable for violating the Fourth Amendment's prohibition on unlawful seizures, the Fifth Amendment's proscription against deprivations of liberty without due process of law, and the First Amendment's guarantee of free speech. She also seeks damages under the Federal Tort Claims Act.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this case pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), and pursuant to 28 U.S.C. § 1331, as this action presents federal questions and seeks to redress the deprivation of rights under the First, Fourth, and Fifth Amendments to the United States Constitution.

10.    Ms. Carmer has complied with 28 U.S.C. § 2401(b) by presenting her tort claim in writing, via certified mail, to the United States Park Police on April 1, 2021. The instant suit is timely under 28 U.S.C. §§ 2401(b), 2675(a).

11.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1), 1391(e)(1), and 1402(b) because the events giving rise to these claims occurred in the District of Columbia.

## **PARTIES**

12.    Plaintiff Elizabeth Carmer is an adult resident of Washington, D.C. At the time of the incidents described in this Complaint, she was 56 years old.

13.    Defendant United States of America is the proper defendant with respect to Ms. Carmer's Federal Tort Claims Act claim pursuant to 28 U.S.C. § 2679.

14.    Defendant Mark Adamchik is a major in the United States Park Police, an agency of Defendant United States of America. He was the incident commander at Lafayette Square on June 1, 2020 and gave the immediate order for law enforcement officers to attack the peaceably assembled protesters. He is being sued in his individual capacity for violating Ms. Carmer's constitutional rights.

15.    Defendants John Does 1-2 are law enforcement officers employed by the United States Park Police.[1] They are being sued in their individual capacities for causing the damages alleged herein.

---

[1] The "John Doe" officers are both known to be US Park Police officers by the "USPP" marking on their helmets.

## FACTS

16.    On May 25, 2020, Minneapolis Police Officer Derek Chauvin murdered George Perry Floyd Jr., an unarmed, 46-year-old Black man, on the street outside of a Minneapolis convenience store.

17.    Witnesses captured the murder on video. The footage showed Officer Chauvin kneeling on Floyd's neck and back for eight minutes and forty-six seconds. Floyd, with his face pressed against the pavement, pleaded, "Please, please, I can't breathe!" and cried for his mother. Onlookers begged Officer Chauvin to remove his knee from Floyd's neck. Chauvin ignored them.

18.    The images of Floyd's death were soon seen across the United States, forcing a nationwide reckoning with the broader phenomenon of police brutality and systemic racism in American law enforcement.

19.    Within hours of the killing, a movement began to take shape. In cities throughout the country, crowds assembled to pay tribute to Floyd and other victims of police violence and to demand accountability and reform.

### Peaceful Demonstrations in Washington, D.C.

20.    Washington, D.C. was among the cities touched by these outpourings of grief and frustration. On Friday, May 29, 2020, demonstrators marched through the District chanting Floyd's final words: "I can't breathe."

21.    The march culminated at Lafayette Square, a federally owned park that, because of its proximity to the White House, has a long tradition as a venue for public demonstrations. The

park is seven acres in area, with H Street NW to the north, Madison Place NW to the east, Pennsylvania Avenue NW to the south, and Jackson Place NW to the west.



*- Google Maps*

22.    Protesters continued to gather daily at Lafayette Square through June 1, 2020.

23.    The protests in the Lafayette Square area between May 29 and June 1, 2020 were peaceful throughout daylight hours. Demonstrators sang and chanted. Many had their young children with them.

### The Police Crackdown

24.    US Park Police officers, including Defendant Adamchik, had been monitoring the events in Lafayette Square throughout the night of Friday, May 29, as the demonstrations were first getting under way. That night had begun peacefully but grew tense after midnight when a few demonstrators in the dwindling crowd threw water bottles and dislodged pieces of the barriers at the edge of the park, and police officers responded with what appeared to be tear gas.

25.     The next morning, on Saturday, May 30, the Park Police and the US Secret Service established a "unified command" to coordinate the agencies' response to the demonstrations near the White House and Lafayette Park. Under this arrangement, the two agencies were encouraged to work together, but each retained independent authority over its own personnel and resources.

26.     Defendant Adamchik was the Park Police's incident commander. As such, he had full command and control over the Park Police's response to the demonstrations in the area of Lafayette Square and was authorized to make any and all decisions with regard to this operation.

27.     Among the first topics of discussion between the Park Police and the Secret Service on Saturday, May 30 was whether to procure extra-tall "anti-scale" fencing to wall off the north side of Lafayette Park. The purpose of the fencing would be to create a barrier between protesters and law enforcement officers and to make it harder for spray-painters to vandalize monuments in the park.[2]

28.     The Secret Service Procurement Division contacted a contractor to inquire about anti-scale fencing. Those discussions continued over the course of the weekend.

29.     The law enforcement response to the demonstrations in Lafayette Square, once they resumed on the afternoon of Saturday, May 30, was heavily militarized. At night, Park Police

---

[2] The purpose was *not* to protect the White House or its occupants, who were never under any threat. Indeed, on May 30, 2020, President Trump tweeted that he had been watching events from inside the White House the previous night and "couldn't have felt more safe." The American Presidency Project, Tweets of May 30, 2020, https://www.presidency.ucsb.edu/documents/tweets-may-30-2020. Press releases issued by the Secret Service on May 30 and May 31 affirmed that "no Secret Service protectees were ever in any danger." *See* Statement, U.S. Secret Service, Secret Service Statement on Pennsylvania Avenue Demonstrations (May 30, 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations; Press Release, U.S. Secret Service, Secret Service Statement on Pennsylvania Avenue Demonstrations (May 31, 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0.

officers wielding riot shields and batons pushed members of the crowd back from the edge of the park. Park Police officers fired more than 5,000 PepperBall rounds into the crowd over the course of the night, depleting the agency's supply.

30.    The following morning, Defendant Adamchik personally instructed Park Police personnel to reach out to other law enforcement agencies in the region to solicit more PepperBall rounds for use in the days ahead.

### Development of a Plan to Forcibly Remove Protesters from the Square

31.    As morning dawned on Monday, June 1, 2020, plans to procure anti-scale fencing for Lafayette Park had yet to be finalized.

32.    At 9:38 a.m., Defendant Adamchik approved a proposal to shore up the bike-rack barricades the Park Police had been using throughout the weekend. In an email to Park Police colleagues, he wrote that the shorter barricades would probably have to suffice for "only one more day" while they waited for the anti-scale fencing to be ready.

33.    By 10 a.m., the fencing contractor had confirmed to the Secret Service that it would be possible to deliver and install the anti-scale fence before the end of the day. The Secret Service arranged for the fence to be delivered—though not necessarily installed—that afternoon. The Secret Service's incident commander promptly shared this information with Defendant Adamchik.

34.    Following a 10 a.m. conference call, in which he notified US Park Police command staff that there was a chance the anti-scale fence could be installed later in the day, Defendant Adamchik began to draw up a plan to forcibly remove demonstrators from H Street NW—the street abutting the park's northern border—to clear space for the contractor to build the fence.

35.    While working on this plan, Defendant Adamchik and the US Park Police command staff were aware that demonstrations were scheduled to resume near Lafayette Square in the

afternoon. Having observed the previous days' demonstrations, they had every reason to expect that H Street NW would be teeming with hundreds or even thousands of demonstrators.

36.     Though the demonstrations in Lafayette Park were not scheduled to recommence— and, indeed, did not recommence—for several more hours, Defendant Adamchik made no attempt to reposition the bike-rack barricades or otherwise expand the security perimeter around the park *before* the protesters returned.

**The Establishment of a 7 p.m. Curfew**

37.     While the plan to clear the square was being formulated, District of Columbia Mayor Muriel Bowser and the chief of the District's police force held an 11 a.m. press conference on June 1, 2020. Having assessed that it would be safe for protesters to peaceably assemble in the District while the sun was still out, Mayor Bowser announced that a District-wide curfew would go into effect at 7 p.m. The curfew order authorized police to arrest anyone who was out on the streets after hours in violation of the order.

38.     Defendant Adamchik and other Park Police supervisors were aware, even before the mayor's press conference, that the curfew would begin that evening at 7 p.m. They understood that any demonstrators or other individuals lingering on H Street NW—or anywhere else in the District—would be subject to arrest at that time.

39.     Despite this knowledge, Defendant Adamchik and his Secret Service counterpart decided to proceed with the dispersal operation and fence construction *before* the start of curfew, regardless of the risk of injury to peaceful protesters.

40.     At noon, the Secret Service issued orders for the contractor to install the fence. At 12:38 p.m., the Secret Service confirmed that the contractor would deliver the fencing materials that afternoon.

**Finalization of the Operational Plan**

41.     By 4:30 p.m., the fencing contractor had started to deliver supplies to Lafayette Square.

42.     Around this same time, Defendant Adamchik and his Secret Service counterpart were finalizing the operational plan to clear the park and its surrounding streets to facilitate the fence's construction.

43.     Defendant Adamchik could see, at that time, that the demonstrators in Lafayette Square were behaving peacefully.

44.     Despite this, his plan called for US Park Police and Arlington County Police Department (ACPD) civil disturbance units to use force to push the demonstrators west down H Street NW, with the Park Police's Mounted Patrol unit, the District of Columbia National Guard, and other law enforcement officers following behind them to provide additional assistance.

45.     Defendant Adamchik was aware, by 5 p.m., that there was a possibility President Trump might venture out into Lafayette Square at some point later in the day, after the protesters had been removed from the area to clear space for the fencing contractor. The president's plans, though, had yet to be finalized. The Park Police's then-acting chief, Gregory Monahan, has stated, emphatically: "There is 100 percent zero correlation between our operation and the President's visit to the church."

46.     At roughly 5:30 p.m.—around the same time the contractor completed delivery of the fence equipment—Defendant Adamchik briefed representatives of the US Park Police, the Secret Service, MPD, and ACPD on the final operational plan and informed them that the operation would begin shortly.

**Ms. Carmer's Arrival**

47.    Plaintiff Elizabeth Carmer had spent part of the afternoon of Monday, June 1, 2020 watching news coverage of the peaceful demonstrations in Washington, D.C.

48.    At roughly 5:25 p.m., she and her husband decided to leave their home and take the short walk to Lafayette Square and show support for the Black Lives Matter cause. The sun was still shining, and they believed they would have about an hour and a half before the District of Columbia's curfew took effect at 7 p.m. They planned to return home before curfew.

49.    Along the way to Lafayette Square, they saw many young people carrying signs, chanting, and taking pictures. They did not see any violence.

50.    When she arrived at the square, Ms. Carmer saw that the park was fenced off. On one side of the fence was a large crowd of peaceful demonstrators. On the other, standing inside the park, was a phalanx of armed law enforcement officers and military personnel.

51.    Ms. Carmer stopped on H Street NW, across the street from St. John's Church. She was moved by the scene. In a demonstration of solidarity with the protesters, she took a knee and began to chant.

**The Attack**

52.    By 6 p.m., the area around Lafayette Square was packed with peaceful demonstrators.

53.    At 6:12 p.m., Defendant Adamchik was on the phone with the MPD assistant chief.

54.    Defendant Adamchik explained to the assistant chief that the clearing operation would begin shortly.

55.    The assistant chief urged him to postpone the operation until after 7 p.m., when the curfew was set to take effect. At that time, the MPD would have legal grounds to arrest members of the crowd who were lingering around Lafayette Square in violation of the curfew.

56.    Defendant Adamchik rejected the assistant chief's recommendation.

57.    Defendant Adamchik issued dispersal warnings at 6:23 p.m., 6:26 p.m., and 6:28 p.m., stating that the public must depart the area immediately.

58.    The warnings were inaudible to all or nearly all of the crowd. Even some Park Police officers in the park were unable to hear the warnings.

59.    Ms. Carmer, too, was unable to hear any warnings or instructions from police.

60.    Defendant Adamchik failed to take steps to verify that the warnings were audible, even though Park Police policy states that, in such situations, officers "should be positioned in the rear of the crowd so they can hear the warnings" and "should give a verbal and/or physical indication to the official giving the warnings, confirming that they are audible."

61.    The content of the warnings, even if they had been audible, failed to comply with Park Police policy, which recommends that an officer issuing dispersal warnings state the reason for the dispersal, identify available exits, and advise the crowd of what will happen if people fail to comply with the dispersal order. Defendant Adamchik's warnings failed to include any such information.

62.    Because of the police's failure to issue adequate warnings, the demonstrators remained in place, entirely unaware of the violence the police were about to unleash on them.

63.    The crowd, throughout this time, remained peaceful. Notably, no Park Police officers reported any injuries on June 1, 2020 before the start of the dispersal operation.

64.     By contrast, Park Police officers were armed to attack. In their left arms, they wielded small, circular shields meant as much for striking protestors as for protecting the officers. In their right arms, they held batons. Batons are most suitable for crowd control techniques like prodding when held with two hands and are more suitable for striking when held in one hand. With shields in one hand and batons in the other, the Park Police officers were armed to enable them to strike protestors.

65.     At approximately 6:32 p.m., knowing that the crowd remained peaceful, Defendant Adamchik ordered law enforcement units to attack the demonstrators on H Street NW.

66.     Officers with the Park Police and ACPD civil disturbance units marched westward down H Street. Park Police officers barreled into demonstrators and shoved them with their shields.

67.     Park Police SWAT officers, who were embedded within the civil disturbance units on H Street NW, fired PepperBall rounds, Stinger Ball grenades, and smoke cannisters into the crowd.

68.     Ms. Carmer heard a series of loud bangs but did not know what had caused them.

69.     Ms. Carmer remained in the kneeling position and continued to chant. She held both arms aloft in the air.

70.     While she was in this position, two Park Police officers—identified in this Complaint as John Doe Officers 1 and 2—charged at her.

71.     The officers did not give any orders or instructions to Ms. Carmer.

72.     One of the two John Doe officers battered her with a shield, knocking her down.

73.     Then, while standing above her, one or both of the John Doe officers bludgeoned her twice with a baton, striking her with a downward motion on her right leg.

74.     The blows were intensely painful.

75.    After the beating, Ms. Carmer was able, with some assistance, to make it to her feet. She hobbled briefly. Quickly, two young demonstrators came to her aid. They picked her up and carried her toward the corner of H Street NW and 17th Street NW.

76.    Defendant Adamchik's operational plan was still proceeding largely as planned. Soon, officers on horseback charged in Ms. Carmer's direction. A reporter helped her hobble away from them.

77.    On 17th Street NW, law enforcement officers continued to shoot PepperBalls toward Ms. Carmer and the reporter. Ms. Carmer felt the sting of the chemical irritant in her eyes, nose, and throat.

78.    Ms. Carmer, in pain, continued hobbling away from Lafayette Square as the police continued their pursuit. She was ultimately able to make it to safety.

79.    The unprovoked attack on Ms. Carmer was not an isolated incident. In the course of the dispersal operation, Park Police officers and other members of law enforcement acting on Defendant Adamchik's orders waged similarly violent assaults on other peaceful members of the crowd.

80.    One Park Police officer, for example, bashed an Australian TV news cameraman in the chest with the edge of a riot shield, knocking the cameraman down. While the cameraman and his colleague, an Australian reporter, were running away, another Park Police officer battered the reporter with a baton.

81.    Elsewhere amid the chaos, a law enforcement officer bashed a female protester with a riot shield, knocking her down. When the protester got to her feet and began to run away from the square, another law enforcement officer shoved her to the ground and bludgeoned her leg with a riot stick.

82.     The widespread use of undeniably excessive force against Ms. Carmer, members of the media, and other members of the peacefully assembled crowd was in blatant violation of the Park Police's use-of-force policy, which states that officers are "expected to employ only the minimum level of reasonable force necessary to control a situation."

83.     The attack on Ms. Carmer was consistent with and resulted from a plan, formulated and ordered by Defendant Adamchik, to attack a peaceful crowd of demonstrators with shields, batons, PepperBall rounds, Stinger Ball grenades, and smoke cannisters.

84.     Following the dispersal, the fencing contractor began to unload materials and build the fence. Construction concluded sometime between 12:30 a.m. and 12:50 a.m. on June 2, 2021.

### Ms. Carmer's Injuries

85.     Ms. Carmer has never fully recovered from the officers' unprovoked assault.

86.     Her right leg was badly bruised and dented. She also sustained bruises on her arms, from when one of the Park Police officers knocked her to the ground.

87.     Her eyes, meanwhile, continued to feel the sting of chemical irritants for several hours after the attack.

88.     Within a few days, the bruises on her right thigh had become a deep shade of purple and red.



*Ms. Carmer's right thigh, three days after the attack.*

The thigh remained swollen for months. During that time, Ms. Carmer experienced intense soreness, which interfered with her sleep and made it painful to sit or move. She also experienced numbness.

89.    For weeks after the attack, she was unable to take her usual daily walks or go on hikes.

90.    She continues to suffer from permanent nerve damage in her right thigh. Even now, more than a year and a half after the attack, she feels pain when she lies on her right side.

91.    The attack also caused her severe and ongoing emotional distress and anxiety. She often replays the attack in her mind and continues to feel anxiety when in the area of Lafayette Square or in situations where law enforcement are present. News reports about the officers' use of force against protesters in the square remain a source of stress.

92.    An indentation on her right thigh, which remains visible to this day, even through her leggings, reminds her of the officers' brutality.

## CLAIMS FOR RELIEF

### CLAIM I:
**Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* – Assault and Battery**

**(Defendant United States of America)**

93.     Ms. Carmer incorporates the foregoing paragraphs by reference as if fully set forth herein.

94.     Defendant John Doe Officers 1 and 2, while acting within the scope of their employment as law enforcement officers with the US Park Police, willfully, maliciously, and wrongfully shoved Ms. Carmer to the ground and battered her with a baton, causing her serious bodily injury and pain. Each of the injuries suffered by Ms. Carmer were inflicted without provocation from Ms. Carmer and while she was presenting no immediate threat to anyone.

95.     Ms. Carmer's injuries were a direct and proximate result of Defendants' willful, malicious, and intentional actions.

### CLAIM II:
**Violation of the Fourth Amendment – Excessive Force**
***Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)**

**(Defendants Adamchik and John Doe Officers 1 and 2 in their individual capacities)**

96.     Ms. Carmer incorporates the foregoing paragraphs by reference as if fully set forth herein.

97.     Defendant John Doe Officers 1 and 2 used unreasonable and excessive force against Ms. Carmer in violation of her rights under the Fourth Amendment.

98.     Defendant Adamchik was a direct participant in the John Doe Officers' use of unreasonable and excessive force against Ms. Carmer, in that he ordered the use of excessive force to move the protestors.

99.     Further, Defendant Adamchik set in motion a series of events that he knew or reasonably should have known would cause his officers to violate Ms. Carmer's Fourth Amendment rights.

100.     As a direct and proximate result of Defendants' actions, Ms. Carmer suffered injuries including, but not limited to, pain and suffering, anxiety, mental anguish, and medical costs.

101.     Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Defendants are jointly and severally liable to Ms. Carmer for the violation of her Fourth Amendment rights.

102.     Further, Defendants acted with reckless or callous indifference to Ms. Carmer's federally protected rights and are therefore liable for punitive damages.

**CLAIM III:**
**Violation of the Fifth Amendment – Deprivation of Substantive Due Process**
***Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)**

**(Defendants Adamchik and John Doe Officers 1 and 2 in their individual capacities)**

103.     Ms. Carmer incorporates the foregoing paragraphs by reference as if fully set forth herein.

104.     Defendants' deployment of manifestly excessive force against Ms. Carmer was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998), and therefore constitutes a violation of her Fifth Amendment right to due process of law.

105.     Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Defendants are jointly and severally liable to Ms. Carmer for the violation of her Fifth Amendment rights.

106.     Further, Defendants acted with reckless or callous indifference to Ms. Carmer's federally protected rights and are therefore liable for punitive damages.

**CLAIM IV**:
**Violation of the First Amendment – Restriction of Speech**
*Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)

**(Defendants Adamchik and John Doe Officers 1 and 2 in their individual capacities)**

107.     Ms. Carmer incorporates the foregoing paragraphs by reference as if fully set forth herein.

108.     Ms. Carmer's act of kneeling and chanting in solidarity with demonstrators protesting police brutality and racial injustice was protected by the First Amendment to the United States Constitution.

109.     The actions of Defendants John Doe Officers 1 and 2—namely, the suppression of Ms. Carmer's speech—and the actions of Defendant Adamchik in ordering suppression of Ms. Carmer's speech and the speech of the other demonstrators deprived Ms. Carmer of her First Amendment rights to freedom of speech, freedom of assembly, and freedom to petition the government for a redress of grievances.

110.     All Defendants deliberately violated well-established limitations on the exercise of speech in and assembly in public places.

111.     Defendants' violent actions were not a reasonable regulation of the time, place, or manner of Ms. Carmer's First Amendment protected activity. These actions were not narrowly tailored to serve a compelling government interest justifying the infringement of Ms. Carmer's First Amendment rights.

112.     As a direct and proximate result of Defendants' deliberate violation of Ms. Carmer's First Amendment rights, Ms. Carmer suffered the injuries and damages set forth above.

113.    Pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Defendants are jointly and severally liable to Ms. Carmer for the violation of her First Amendment rights.

114.    Further, Defendants acted with reckless or callous indifference to Ms. Carmer's federally protected rights and are therefore liable for punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Carmer respectfully requests that this Honorable Court order the following forms of relief:

a.    Damages in an amount to be proved at trial, including, but not limited to, punitive damages; and

b.    An order granting Ms. Carmer costs, attorneys' fees, and disbursements incurred in connection with these proceedings and such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Date:   April 21, 2022

Respectfully submitted,

/s/ Daren H. Firestone
Daren H. Firestone (D.C. Bar # 1019038)
Scott G. Brooks (D.C. Bar # 1673708)
Levy Firestone Muse LLP
900 17th Street NW
Suite 1200
Washington, D.C. 20006
(202) 845-3215
dhf@levyfirestone.com
sbrooks@levyfirestone.com

Attorneys for Plaintiff