## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELIZABETH CARMER, | |
| Plaintiff, | Civil Action No. 22-1100 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES OF AMERICA *et al.*, | |
| Defendants. | |

### <u>MEMORANDUM OPINION</u>

Plaintiff Elizabeth Carmer brings this four-count action against three United States Park Police ("USPP") officers, Mark Adamchik, Stephanie Sinacore, and Sean Kellenberger (jointly, the "Officer Defendants"), and the United States, arising out of law enforcement's response to protests in Lafayette Square on June 1, 2020.  Specifically, she alleges one count of assault and battery against the United States, under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, and three counts against the Officer Defendants, premised on the Supreme Court's decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for: (1) excessive force, in violation of the Fourth Amendment; (2) deprivation of substantive due process, in violation of the Fifth Amendment; and (3) restriction of speech, in violation of the First Amendment.  *See generally* Am. Compl., ECF No. 19.  The Officer Defendants have moved to dismiss the three counts against them, pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Adamchik Mot. to Dismiss, ECF No. 26; Adamchik Mem. Supp. Mot. to Dismiss ("Adamchik Mem."), ECF No. 26-1; Sinacore Mot. to Dismiss, ECF No. 37; Sinacore Mem. Supp. Mot. to Dismiss ("Sinacore Mem."), ECF No. 37-1; Kellenberger Mot. to Dismiss ("Kellenberger Mem."), ECF No. 41.  For the reasons explained below, the motions are **GRANTED**.

I.      **BACKGROUND**

The factual allegations and procedural history of the instant matter are summarized

below.

A.      **Factual Background**

Between May 29 and June 1, 2020, thousands of protesters marched through the streets of

Washington, D.C. "to speak out against police brutality and racial injustice," in the wake of the

murder of George Floyd, an unarmed Black man, in Minneapolis on May 25, 2020.  Am. Compl.

¶¶ 1–2, 17, 21.  These marches "culminated" at Lafayette Square, a federally owned park near

the White House.  *Id.* ¶ 22.  On May 29, the crowd at Lafayette Square was peaceful until just

"after midnight when a few demonstrators in the dwindling crowd threw water bottles and

dislodged pieces of the barriers at the edge of the park."  *Id.* ¶ 25.  USPP officers responded with

tear gas.  *Id.*

The USPP and U.S. Secret Service consequently began coordinating a response to the

demonstrations, with Adamchik, a major in the USPP, tasked as the incident commander and

granted "full command and control over the [USPP's] response to the demonstrations in the area

of Lafayette Square."  *Id.* ¶¶ 14, 26–27.  As part of their response, the USPP and Secret Service

decided to procure "anti-scale" fencing for the north side of Lafayette Square on H Street NW

"to create a barrier between protesters and law enforcement officers and to make it harder for

spray-painters to vandalize monuments in the park."  *Id.* ¶ 28.  Before installation of the fence

was directed, however, law enforcement and the protesters clashed during the afternoon and into

the evening of May 30, with USPP officers, "wielding riot shields and batons," "fir[ing] more

than 5,000 PepperBall rounds into the crowd over the course of the night," and "push[ing]

members of the crowd back from the edge of the park."  *Id.* ¶ 30.

2

On June 1, the Secret Service directed a contractor to install the fence and received notice, by 10 a.m., that the fence could potentially be installed that same afternoon. *Id.* ¶¶ 29, 34. With construction of the fence imminent, Adamchik developed a plan to disperse protesters from H Street NW along the northern border of Lafayette Square "to clear space for the contractor to build the fence." *Id.* ¶ 35. While this plan was being formulated, Mayor Muriel Browser and the Chief of Police held a press conference at 11 a.m. to announce a District-wide curfew to go into effect at 7 p.m. *Id.* ¶ 38. Although Adamchik and his Secret Service counterpart knew about the curfew, they nonetheless "decided to proceed with the dispersal operation and fence construction *before* the start of curfew." *Id.* ¶¶ 39–40 (emphasis in original).

The contractor delivered, to Lafayette Square, supplies for the fence from 4:30 to 5:30 p.m., during which time the protests remained peaceful. *Id.* ¶¶ 42, 44, 47. As the delivery was being completed, Adamchik briefed representatives of the USPP, Secret Service, D.C. Metropolitan Police Department ("MPD"), and Arlington County Police Department ("ACPD") on the final operational plan, which instructed USPP and ACPD civil disturbance units "to use force to push the demonstrators west down H Street NW, with the [USPP's] Mounted Patrol unit, the District of Columbia National Guard, and other law enforcement officers following behind them to provide additional assistance." *Id.* ¶¶ 45, 47.[1]

Plaintiff and her husband left their home to join the protesters in Lafayette Square at around 5:25 p.m., fully intending on returning home before the 7 p.m. curfew. *Id.* ¶ 49. As they walked towards Lafayette Square, "they saw many young people carrying signs, chanting, and taking pictures" but no violence. *Id.* ¶ 50. At Lafayette Square, plaintiff saw that the park had been fenced off. On one side was a large crowd of peaceful demonstrators, and on the other side

---

[1]     Although Adamchik became aware at around 5 p.m. that then-President Trump "might venture out into Lafayette Square at some point later in the day," USPP's then-acting chief, Gregory Monahan, disavowed any correlation between USPP's operation and Trump's visit. Am. Compl. ¶ 46.

was "a phalanx of armed law enforcement officers and military personnel." *Id.* ¶ 51. Plaintiff

stopped on H Street NW, across the street from St. John's Church, and, in demonstration of

solidarity with the protesters, "took a knee and began to chant." *Id.* ¶¶ 2, 52. By 6 p.m.,

Lafayette Square was "packed" with protesters. *Id.* ¶ 53.

At 6:12 p.m., Adamchik told the MPD assistant chief by phone that the dispersal

operation would begin shortly. *Id.* ¶¶ 54–55. Dispersal warnings were issued at 6:23 p.m., 6:26

p.m., and 6:28 p.m., announcing that the public must depart the Lafayette Square area

immediately. *Id.* ¶ 58.[2] Plaintiff alleges that the crowd remained peaceful prior to the dispersal

operation, in stark contrast to the USPP officers, who were "armed to attack," "wield[ing]," in

their left arms, "small, circular shields" and, in their right arms, "batons." *Id.* ¶¶ 64–65.

At 6:32 p.m., Adamchik ordered law enforcement to disperse any protesters who

remained on H Street. *Id.* ¶ 66. USPP and ACPD officers marched down H Street, "barrel[ing]

into demonstrators and shov[ing] them with their shields," and USPP SWAT officers "fired

PepperBall rounds, Stinger Ball grenades, and smoke cannisters into the crowd." *Id.* ¶¶ 67–68.

During the commotion, plaintiff remained kneeling on the ground with both hands in the

air and continued to chant. *Id.* ¶ 70. At approximately 6:38 p.m., "without warning,"

Kellenberger and Sinacore allegedly charged at her, with Sinacore battering her with a shield and

knocking her down, and both officers standing above her, bludgeoning her with batons, and

striking her, in downward motion, on her right leg. *Id.* ¶¶ 6, 71–74.

---

[2]     Plaintiff contends that the warnings "failed to comply with [USPP] policy" for two reasons. Am. Compl.
¶ 62. First, the substance of the warnings did not "state the reason for the dispersal, identify available exits, and
advise the crowd of what will happen if people fail to comply." *Id.* Second, Adamchik allegedly failed to take steps
to verify that the warnings were audible, as required by USPP policy, such as by ensuring that officers were
"positioned in the rear of the crowd so they can hear the warnings" and can "give a verbal and/or physical indication
to the official giving the warnings, confirming that they are audible." *Id.* ¶ 61. Consequently, most of the crowd,
including some USPP officers and plaintiff, were allegedly unable to hear the warnings, remained in place, and were
"entirely unaware of the violence the police [was] about to unleash." *Id.* ¶¶ 59–60, 63.

Plaintiff was then carried by two demonstrators to the corner of H Street NW and 17th Street NW, where officers on horseback "charged" in her direction, and other law enforcement officers shot PepperBalls towards her. *Id.* ¶¶ 76–78. Plaintiff, suffering from the "sting of the chemical irritant in her eyes, nose, and throat," "hobbl[ed] away" from Lafayette Square and ultimately made it to safety. *Id.* ¶¶ 78–79. Plaintiff's eyes continued to sting for several hours after the attack. *Id.* ¶ 89.

After the crowd was dispersed, the fencing contractor began to build the fence, which construction concluded sometime between 12:30 a.m. and 12:50 a.m. *Id.* ¶ 86.

Plaintiff alleges that she has never fully recovered from the attack. *Id.* ¶ 87. Her right leg was "badly bruised and dented," with the bruises turning a "deep shade of purple and red" a few days later, and her thigh remaining swollen even several months later. *Id.* ¶¶ 88, 90 (photo of plaintiff's thigh). She experienced "intense soreness, which interfered with her sleep and made it painful to sit or move," and some numbness. *Id.* ¶ 90. For weeks after the attack, she was unable to go on her usual daily walks or go on hikes, and she continues to suffer from permanent nerve damage in her right thigh. *Id.* ¶¶ 91–92. As of December 2022, when the Amended Complaint was filed, more than two years after the attack, plaintiff continues to feel pain when she lies down on her right side, where the indentation on her thigh as a result of the attack remains visible, even through her clothes. *Id.* ¶¶ 92, 94.

In addition to plaintiff's physical injuries, she also alleges "severe and ongoing emotional distress and anxiety." *Id.* ¶ 93. She often replays the attack in her mind and experiences anxiety when in the Lafayette Square area, when she sees law enforcement, and when she sees news reports of law enforcement officers' use of force against protesters. *Id.*

B.     **Procedural Background**

On April 21, 2022, plaintiff brought this action against the Officer Defendants and the United States.  *See* Compl., ECF No. 1.  As amended, the complaint alleges four counts stemming from the officers' conduct: assault and battery against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, *see* Am. Compl. ¶¶ 95–97 (Count 1); and three counts under *Bivens* against the Officer Defendants for (1) excessive force, in violation of the Fourth Amendment, *see id.* ¶¶ 98–104 (Count 2); (2) deprivation of substantive due process, in violation of the Fifth Amendment, *see id.* ¶¶ 105–08 (Count 3); and (3) restriction of speech, in violation of the First Amendment, *see id.* ¶¶ 109–16 (Count 4).  She seeks only money damages and attorneys' fees and costs.  *Id.* (Prayer for Relief).

The Officer Defendants have each moved to dismiss the three counts against them for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), which motions are ripe to resolve.

## II.     LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (citation omitted).  A claim is facially plausible when the plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

In deciding a motion under Rule 12(b)(6), a court must consider the whole complaint, accepting all factual allegations in the complaint as true, even if doubtful in fact, and construing all reasonable inferences in the plaintiff's favor.  *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022).  A court, however, does not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint."  *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original accepted and citation omitted); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").  In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice."  *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).[3]

## III.   DISCUSSION

In *Bivens*, "the Supreme Court recognized an implied cause of action for damages for persons injured by federal officers who violated the Fourth Amendment's prohibition against unreasonable searches and seizures."  *K.O. by and through E.O. v. Sessions*, No. 20-5255, 2022 WL 3023645, at *3 (D.C. Cir. July 29, 2022).  In the immediate years following, the Supreme Court extended *Bivens* to two limited contexts: a former congressional staffer's Fifth Amendment claim of dismissal based on sex, *see Davis v. Passman*, 442 U.S. 228 (1979), and a federally incarcerated individual's Eighth Amendment claim for failure to provide adequate medical treatment, *see Carlson v. Green*, 446 U.S. 14 (1980).  *See Hernandez v. Mesa*, 589 U.S.

---

[3]     The news articles cited by Adamchik to support factual allegations not explicitly alleged in the Amended Complaint, *see, e.g.*, Adamchik Mot. at 19–20, will not be considered because they are not integral to the Amended Complaint, and plaintiff did not intend their incorporation, *see* Pl.'s Opp'n Adamchik Mot. to Dismiss ("Pl.'s Adamchik Opp'n") at 19 n.8, ECF No. 27.  *See Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1137 (D.C. Cir. 2020).

93, 99 (2020). Since then, however, "the Supreme Court has repeatedly refused to expand the *Bivens* remedy into a new context or category of defendants." *K.O.*, 2022 WL 3023645, at *3; *see also Hernandez*, 589 U.S. at 100–02 (collecting cases).

Plaintiff seeks to expand the *Bivens* remedy to her claims of excessive force, deprivation of substantive due process, and restriction of speech. As the discussion that follows makes clear, plaintiff's claims against the Officer Defendants must be dismissed because extension of *Bivens* to this "new context" is unwarranted. *Ziglar v. Abbassi*, 582 U.S. 120, 136 (2017).[4]

## A.    Legal Standard for Claims Brought Under *Bivens*

To determine whether an extension of the *Bivens* remedy is appropriate, a court must conduct a "two-step inquiry." *Hernandez*, 589 U.S. at 102; *see also Meshal v. Higgenbotham*, 804 F.3d 417, 422 (D.C. Cir. 2015) (emphasizing that this inquiry requires "a case-by-case approach"). First, a court must "inquire whether the request involves a claim that arises in a new context or involves a new category of defendants." *Hernandez*, 589 U.S. at 102 (citation omitted). The Supreme Court's "understanding of a 'new context' is broad." *Id.* A context is "new" if it is "different in a meaningful way from previous *Bivens* cases decided by [the] Court,"

---

[4]    Kellenberger appears to argue that plaintiff lacks standing to pursue the claims against him because "Kellenberger had NO contact with the plaintiff." Kellenberger Mem. at 8. Although he does not move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and seeks dismissal with prejudice, *id.* at 9, his standing argument is briefly addressed, in light of this Court's "affirmative obligation to consider whether the constitutional and statutory authority exist[s] for us to hear each dispute," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (citation omitted). It is axiomatic that where a plaintiff's standing is challenged, a court must "must assume that [the plaintiff] states a valid legal claim," *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003), and must "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). As Kellenberger concedes, *see* Kellenberger Mem. at 3, the Amended Complaint clearly alleges that Kellenberger "charged" at plaintiff and, without warning, "bludgeoned" her with a baton, "striking her with a downward motion on her leg," which beating resulted in plaintiff's significant physical and psychological injuries, *see* Am. Compl. ¶¶ 71–72, 74, 88–94. Taking these facts as true, plaintiff has adequately alleged actual concrete injury caused by Kellenberger that can be redressed by money damages. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). "[A]t the pleadings stage, the burden imposed on plaintiffs to establish standing is not onerous, and general factual allegations of injury resulting from the defendant's conduct may suffice." *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (citations omitted). For the same reasons, Kellenberger's arguments that the claims against him should be dismissed for "failure to sue a real party of interest, and in [the] alternative, to join a necessary party to the lawsuit," Kellenberger Mem. at 6, 8–9, are rejected.

such as "because of the rank of the officers involved; the constitutional right at issue; the

generality or specificity of the official action; the extent of judicial guidance as to how an officer

should respond to the problem or emergency to be confronted; the statutory or other legal

mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary

into the functioning of other branches; or the presence of potential special factors that previous

*Bivens* cases did not consider." *Ziglar*, 582 U.S. at 139–40.

Second, if a plaintiff's allegations are found to arise in a "new context," a court must "ask

whether there are any special factors that counsel hesitation about granting the extension" of

*Bivens*. *Hernandez*, 489 U.S. at 102 (alterations in original accepted and citation omitted). "If

there is even a single reason to pause before applying *Bivens* in a new context, a court may not

recognize a *Bivens* remedy." *Egbert v. Boule*, 596 U.S. 482, 492 (2022) (citation omitted). "The

guiding principle behind the inquiry is respect for the separation of powers and deference to

Congress's preeminent role as the legislative body." *Buchanan v. Barr*, 71 F.4th 1003, 1007

(D.C. Cir. 2023). "Put another way, the most important question is who should decide whether

to provide for a damages remedy, Congress or the courts?" *Egbert*, 596 U.S. at 491–92 (citation

omitted). "If there is a rational reason to think that the answer is 'Congress'—as it will be in

most every case, no *Bivens* action may lie." *Id.* (citation omitted); *see also Loumiet v. United*

*States*, 948 F.3d 376, 381 (D.C. Cir. 2020) ("[I]n most instances . . . the Legislature is in the

better position to consider if the public interest would be served by imposing a new substantive

legal liability.").

Although the Supreme Court has repeatedly refused to "dispense with *Bivens* altogether,"

*Egbert*, 596 U.S. at 491, "expanding the *Bivens* remedy is now a disfavored judicial activity,"

*Ziglar*, 582 U.S. at 135; *see also Hernandez*, 489 U.S. at 101 ("[O]ur watchword is caution.").

### B.      Applied Here

Plaintiff does not dispute that her claims arise in a new context, *see, e.g.*, Pl.'s Opp'n

Adamchik Mot. to Dismiss ("Pl.'s Adamchik Opp'n") at 8, ECF No. 27; Pl.'s Opp'n Sinacore

Mot. to Dismiss ("Pl.'s Sinacore Opp'n") at 9, ECF No. 38; Pl.'s Opp'n Kellenberger Mot. to

Dismiss ("Pl.'s Kellenberger Opp'n") at 11, ECF No. 43, and for good reason.  The Supreme

Court has never recognized the availability of a *Bivens* claim for First Amendment violations,

*see Egbert*, 596 U.S. at 498 ("[W]e have never held that *Bivens* extends to First Amendment

claims." (citation omitted)), and plaintiff's Fourth and Fifth Amendment claims, which relate to

"the clearing of protestors from a public park by federal law enforcement officers[,] is notably

different from an unlawful search and arrest by federal narcotics officers, and from sex

discrimination by a Congressman," *Buchanan*, 71 F.4th at 1008 (citations omitted); *see also*

*Egbert*, 596 U.S. at 486 (declining to extend *Bivens* to a Fourth Amendment excessive force

claim).  Although "the absence of any *Bivens* remedy in similar circumstances [is] highly

probative," *Meshal*, 804 F.3d at 426, plaintiff nonetheless argues that *Bivens* should be extended

to her claims because no special factors, at the second step, counsel hesitation, *see* Pl.'s

Adamchick Opp'n at 8; Pl.'s Sinacore Opp'n at 9–10; Pl.'s Kellenberger Opp'n at 11.

The Officer Defendants each point to national security—specifically, "the country's

national-security interest in the safety and security of the President and the area surrounding the

White House"—as a special factor, Sinacore Mem. at 10 (citation omitted); *see also*

Kellenberger Mem. at 9–10; Adamchik Mem. at 19–21, and the law is well-settled that "a *Bivens*

cause of action may not lie where . . . national security is at issue," *Egbert*, 596 U.S. at 494.

"Officers need not have been responding to an ongoing or imminent threat to national security to

invoke national security as a special factor."  *Buchanan*, 71 F.4th at 1009; *Hernandez*, 589 U.S.

at 108 ("The question is not whether national security requires such conduct.").  Instead, "courts

ask whether they 'should alter the framework established by the political branches' for handling cases with possible national security implications." *Buchanan*, 71 F.4th at 1009 (quoting *Hernandez*, 589 U.S. at 108). "Because 'national-security policy is the prerogative of the Congress and President,' the answer most often will be no," *id.* (alteration in original accepted) (quoting *Ziglar*, 582 U.S. at 142), as the answer is here.

Notably, this action does not proceed on untrodden ground. In *Black Lives Matter D.C. v. Trump* ("*BLM*"), 544 F. Supp. 3d 15 (D.D.C. 2021) (DLF), four sets of plaintiffs brought a variety of constitutional and statutory claims against federal and state officials and agencies, based on law enforcement's efforts, on June 1, 2020, to clear the protestors from Lafayette Square, "roughly 25 yards" away from plaintiff in the instant case, Am. Compl. ¶ 82. Among these claims were *Bivens* claims against several named defendants, including Adamchik and Kellenberger, in their personal capacities, seeking damages for alleged First, Fourth, and Fifth Amendment violations. *BLM*, 544 F. Supp. at 29. The plaintiffs' claims were found to arise in a new context and implicate three special factors: (1) national security, namely, "the country's national-security interest in the safety and security of the President and the area surrounding the White House"; (2) "Congress' activity in the field governing the relationship between White House and presidential security and protesters' rights"; and (3) the availability of alternative remedies. *Id.* at 31–34. As to national security, the Court explained that "[w]hen it comes to managing crowd activity directly outside of the White House, decisionmakers must weigh public, presidential, and White House security interests," and "when it comes to presidential security specifically, the presence of a large crowd of protesters, even a peaceful one, near the president implicates presidential security questions." *Id.* at 32. Accordingly, the Court refused

11

to extend *Bivens* into the new context presented by law enforcement's response to the protests at Lafayette Square and dismissed plaintiff's *Bivens* claims.  *Id.* at 34.

On appeal, the D.C. Circuit, on *de novo* review, affirmed the dismissal of plaintiffs' *Bivens* claims.  *See Buchanan*, 71 F.4th at 1005–06.  Applying the two-step framework, the Court agreed that plaintiffs' claims arose in a new context and implicated national security concerns.  *Id.* at 1008–09.  Though acknowledging that a public gathering at Lafayette Square presents "a unique situs for First Amendment activity," the Court reasoned this site also "presents some measure of hazard to the security of the President and the White House" and that, "[g]iven the nation's overwhelming interest in protecting the safety of its Chief Executive, officers in the area surrounding the White House and the President must be able to act without hesitation."  *Id.* at 1009 (alteration in original accepted and citations omitted).  "Because regulating the conduct of law enforcement officers near the White House unquestionably has national security implications, the risk of undermining presidential and White House security provides reason to hesitate before extending *Bivens* into this field."  *Id.* (alterations in original accepted and citation omitted).  Since "the presence of one special factor is sufficient to preclude the availability of a *Bivens* remedy," the Court did not address defendants' arguments about congressional activity and the availability of alternative remedies.  *Id.* at 1010.

The reasoning in *BLM* and *Buchanan* applies with equal force to plaintiff's claims in the instant matter, which involve the same triggering event, *i.e.*, law enforcement's response to the protests at Lafayette Square, and similar allegations of harm, *i.e.*, physical and psychological injuries as a result of law enforcement's response to the protest.  As alleged in the Amended Complaint, the USPP and Secret Service coordinated a response to the demonstrations that occurred between May 29 and June 1, 2020, at Lafayette Square, near the White House, which

demonstrations were peaceful during the day but turned tense and violent at night.  Am. Compl.

¶¶ 25–26.  Part of this response involved the procurement of "anti-scale" fencing for the north

side of Lafayette Square—in light of protesters' efforts to "dislodge[] pieces of the barriers at the

edge of the park" the night prior—"to create a barrier between protesters and law enforcement

officers and to make it harder for spray-painters to vandalize monuments in the park."  *Id.* ¶¶ 25,

28.  "[T]o clear space for the contractor to build the fence," the USPP and Secret Service, with

the help of MPD, ACPD, and the National Guard, engaged in a "dispersal operation" to remove

the crowd from Lafayette Square, which operation ultimately involved the use of violence.  *Id.*

¶¶ 35, 40.  The decision to disperse a large crowd of protesters from Lafayette Square, which is

located near the White House, to make space for the erection of an anti-scale fence to control the

crowd better, and the discussions and deliberations that led to this decision, undeniably

implicates national security.  *See BLM*, 544 F. Supp. 3d at 32; *see also White House Vigil for*

*ERA Comm. v. Clark*, 746 F.2d 1518, 1533 (D.C. Cir. 1984) ("Just as the White House area is a

'unique situs' for first amendment activity, it is also a unique situs for considerations of

presidential and national security."); *A Quaker Action Grp. v. Morton*, 516 F.2d 717, 730–31

(D.C. Cir. 1975) (acknowledging that "a public gathering" "in the White House area" "presents

some measure of hazard to the security of the President and the White House," and that

"[c]ommon sense mandates caution in this matter"; and concluding that, even though "[t]he

record is inconclusive as to the relationship between the size of a public gathering and the threat

that gathering might pose to White House security," such inconclusiveness "does not give [a

court] license to ignore potential risks to the President"); *cf. Jones v. U.S. Secret Serv.*, No. 22-

cv-962, 2023 WL 8634586, at *3 (D.D.C. Nov. 10, 2023) (emphasizing the Secret Service's

"statutory mandate to ensure the President and other high-ranking officials' protection by

investigating and thwarting threats to their security, their immediate families, and the buildings in which they live and work").

Plaintiff offers two arguments in response. First, plaintiff attempts to distinguish *BLM* and *Buchanan* by arguing that whereas the *BLM* and *Buchanan* plaintiffs "had made the case's connection to presidential security explicit," plaintiff here expressly alleged that the USPP declared that there was a "100 percent zero correlation between our operation and the President's visit to the church." Pl.'s Kellenberger Opp'n at 12–14 & n.5; *see also* Pl.'s Adamchik Opp'n at 18–20; Pl.'s Sinacore Opp'n at 3–4. To be sure, the *Buchanan* plaintiffs offered the need to ensure the safety of the President as one rationale for law enforcement's actions, but they offered others, including the need "to enforce the city's curfew, which was not until twenty-five minutes after officers began clearing the park; to expand the security perimeter surrounding the White House; to protect St. John's Church, which had suffered fire damage the day before but was not encompassed by the expanded perimeter; and to curtail ongoing violence." *Buchanan*, 71 F.4th at 1006. In fact, their "conflicting statements on the rationale for clearing the park" was expressly called out. *Id.* The Court nonetheless concluded that "[u]nder any of the proffered explanations given for clearing protestors from Lafayette Park," defendants' "actions implicate national security under the Supreme Court's broad understanding of that special factor" for the reasons explained above. *Id.* at 1009; *see also BLM*, 544 F. Supp. 3d at 32 n.7 (acknowledging defendants' "varying justifications for the park clearing" but nonetheless concluding that "[r]egardless whether the park was cleared to protect the President, to expand the perimeter of the White House, or to enforce the curfew or prevent further violence by demonstrators near the White House, all of these possible justifications raise national security issues that counsel hesitation in extending a *Bivens* remedy here").

14

This conclusion is further supported by the analysis in *Buchanan* itself, which focused on the proximity of Lafayette Square to the White House and the nation's interest in adequately protecting the President, the White House, and its surrounding area. *See Buchanan*, 71 F.4th at 1009. It also heeds the Supreme Court's instruction that "[t]he question is not whether national security requires such conduct" but whether "national-security concerns" might have been present in the decision-making process faced by the federal officials. *Hernandez*, 489 U.S. at 108; *see also Buchanan*, 71 F.4th at 1009 ("Officers need not have been responding to an ongoing or imminent threat to national security to invoke national security as a special factor."); *BLM*, 544 F. Supp. 3d at 32 ("In this context, it matters not whether the national security risk actually justified the particular action taken.").

Second, plaintiff criticizes the Officer Defendants' reliance on Lafayette Square's proximity to the White House. She argues that proximity is "irrelevant" and contends, relying on *Egbert v. Boule*, 596 U.S. 482 (2022), that the appropriate inquiry is simply "whether national security concerns preclude a *Bivens* remedy against [USPP] officers generally." Pl.'s Adamchick Opp'n at 16; *see also* Pl.'s Adamchick Opp'n at 17–18 (arguing that the purpose and prescribed functions of USPP are not related to national security); Pl.'s Sinacore Opp'n at 10–11; Pl.'s Kellenberger Opp'n at 12–14. Plaintiff, however, falls into the same trap she accuses the Officer Defendants of laying, by overly focusing on certain factors to the exclusion of others in an approach rejected in *Egbert*.

In *Egbert*, the Supreme Court refused to recognize a *Bivens* claim based on the alleged use of excessive force by Agent Egbert, a Border Patrol agent, on the operator of an inn near the U.S.–Canadian border. 596 U.S. at 494. The Ninth Circuit had focused its analysis on Agent Egbert's location, which was not "literally at the border"; the alleged victim, who is "a United

15

States citizen, complaining of harm suffered on his own property"; and the fact that the alleged use of force occurred on U.S. soil. *Id.* at 495. The Supreme Court sharply criticized this "deeply flawed" approach, which focused on "the balance of circumstances in the particular case," for "downplay[ing] the national-security risk," and applying the special factors analysis at too "narrow [a] level of generality." *Id.* at 495–96 (alterations in original accepted and citation omitted). "[U]nder the proper approach, a court must ask more broadly if there is any reason to think that judicial intrusion into a given field might be harmful or inappropriate." *Id.* (alteration in original accepted and citation omitted).

Plaintiff reads *Egbert* to suggest that when evaluating national security risk, the only consideration is "which federal agency the officer was representing," Pl.'s Sinacore Opp'n at 11, *i.e.*, Border Patrol agents in *Egbert* and USPP officers here. She contends that when the Supreme Court criticized the Ninth Circuit for focusing on "the balance of circumstances in the particular case," *Egbert*, 596 U.S. at 496, "particular case" refers to "the location where the alleged misconduct took place," Pl.'s Sinacore Opp'n at 2. She therefore concludes that a court cannot consider location when evaluating national security risk.

Plaintiff's strained reading of the phrase "particular case" is unsupported by the broader discussion in *Egbert*, which criticized the Ninth Circuit for focusing too "narrow[ly]" on the specific conduct of one specific Border Patrol agent. *Id.* at 496. The "proper approach" considers the appropriateness of "judicial intrusion into a given field," *id.*, which "field," in *Egbert*, was "the conduct of [Border Patrol] agents at the border," "carrying out Border Patrol's mandate to 'interdict persons attempting to illegally enter or exit the United States,'" *id.* at 494 (alteration in original accepted) (quoting 6 U.S.C. § 211(e)(3)(A)). Put differently, plaintiff's suggested approach, which considers only the status of defendant as a USPP officer and nothing

16

else—not where the alleged unlawful conduct occurred nor the context in which the alleged

unlawful conduct arose, such as why law enforcement officers were stationed at Lafayette

Square and what functions they were performing—applies the special factors analysis at too

"narrow [a] level of generality." *Id.* at 496.  Indeed, if plaintiff's approach were adopted and

taken to its logical conclusion, no *Bivens* action could ever be brought against a Border Patrol

agent, regardless of whether the alleged unlawful conduct involves Border Patrol's mandate to

secure the borders of the United States—an utterly untenable outcome.  *Cf. Jones*, 2023 WL

8634586, at *4 (emphasizing the Secret Service's crucial role in protecting the President but

nonetheless concluding that "[n]ot every interaction involving Secret Service officers implicates

national security").

   For the avoidance of doubt, the conclusion that national security weighs against creating

a *Bivens* remedy here does not turn solely on the proximity of Lafayette Square to the White

House, in light of the fact that large crowds gathered in Lafayette Square for three days, became

tense during the evenings, and dislodged pieces of the barriers at the edge of the park, resulting

in the procurement of fencing by the Secret Service, which is tasked with protecting the

President and the White House, to better control the crowd and the concomitant need for the

USPP to disperse the crowd to clear space for the fence.  *See* Am. Compl. ¶¶ 25–26, 28, 35, 39;

*see also* 54 U.S.C. § 102701(a)(1) (explaining that a purpose of the USPP is to "maintain law

and order and protect individuals and property within [National Park] System units").  Contrary

to plaintiff's contention, however, considering Lafayette Square's proximity to the White House

as a factor in this analysis is entirely appropriate.  *See Wood*, 572 U.S. at 762–63 (concluding

that qualified immunity protected defendant's decision to move protesters, but not supporters,

away from the President and crediting defendant's national security rationale that only "the

protesters, but not the supporters, were within weapons range of [the President's] location" and thus "because of their location, the protesters posed a potential security risk to the President, while the supporters, because of their location, did not"); *Robinson v. Pilgram*, No. 20-cv-2965, 2021 WL 5987016, at *13 (D.D.C. Dec. 17, 2021) (considering plaintiff's proximity to the White House, which "perhaps not as close as the protestors in [*BLM*] were to the President and the residence," was "nevertheless within the vicinity of the White House, where the need for effective security is great," and concluding that extending *Bivens* to plaintiff's claims would thus "implicate serious national security concerns and impair the Executive Branch's ability to properly respond to security risks around its nerve center, the White House" (alterations in original accepted and citation omitted)); *see also White House Vigil for ERA Comm.*, 746 F.2d at 1533 ("[T]he need for effective security in the vicinity of the White House is great, but the geographical position of the Mansion renders it inherently insecure.  Several federal agencies have brought considerable experience and expertise to bear on the problem of White House security."); *cf. Hernandez*, 589 U.S. at 108 (considering Border Patrol agent's proximity to border and concluding that "the conduct of agents positioned at the border has a clear and strong connection to national security").

Plaintiff finally cautions that such conclusion would preclude a *Bivens* claim for any constitutional violation occurring in Lafayette Square due to its proximity to the White House and treats national security as "a talisman used to ward off inconvenient claims."  Pl.'s Sinacore Opp'n at 10 (quoting *Ziglar*, 582 U.S. at 143).  The D.C. Circuit squarely addressed this concern in *Buchanan*, explaining:

> Without purporting to decide the availability of any Bivens claim arising from events in Lafayette Park under other circumstances, we note that to the extent [plaintiffs'] fears come to fruition, it is a result of heeding the Supreme Court's admonition to "ask 'more broadly' if there is any reason to think that 'judicial

> intrusion' into a given *field* might be 'harmful' or 'inappropriate.'" Finally, it
> bears mention that First Amendment activity in Lafayette Park remains
> constitutionally protected. We decide only the availability of damages, not the
> existence of a constitutional violation. To the extent damages under a federal
> cause of action are necessary for full enjoyment of that constitutional right, such
> endorsement must come from the Supreme Court or from Congress.

*Buchanan*, 71 F.4th at 1009–10 (emphasis in original) (quoting *Egbert*, 596 U.S. at 484).

Accordingly, interpreting what constitutes a special factor "broadly," as counseled by the

Supreme Court, *Egbert*, 596 U.S. at 496, national security weighs against creating a *Bivens*

remedy here. The presence of a large crowd of protesters, even if peaceful during the day and

tense only at night, near the White House and the concomitant need to manage such crowd

involves the weighing of public, presidential, and White House security interests. The nation's

interest in protecting the safety of the President, the White House, and the surrounding areas is

"overwhelming," *Watt v. United States*, 394 U.S. 705, 707 (1969), and "officers in the area

surrounding the White House and the President must be able to act without hesitation" and

without "second-guess[ing] difficult but necessary decisions concerning national-security

policy," *Buchanan*, 71 F.4th at 1009 (quoting *Ziglar*, 582 U.S. at 142). *See Robinson*, 2021 WL

5987016, at *13 n.13 ("[T]he road to a *Bivens* remedy is a rocky one, and one which recognizes

the Executive Branch's legitimate national security interests in safeguarding the White House.").

"Where there is even the potential that judicial intrusion into a given field might be harmful or

inappropriate," as there is here, "courts cannot permit *Bivens* claims to proceed." *Buchanan*, 71

F.4th at 1009 (citation omitted).

Only "one special factor is sufficient to preclude the availability of a *Bivens* remedy." *Id.*

at 1010; *see also Egbert*, 596 U.S. at 492 ("If there is even a single reason to pause before

applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy." (citation

omitted)). Adamchik and Sinacore's arguments about the availability of alternative remedies,

*see* Adamchik Mem. at 14–19; Sinacore Mem. at 12–13, and congressional activity governing the relationship between the protection of federal property and protesters' rights, *see* Adamchik Mem. at 21–22; Sinacore Mem. at 11, thus need not be addressed.  *See, e.g.*, *Buchanan*, 71 F.4th at 1010 (refusing to reach defendants' other special factors arguments); *Ahmed v. Kable*, No. 21-cv-3333, 2023 WL 6215024, at *16 (D.D.C. Sept. 25, 2023) (similar; and noting that "[n]o further analysis is appropriate"); *Jones*, 2023 WL 8634586, at *4 (noting that "at least one special factor counsels hesitation" and discussing only national security).  In addition, since *Bivens* cannot be extended to the new contexts presented the instant case, Adamchik and Sinacore's arguments about whether the facts pled are adequate to sustain each claim on its merits, *see* Adamchick Mem. at 24–30; Sinacore Mem. at 14–19, and the Officer Defendants' arguments about qualified immunity, *see* Adamchik Mem. at 30–33; Sinacore Mem. at 19–22; Kellenberger Mem. at 14–25, also need not be addressed.

## IV.    CONCLUSION

For the foregoing reasons, the Officer Defendants' Motions to Dismiss, ECF Nos. 26, 37, 41, are **GRANTED**, and plaintiffs' *Bivens* claims for excessive force, in violation of the Fourth Amendment; deprivation of substantive due process, in violation of the Fifth Amendment; and restriction of speech, in violation of the First Amendment, in Counts 2, 3, 4 of the Amended Complaint, respectively, are **DISMISSED**.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:  April 12, 2024

_____
**BERYL A. HOWELL**
United States District Judge