**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ELIZABETH CARMER,**<br><br>        **Plaintiff,**<br>  **v.**<br><br>**UNITED STATES OF AMERICA, et al.,**<br><br>        **Defendants**. | **Case No: 1:22-cv-01100-BAH** |

**THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, the United States respectfully moves this Court for summary judgment as to the sole claim against it in the Amended Complaint. The undisputed material facts establish that this Court lacks jurisdiction over Plaintiff Elizabeth Carmer's claim against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, because her claim is based on a discretionary plan to remove Carmer and other individuals near Lafayette Square, including by the use of reasonable force, thereby triggering the discretionary function exception to the United States' limited waiver of sovereign immunity. In addition, the evidence demonstrates that, based on the totality of the circumstances, the United States' employees used reasonable force on Carmer, rendering their conduct privileged under D.C. law. The grounds for this motion are set forth in the accompanying memorandum. A proposed order is attached.

DATE: April 4, 2025

                                        Respectfully submitted,

                                        YAAKOV M. ROTH
                                        Acting Assistant Attorney General
                                        Civil Division

                                        C. SALVATORE D'ALESSIO, JR.
                                        Director, Torts Branch

PAUL E. WERNER
Senior Trial Counsel

JOHN B. F. MARTIN
N.Y. Bar No. 4682928
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov


SHMUEL BUSHWICK
N.Y. Bar No. 5268271
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044-7146
T: (202) 305-0401; F: (202) 616-4314
Shmuel.Bushwick@usdoj.gov


*Counsel for the United States*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELIZABETH CARMER,

    **Plaintiff,**

 v.

UNITED STATES OF AMERICA, et al.,

    **Defendants**.

**Case No: 1:22-cv-01100-BAH**

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'
MOTION FOR SUMMARY JUDGMENT**

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

C. SALVATORE D'ALESSIO, JR.
Director, Torts Branch

PAUL E. WERNER
Senior Trial Counsel

JOHN B. F. MARTIN
N.Y. Bar No. 4682928
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4492; F: (202) 616-4314
John.B.Martin@usdoj.gov

SHMUEL BUSHWICK
N.Y. Bar No. 5268271
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044-7146
T: (202) 305-0401; F: (202) 616-4314
Shmuel.Bushwick@usdoj.gov

*Counsel for the United States*

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................................iii

INTRODUCTION ...........................................................................................................................1

BACKGROUND..............................................................................................................................2

I.     Protests and Civil Unrest Occur on H Street and in Lafayette Square Park between May 29 and May 31, 2020...........................................................................................................................2

II.    As Violence Continues, the Unified Command Plans to Erect an Anti-Scale Fence. ................3

III.   The Unified command Develops an Operational Plan. ..................................................................5

IV.    Law Enforcement Officers Face Violence as They Clear H Street. .............................................9

V.     Officers Encounter Carmer. .......................................................................................................12

VI.    Claim Against the United States..................................................................................................17

LEGAL STANDARD .....................................................................................................................17

DISCUSSION .................................................................................................................................18

I.     The Discretionary Function Exception Bars Carmer's Claim. .....................................................18

   A.   The Government's Decisions Regarding the Planning and Execution of the Clearing Operation Were Discretionary. ........................................................................................................21

   B.   The Decisions to Erect a Fence, Conduct a Clearing Operation, and Use the CDU Were Susceptible to Policy Judgment. .......................................................................................................23

II.    CARMER'S ASSAULT CLAIM FAILS ON THE MERITS BECAUSE THE OFFICERS USED REASONABLE FORCE UNDER THE CIRCUMSTANCES............................................32

   A.   Tort Liability Under the FTCA and Assault and Battery Under D.C. Law..............................33

   B.   The Use of Force Against Carmer Was Objectively Reasonable Under the Totality of the Circumstances. ...................................................................................................................................34

      1.   The facts known to a reasonable officer encountering Carmer............................................34

      2.   A reasonable officer would conclude that protestors were violating the law. ....................36

      3.   An objectively reasonable officer would conclude that Carmer posed an immediate threat to the safety of the officers or those around them. ...............................................................37

      4.   An objectively reasonable officer would conclude that Carmer was intentionally disobeying lawfully issued orders. .....................................................................................................38

      5.   An objectively reasonable officer would conclude that the amount of force used was reasonable. ..........................................................................................................................................38

      6.   The use of force was consistent with generally accepted police practices...........................40

CONCLUSION ..............................................................................................................................42

# TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................................17

*Andrade v. United States*, 116 F. Supp. 2d 778 (W.D. Tex. 2000), *aff'd, Andrade v. Chojnacki*, 338 F.3d 448 (5th Cir. 2003) ............................................................................................................ 28, 29

*Arthur v. D.C. Housing Auth.*, 2020 U.S. Dist. LEXIS 64011, 2020 WL 1821111 (D.D.C. Apr. 11, 2020) ...................................................................................................................................41

*Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462 (D.C. Cir. 2009) ......18

*Ayala v. United States*, 982 F.3d 209 (4th Cir. 2020) ...................................................................24

*Baker v. Coburn*, 68 F.4th 240 (5th Cir. 2023) ...........................................................................34

*Berkovitz v. United States*, 486 U.S. 531 (1988) ...............................................................19, 24, 32

*Bernini v. City of St. Paul*, 665 F.3d 997 (8th Cir. 2012) ...........................................................30, 37

*Best v. United States*, 522 F. Supp. 2d 252 (D.D.C. 2007) .............................................................20

*Birchfield v. North Dakota*, 579 U.S. 438 (2016) .........................................................................29

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ..............................17

*Brown v. Secretary of the Army*, 78 F.3d 645 (D.C. Cir. 1996) .........................................................19

*Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) ......................................................................34

*Bushrod v. District of Columbia*, 521 F. Supp. 3d 1 (D.D.C. 2021) .....................................................33

*Caraway v. City of Pineville*, 111 F.4th 369 (4th Cir. 2024) ...........................................................34

*Carr v. District of Columbia,* 587 F.3d 401 (D.C. Cir. 2009) ...........................................................36

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ...................................................................30, 31

*Colburn v. United States*, 617 F. Supp. 3d 377 (E.D. Va. 2022) ......................................................28, 29

*Conset Corp. v. Cmty. Servs. Admin.*, 624 F. Supp. 601 (D.D.C. 1985) ..................................................19

*Dalehite v. United States*, 346 U.S. 15 (1952) .......................................................................24, 25

*Doe v. District of Columbia*, 796 F.3d 96 (D.C. Cir. 2015) .............................................................33

*Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) ....................................34

*Etheredge v. District of Columbia*, 635 A.2d 908 (D.C. 1993) ......................................................................33

*Evans-Reid v. District of Columbia*, 930 A.2d 930 (D.C. 2007) ....................................................................33

*Felarca v. Birgeneau*, 891 F.3d 809 (9th Cir. 2018) ...................................................................... 30, 37, 38, 40

*Fuller-Avent v. United States Prob. Office*, 226 F. App'x 1 (D.C. Cir. 2006) ...............................................22

*Garza v. United States*, 161 F. App'x 341 (5th Cir. 2005) ...........................................................................32

*Graham v. Connor*, 490 U.S. 386 (1989) ........................................................................ 30, 33, 34, 39

*Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983) ..............................................................................19, 20, 26

*Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191 (D.D.C. 2002) ....................................................................19

*Hargraves v. District of Columbia*, 134 F. Supp. 3d 68 (D.D.C. 2015) ...........................................37, 39

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ....................................................................................................32

*Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907 (D.C. Cir. 2015) ...................................................33, 34

*Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59 (D.D.C. 2011) ...........................................................17

*Jackson-Moeser v. Armstrong*, 765 F. App'x 299 (9th Cir. 2019) ....................................................................29

*Jenkins v. District of Columbia*, 223 A.3d 884 (D.C. 2020) ...........................................................................41

*Kelly v. Gaton*, 2021 U.S. Dist. LEXIS 219614, 2021 WL 5310566 (D.D.C. Nov. 15, 2021) ...............41

*Kotsch v. District of Columbia*, 924 A.2d 1040 (D.C. 2007) ...........................................................................41

*Lam v. United States*, 979 F.3d 665 (9th Cir. 2020) .......................................................................................24

*Lash v. Lemke*, 786 F.3d 1 (D.C. Cir. 2015) ................................................................................................32

*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004) ...........................................................................18

*Loumiet v. United States*, 828 F.3d 935 (D.C. Cir. 2016) ......................................................................29, 32

*Macharia v. United States*, 334 F.3d 61 (D.C. Cir. 2003) ...........................................................................22

*Martin v. Malhoyt*, 830 F.2d 237 (D.C. Cir. 1987) ....................................................................................36

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................................................18

iv

*Molchatsky v. United States*, 713 F.3d 159 (2d Cir. 2013) ................................................................19

*Nichols v. Pierce*, 740 F.2d 1249 (D.C. Cir. 1984) ......................................................................19

*Norris v. District of Columbia*, 737 F.2d 1148 (D.C. Cir. 1984) ..................................................31

*Oberwetter v. Hilliard*, 639 F.3d 545 (D.C. Cir. 2011).................................................................37

*Okpara v. District of Columbia*, 174 F. Supp. 3d 6 (D.D.C. 2016) ..............................................40

*Plumhoff v. Rickard*, 572 U.S. 765 (2014) ...................................................................................33

*Rogala v. Dist. of Columbia*, 161 F.3d 44 (D.C. Cir. 1998)..........................................................33

*Scales v. District of Columbia*, 973 A.2d 722 (D.C. 2009) ...................................................... 33, 41

*Schuler v. United States*, 531 F.3d 930 (D.C. Cir. 2008) ..............................................................20

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12 (D.D.C. 2019)....................................................................................................................18

*Shivers v. United States*, 1 F.4th 924 (11th Cir. 2021)..................................................................32

*Sledge v. United States*, 883 F. Supp. 2d 71 (D.D.C. 2012), *aff'd* (Dec. 13, 2013) ....................................22

*Sloan v. Dep't of Hous. & Urb. Dev.*, 236 F.3d 756 (D.C. Cir. 2001) ...................................... 22, 23

*Talavera v. Shah*, 638 F.3d 303 (D.C. Cir. 2011) ........................................................................17

*Tennessee v. Garner*, 471 U.S. 1 (1985) ......................................................................................30

*Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571 (D.C. Cir. 2003) ............................20

*United States v. Burroughs*, 810 F.3d 833 (D.C. Cir. 2016).........................................................11

*United States v. Faneca*, 332 F.2d 872 (5th Cir. 1964).......................................................... 28, 29

*United States v. Gaubert*, 499 U.S. 315 (1991) ...............................................................19, 23, 25

*United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797 (1984).......24

*Wardlaw v. Pickett*, 1 F.3d 1297 (D.C. Cir. 1993) .............................................................34, 37, 39

*Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977)......................................36

*Westfahl v. District of Columbia*, 75 F. Supp. 3d 365 (D.D.C. 2014).............................................39

*White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984)................................ 24, 31

v

*White v. Jackson*, 865 F.3d 1064 (8th Cir. 2017) ...............................................................................30, 36, 40

**STATUTES**

18 U.S.C. § 111 ..................................................................................................................................36

18 U.S.C. § 13(a).................................................................................................................................21

18 U.S.C. § 1865 ................................................................................................................................36

18 U.S.C. § 231 ..................................................................................................................................36

18 U.S.C. § 232 ..................................................................................................................................36

18 U.S.C. § 2671, *et seq.*.................................................................................................. 17, 18, 19, 33

28 U.S.C. § 1346.................................................................................................................... 17, 18

54 U.S.C. § 102701.............................................................................................................................21

D.C. Code § 22-1307 .........................................................................................................................36

D.C.  Code § 22-405 ..........................................................................................................................36

**RULES**

Fed. R. Civ. P. 56 ..............................................................................................................................17

Fed. R. Evid. 201 ..............................................................................................................................11

**REGULATIONS**

36 C.F.R. § 1.2...................................................................................................................................21

36 C.F.R. § 1.3...................................................................................................................................36

36 C.F.R. § 1.5...................................................................................................................................36

36 C.F.R. § 2.32.................................................................................................................................36

36 C.F.R. § 7.6...................................................................................................................................21

36 C.F.R. § 7.96 ................................................................................................................................7

52 D.C. REG. 2296 § 107 ..............................................................................................................21

**INTRODUCTION**

This case is about an individual's refusal to follow a lawful order to leave an area where federal law enforcement faced a tense, violent crowd. On June 1, 2020, after days of violence and unrest around Lafayette Square Park during protests related to the murder of George Floyd, the United States Park Police and the United States Secret Service decided to clear a large crowd from H Street. They did so to allow safe installation of an anti-scale fence to protect law enforcement officers, the park, and the White House complex. Park Police opted to use a specialized unit for the clearing operation. They did so because of the conduct of the crowd that day. Park Police first issued three amplified orders to disperse. Many people left. But some, including Plaintiff Elizabeth Carmer, remained. Members of this group hurled projectiles at officers and attacked them. Carmer remained in a kneeling position as she saw officers in the unit move towards her while more protestors around her complied with the lawful order and left. Unit officers approached Carmer, who by now was flanked by combative agitators. The officers surged forward. She refused to leave. The officers then contacted Carmer with a shield and hit her thigh twice with a baton to induce her to disperse, in accordance with their specialized training. The interaction had the intended effect, and Carmer promptly left the area.

She now asserts a claim against the United States under the Federal Tort Claims Act for assault and battery. She claims officers had no justification to use force against her, and that the force used was excessive. Carmer's allegations do not withstand scrutiny. The undisputed material facts demonstrate that Park Police and Secret Service based their plan to clear H Street on policy considerations and contemplated the specific tactics used in the circumstances Carmer created through her refusal to leave. She therefore seeks to hold the United States liable for a discretionary function, which she cannot do. Further, the undisputed facts show that Carmer defied a lawful dispersal order and—despite numerous indicia that she must leave—kept herself in the midst of a combative crowd and refused to yield to federal law enforcement. The officers' use of force in these circumstances was

reasonable, rendering those actions privileged under D.C. law. The United States is therefore entitled to summary judgment.

## BACKGROUND

### I. Protests and Civil Unrest Occur on H Street and in Lafayette Square Park between May 29 and May 31, 2020.

From May 29 to May 31, 2020, large crowds gathered each day near Lafayette Square Park in Washington, D.C., to protest the murder of George Floyd. *See* SUMF ¶ 26. During that period, people vandalized buildings and historic statues throughout downtown, including nearby and inside Lafayette Square Park. *See* SUMF ¶¶ 44, 45, 49, 83. Law enforcement reports and news reports described a vehicle on fire and other fires in the street downtown during this period. *See* SUMF ¶¶ 39,49 . On May 29, in an effort to protect Lafayette Square Park and the officers guarding it, Park Police employed a fence around the park out of interlocking bike racks. *See* SUMF ¶ 27.

During the three-day period starting May 29, members of the crowd near the park were violent. On the night of May 29, they lit police shields on fire; punched and kicked law enforcement officers guarding Lafayette Square Park; and launched projectiles at them. *See* SUMF ¶ 33. "Earlier in the day" on May 30, members of the crowd hurled bricks and rocks and damaged law enforcement vehicles. *See* SUMF ¶ 37. On the night of May 30, they threw at officers bottles of frozen liquid, excrement-filled balloons, cinder blocks, pieces of pavement, fireworks, and scooters; tried to light a building on 16th Street on fire; tried to break down the bike rack fence; and went over the fence. *See* SUMF ¶ 39. That day, some protestors screamed in the direction of the White House that they were "coming over the fence" and "moving you out of there." SUMF ¶ 42.

On May 31, the mayor of D.C. established an 11:00 p.m. curfew. See SUMF ¶ 46. On the afternoon of May 31, members of the crowd near Lafayette Square Park again threw projectiles at officers. *See* SUMF ¶ 47. That afternoon, Major Mark Adamchik, the Park Police incident commander, received intelligence reports that crowd members were stockpiling bricks, carrying bladed weapons,

2

and wearing what appeared to be ballistic vests. *See* SUMF ¶ 48. That day, there was "an unbelievably uncontrollable crowd that we [the officers] felt were coming into Lafayette Park to harm the officers and potentially get towards the White House fence." SUMF ¶ 50. That night, members of the crowd lit a fire in the street, lit on fire part of St. John's Church (just across H Street from the park), burned out the comfort station in the park (near H Street), and threw bottles and fireworks at officers. *See* SUMF ¶ 49.

From May 29 to May 31, around forty Park Police officers stationed at the park suffered injuries. *See* SUMF ¶¶ 33, 42, 62. In addition to the injured Park Police officers, Secret Service publicly reported that "[b]etween Friday night and Sunday morning [May 29-31], more than 60 Secret Service Uniformed Division Officers and Special Agents sustained multiple injuries from projectiles such as bricks, rocks, bottles, fireworks and other items." SUMF ¶ 63. On May 30 and May 31, the violence started during daylight hours in the afternoon and intensified after dark. *See* SUMF ¶¶ 37-39, 47-49.

**II.    As Violence Continues, the Unified Command Plans to Erect an Anti-Scale Fence.**

By May 30, Park Police and Secret Service formed a unified command to lead the federal government's response to the unrest near Lafayette Square Park. *See* SUMF ¶ 36. On May 30, Park Police incident commander Adamchik, and his Secret Service counterpart, Uniformed Division Deputy Chief Catrina Bonus, started planning to establish a more secure perimeter around the park and the White House complex. *See* SUMF ¶ 43. Adamchik and Bonus sought to create a stronger barrier to protect federal park property from further damage, to ensure the safety of the officers inside the park, and to protect the White House. *Id.* Because protestors had repeatedly tried to overcome the bike rack fence and had at times managed to cross it, leaving officers without adequate protection, Adamchik and Bonus decided to erect an eight-foot-tall anti-scale fence around Lafayette Square Park. *Id.* Secret Service planned to procure this fence from a contractor, who would erect it. *Id.*

Meanwhile, on May 31, the protestors' violence continued past the D.C. government's 11:00 p.m. curfew. *See* SUMF ¶ 50. That night, Park Police executed a clearing operation to remove the violent crowd from Lafayette Square Park and H Street and to extinguish a fire protestors started at the comfort station.  SUMF ¶¶ 52-59. In advance of the operation, Adamchik issued warnings to the crowd using a long-range acoustic device ("LRAD"). *See* SUMF ¶ 55.  Park Police Civil Disturbance Unit ("CDU") and SWAT officers then cleared the park and its surroundings by slowly moving westward, progressing down the street in formation and periodically deploying CS gas cannisters, which some protestors threw back at the officers. *See* SUMF ¶¶ 57-59.[1]

On May 31, Bonus notified Adamchik that the anti-scale fence would be ready for installation the next day. *See* SUMF ¶ 60. By June 1, Bonus also informed Adamchik that the fence contractor expressed concern for its crew's safety under the proposed plan to erect the fence. *See* SUMF ¶ 61. The violence the night of May 31-June 1 revealed how dangerous it could become for officers to hold the perimeter of the park when no barrier separated them from the protestors. *See* SUMF ¶ 69. That violence also informed the unified command's plan to clear H Street the next day to enable the contractor to install the fence. SUMF ¶ 69. Thus, the unified command decided that law enforcement would need to clear H Street on June 1 to create a buffer area in which the contractors could safely install the fence. *See* SUMF ¶ 70. And, given that in the previous days the crowd had grown more violent as nighttime approached, the unified command determined that law enforcement should establish a perimeter around this buffer area on June 1 as soon as sufficient resources were in place. *Id.* The unified command also selected the intersections of H Street and Vermont Avenue, 16th and I Streets, and H and 17th Streets as the boundaries of this perimeter. *See* SUMF ¶ 71.

---

[1] CS gas is a "less-lethal capabilit[y]" which is sometimes referred to as tear gas. *See* SUMF ¶ 5.  Park Police and Secret Service may use it in some circumstances to clear crowds.  *See* SUMF ¶ 5.

**III.    The Unified command Develops an Operational Plan.**

By early on the morning of June 1, Bonus called Adamchik and confirmed that the contractor would deliver and could install the fence that day. *See* SUMF ¶ 68. The unified command arranged for a large detail of officers from multiple agencies including Park Police, Secret Service, the D.C. National Guard, and the Arlington County Police Department ("Arlington Police"), to support law enforcement activity around Lafayette Square Park on June 1. *See* SUMF ¶ 66. Adamchik knew that law enforcement could not safely clear H Street before those resources arrived. *See* SUMF ¶ 71. Those resources were not scheduled to arrive until 4:00 p.m. that day. *See* SUMF ¶ 71.[2]

**A.  The Unified Command Considers Three Options to Clear H Street, Including CDU Tactics.**

On the morning of June 1, Adamchik spoke with Bonus and Park Police Captain Scott Brecht, one of the CDU commanders, to formulate an operational plan to clear H Street and enable the contractors to install the fence safely. *See* SUMF ¶ 72. The unified command planned not to execute an arrest operation because it "did not want to deplete [its] resources by having these officers carrying people out because [it] needed them to maintain the perimeter line." SUMF ¶ 73.[3]

Adamchik and Bonus considered different methods for clearing H Street, with each one's feasibility depending on the crowd's conduct. *See* SUMF ¶ 75. One option, feasible if the crowd did not throw objects at officers, was to send patrol officers onto H Street to ask people to clear the street. *See* SUMF ¶ 76. A second, similar option, available if the crowd refrained from hostile action towards law enforcement, was for horse-mounted officers to enter H Street without a set formation and ask the crowd to move back. *See* SUMF ¶ 77. The third option, to be used if the crowd threatened or

---

[2] Adamchik was aware that, once the federal officers cleared H Street, the D.C. Metropolitan Police Department ("MPD") planned to clear people across I Street and then south on 15th and 17th Streets, but MPD was not part of the federal clearing plan. *See* SUMF ¶ 81.

[3] Indeed, the previous day, Park Police had refrained from arresting anyone because Adamchik believed that any attempt to enter the crowd of thousands to arrest individuals would have endangered officers and the public. *See* SUMF ¶¶ 51, 54, 73-74.

engaged in violence similar to the previous days and nights, was for CDU officers, followed by horse-mounted officers and patrol officers, to assume line formations and conduct a tactical clearing of H Street from east to west. *See* SUMF ¶ 78. Because Arlington Police had a unit that had received the same training as Park Police CDU units, the third option would include both federal and state CDU units clearing the area. *See* SUMF ¶ 80.

Adamchik knew the tactics the third option would entail. Although Adamchik was not a member of the CDU, he previously observed CDU training and was aware of how the CDU cleared H Street the night before. *See* SUMF ¶¶ 11, 50-59. CDU officers carried, in addition to standard patrol equipment (such as firearms, handcuffs, and a radio), a round shield, a baton, a fire-resistant suit, and a helmet. *See* SUMF ¶ 14. The CDU was trained to clear a crowd from an area by engaging in a start-and-stop surge technique: officers form a line, rush forward a short distance toward the crowd, stop to maintain line integrity once they clear the distance over which they had rushed, and then rush forward again, repeating this process until they cover the entire area the operation commander selected for clearing. *See* SUMF ¶¶ 15-16. According to training, during such movements, if a person does not leave, CDU officers may push them with their shields. *See* SUMF ¶ 20. CDU officers were also trained that they may use their batons to contact people who refuse to move in response to the surges or shield pushes. *See* SUMF ¶ 21; *infra* n.14. And CDU officers were trained to hold batons and shields in their hands as they clear an area, which in most instances would prevent them from using bare hand techniques. *See* SUMF ¶ 17.[4] Like all Park Police officers, CDU officers were taught that a person lying

---

[4] CDU officers hold a round shield in one hand and a baton in the other when they clear a crowd with surges, and therefore have no empty hands to move protestors with bare hand techniques. If an officer were to leave the baton hanging from the officer's wrist or baton holder in order to manage a crowd member with bare hands, it would create a safety hazard because that crowd member or another person could more easily seize the baton. *See* SUMF ¶ 19. As a result, on June 1, while some officers used bare hands to help up protestors, *see* SUMF ¶ 156, the CDU officers otherwise used shields and batons, not their bare hands, to push protestors out of H Street.

on the ground is capable of fighting and toppling officers and that such a person raising a leg may be preparing to kick, which can injure an officer. *See* SUMF ¶ 22.

### B. After Reports of Violence, the Unified Command Chooses the CDU Tactical Clearing Option and Briefs Operational Supervisors on the Plan.

A crowd again gathered on H Street on June 1 and increased in size throughout the day. *See* SUMF ¶ 67. By the afternoon, the crowd appeared to number in the thousands and far outnumbered the officers scheduled to respond to Lafayette Square Park that day. *See* SUMF ¶ 100. The crowd did not have a permit to demonstrate in the park and its surroundings. *See* SUMF ¶ 26; 36 C.F.R. 7.96(g)(1)(vi); 36 C.F.R.7.96(g)(2).

Adamchik arrived at Lafayette Square Park by early in the afternoon. *See* SUMF ¶ 84. Throughout the day, Park Police issued intelligence reports assessing that the potential for violence was similar to the level of violence reported during the previous three nights. *See* SUMF ¶ 82. Federal law enforcement observed members of the crowd carrying bats, wearing eye protection, wearing other protective equipment, and stashing items that could be thrown at officers. *Id.* As Park Police officers were aware, protestors often use eye protection to limit the effectiveness of irritants such as pepper balls. *See* SUMF ¶ 24. Adamchik saw people throw projectiles over the bike rack fence, and believed that some of those individuals were using protestors for cover. *See* SUMF ¶ 101. Officers also received information about the injuries law enforcement personnel suffered on the previous days. *See* SUMF ¶ 65. In light of this information, the unified command concluded that using patrol officers to ask protestors to leave H Street would be ineffective and unsafe and therefore decided to adopt the third clearing method discussed above, under which the CDU would serve as the frontline clearing personnel, to be followed by lines of horse-mounted officers and patrol officers. *See* SUMF ¶¶ 69-70, 78-79, 87. The unified command planned for Adamchik to issue three warnings to the crowd using the LRAD before the CDU began to clear H Street. *See* SUMF ¶ 79.

In the middle of the afternoon, Adamchik briefed the operational plan to Park Police CDU Commanders Brecht and Christopher Cunningham, Park Police Acting Chief Gregory Monahan, Operations Commander David Lamond, Bonus, other members of the Secret Service, the Arlington Police CDU commander, and members of MPD. *See* SUMF ¶ 84. Adamchik outlined the goal of the operation, which was to create a perimeter line beyond the park to enable the installation of the fence, and explained the three options for clearing H Street. *See* SUMF ¶¶ 85-86. Adamchik showed the participants a diagram of the locations where each unit would finish the operation and establish the perimeter. *See* SUMF ¶ 89. As depicted in the diagram, during the advance down H Street, a Park Police patrol unit (that followed the horse-mounted officers) would break off from the main group of officers at the intersection of 16th and H Streets to hold the perimeter there, while the CDU officers would continue west on H Street. *See* SUMF ¶¶ 90-91. Adamchik authorized the CDU, horse-mounted officers, and SWAT team to deploy onto H Street. *See* SUMF ¶¶ 78, 88. Adamchik authorized the officers to use pepper balls and other less-lethal munitions, but he prohibited CS gas without additional authorization. *See* SUMF ¶ 92. Aside from guidance discussed below on how to handle people chaining themselves to fences or experiencing medical emergencies, Adamchik did not issue specific instructions on the use of force in individual interactions because he relied on the officers to use their training. *See* SUMF ¶¶ 92, 95-96. Adamchik also spoke with Park Police leadership and officers throughout the day to adapt to changes in the operational environment. *See* SUMF ¶ 93.

Adamchik did not want officers to carry people out of the area because it would deplete manpower and officers were needed to maintain the perimeter line. *See* SUMF ¶ 94.  He therefore provided guidance for handling people who remained in the area. *See* SUMF ¶ 95. He specified that if one or two people were unable to move—for example, if they chained themselves to a fence or experienced a medical emergency—the patrol units could serve as a "hands team" to remove those people. *See* SUMF ¶ 96. The general guidance he provided was that if people did not comply with the

8

order to leave the area and appeared capable of leaving, the CDU team could get those people to move. *See* SUMF ¶ 95.

By late afternoon, members of the crowd were throwing objects at officers and attempting to cross the bike rack fence. *See* SUMF ¶ 101, 105. Before 5:30 p.m., officers reported that people had entered the comfort station in the park, thrown rocks from there, stashed projectiles in the area, taken zip ties from the bike rack fence, and crossed over the fence. *See* SUMF ¶¶ 101, 105. By late afternoon, officers reported that people with bricks were on the roof of the comfort station. *See* SUMF ¶ 105.[5] Given intelligence reporting that protestors were staging weapons in the comfort station and might be hiding there, Brecht and Cunningham warned their CDU subordinates about a greater risk of violence in the area around the station. *See* SUMF ¶ 97.

### IV.   Law Enforcement Officers Face Violence as They Clear H Street.

By 5:50 p.m., the last of the fence contractor's personnel and equipment arrived at the park, and the various federal and Arlington Police officers who were needed to conduct the clearing operation had arrived and were ready to carry out the operation. *See* SUMF ¶ 106. At about 6:12 p.m., Secret Service personnel entered H Street from Madison Place, near the northeast corner of the park, and held a position there but did not attempt to move west down H Street. *See* SUMF ¶ 108. The crowd on H Street advanced on the officers and threw projectiles at them.  SUMF ¶ 109.  The Secret Service officers soon retreated to the edge of the park. *See* SUMF ¶ 110.

Five minutes later, at about 6:23 p.m., Adamchik, who was located near the Andrew Jackson statue in the middle of the park, used the LRAD to issue the first warning to the crowd to leave H

---

[5] At some point that afternoon, Adamchik learned that President Trump and other White House dignitaries would be coming to Lafayette Square Park, but their planned visit did not affect Adamchik's decision to clear H Street or the timing of the operation. *See* SUMF ¶ 98. That afternoon, the MPD assistant chief discussed with Adamchik the D.C. government's curfew planned for 7:00 p.m. that day. *See* SUMF ¶ 99. Adamchik did not intend to wait for the curfew to take effect before clearing H Street because the unified command had already planned to start the clearing operation as soon as the necessary resources were in place. *See* SUMF ¶ 99.

Street. *See* SUMF ¶ 111. That warning stated, "This is Major Mark Adamchik with the United States Park Police, for safety and security reasons Lafayette Park and H Street are closed to pedestrians. You are ordered to depart the area immediately. This is your first warning." SUMF ¶ 112. Park Police officers in an observation post in the Hay-Adams Hotel along H Street observed some members of the crowd start to leave the area immediately after Adamchik issued the first warning. *Id.* At about 6:26 p.m., Adamchik issued a second warning, which was the same as the first except Adamchik substituted the word "second" for "first" in the warning. SUMF ¶ 113. About two minutes later, he issued the final warning, substituting the word "final" for "first." *See* SUMF ¶ 114. The warnings were audible from the observation post, and Adamchik received a transmission that a CNN reporter on the roof of the Hay-Adams had reported hearing the Park Police issue warnings in the park. *See* SUMF ¶ 115.

According to video footage, after Adamchik issued the final warning, a line of National Guard and federal law enforcement officers inside the park advanced toward the bike rack fence. SUMF ¶ 116. A large group of protestors on the opposite side of the fence line immediately left the fence line and headed north (away from the park) and east or west. *Id.* Some protestors, however, advanced towards the officers securing the fence line and threw objects at them. *Id.* At approximately the same time, Park Police CDU and Arlington Police CDU officers entered H Street from Madison Place. *See* SUMF ¶ 117. Members of the crowd immediately started hurling objects at them. *Id.*

As video footage shows, those officers formed a "U"-shaped formation on H Street—one line of officers facing east, one facing north, and one facing west—where Madison Place enters onto H Street, creating a perimeter to block off the intersection. *See* SUMF ¶ 118. After that, more CDU officers entered H Street and conducted a brief start-and-stop surge maneuver westward with their shields in front of them to drive the crowd west down H Street. *Id.* The officers ended this first surge a short distance west of where Madison Place enters onto H Street, and significantly to the east of St. John's Church. *See* SUMF ¶ 121. Immediately after this first surge, no one remained in the street

10

behind (that is, to the east of) the line of officers, and a group of protestors started leaving the area farther west, down the street, with some people departing north or west as far away as 16th Street. *See* SUMF ¶¶ 121-122. Others in the crowd remained near the line of officers, and some people continued to throw objects at them. *See* SUMF ¶ 122. The CDU officers walked west on H Street. *See* SUMF ¶ 123.

The following excerpt from Google Maps shows the operational area involved and includes labels for Madison Place, H Street, 16th Street, St. John's Church, and the Hay-Adams Hotel:[6]



Footage indicates that after the first surge, as the CDU officers continued to walk west down H Street, a couple of individuals threw milk jugs into the intersection of 16th Street and H Street, in the general direction of the park, and they landed near other members of the crowd. *See* SUMF ¶ 123.[7]

---

[6] The Court may take judicial notice of a Google map pursuant to Federal Rule of Evidence 201, which authorizes a court to judicially notice information "from [a] source[] whose accuracy cannot reasonably be questioned." *See United States v. Burroughs*, 810 F.3d 833, 835 n.1 (D.C. Cir. 2016) (quoting Fed. R. Evid. 201(b) and taking judicial notice of a Google map to identify the area where an arrest took place).

[7] In the officers' experience, protestors would sometimes use milk to wash chemical irritants launched by the police out of their eyes, and they would throw plastic bottles, such as plastic milk jugs, at officers. *See* SUMF ¶ 24.

Within three to four minutes of the first surge, horse-mounted officers had entered H Street from Madison Place and followed in formation behind the CDU line, and a line of patrol officers walked behind the horse-mounted officers. *See* SUMF ¶ 124. The CDU officers conducted a second surge westward down H Street, still to the east of the intersection of 16th and H Streets, approximately next to St. John's Church. *See* SUMF ¶ 125. The video depicts the officers stopping the surge movement on H Street just east of the façade of St. John's Church, which faces 16th Street. *Id.* At this point, a substantial number of people at the CDU line and farther west started to run north or west, away from the officers. *Id.* Once the second surge concluded, the officers walked a short distance west on H Street and stopped. *Id.* A little over two minutes after the end of the second surge, the officers conducted a third surge, starting from H Street near the church up until the intersection with 16th Street, and some people again ran north or west past the intersection. *See* SUMF ¶ 126. Between the second and third surges, as well as after the third surge, members of the crowd continued throwing objects at the officers. *See* SUMF ¶ 127. Within about thirty seconds of the start of the third surge, the crowd had cleared out of the intersection of H and 16th Streets, and many crowd members had run farther west on H Street. *See* SUMF ¶ 128.[8] After the CDU officers and horse-mounted officers had moved on, Park Police patrol officers broke off from the advancing group of law enforcement officers to form a stationary line across 16th Street facing north at the intersection. *Id.*

### V.   Officers Encounter Carmer.

After these three surges, the CDU officers, still on H Street, reached the west side of the intersection of H and 16th Streets. *See* SUMF ¶ 132. Carmer was positioned on the sidewalk on the

---

[8] While three surges are clearly visible on video taken from the observation post at the Hay-Adams, it is possible that the officers conducted additional surges between Madison Place and 16th Street, because parts of the video are blurry. Therefore, this summary refers only to the three surges that are indisputably visible on this video.

southern side of H Street, by the edge of the park and roughly across from the Hay-Adams. *See* SUMF ¶ 133.

As video footage depicts, CDU officers walked westward, reached parallel to the stop light at the west side of the intersection, and kept walking west toward members of the crowd with shields and batons out, prompting the crowd to move away from them. *Id.* Smoke was released near the front of the crowd. *See* SUMF ¶ 134. In the area of that traffic light, some members of the crowd wore gas masks, and others wore eye goggles. *See* SUMF ¶¶ 133-134. Officers yelled: "Move!" SUMF ¶ 134. Video footage shows that someone on the sidewalk on the south side of H Street, roughly parallel to the Hay-Adams, threw a bottle, which landed near the officers in the roadway. *See* SUMF ¶ 135. Similarly, footage shows that another person in that area threw a bottle eastward in the direction of the officers, though it fell far short. *Id.* Someone soon threw another bottle at the CDU line. *Id.* Two projectiles released smoke and particles near some people. *See* SUMF ¶ 136. After members of the crowd threw bottles as described above, additional members of the crowd moved away from the officers, while others moved toward them, with some protestors raising their hands. *See* SUMF ¶ 137. Among the protestors remaining, one had an umbrella open, another was carrying a broom, and another had a white jug. *Id.* The CDU line paused west of 16th Street and stretched across H Street at a point that appears just past the eastern edge of the Hay-Adams. *See* SUMF ¶ 138. When the CDU officers paused, some members of the crowd moved closer to them. *Id.*

At about this time, Carmer was kneeling on the sidewalk on the south side of H Street, abutting the northern edge of Lafayette Square Park, across from the Hay-Adams. *See* SUMF ¶¶ 133, 139, 141. The CDU line of officers remained in its position stretching across H Street, which Carmer believed was a maximum of approximately twenty feet away from her. *See* SUMF ¶¶ 139, 140. On H Street between the CDU line and Carmer's position, some members of the crowd stood or kneeled with their hands up. *See* SUMF ¶ 145. Some members of the crowd chanted "we are not afraid." *See* SUMF ¶ 144. Someone wearing goggles and holding an open umbrella, which was facing toward the officers,

13

kneeled on the asphalt, while another person stood behind and to the right of her, wearing goggles. *See* SUMF ¶ 145. A man wearing a tie-dye shirt and gas mask also stood in the street. *See* SUMF ¶¶ 136, 145.

A man with a blue mask stood on the sidewalk in the area between the officers and where Carmer crouched. *See* SUMF ¶ 143. She remained in a kneeling position, and someone next to her stood on the stone lip against the bike rack fence, wearing goggles. *See* SUMF ¶¶ 142, 144. Carmer soon raised her hands but did not otherwise move. *See* SUMF ¶ 144. Carmer was kneeling on one knee on the sidewalk, adjacent to the stone lip on which the bike rack fence sat. *See* SUMF ¶ 141. She wore a mask, glasses, a cap, and had a bag slung across her torso. *Id.* To her right, on the stone lip, was a white plastic jug. *See* SUMF ¶ 142. Bottles and another plastic jug—the types of objects people had previously thrown at officers—were strewn in a tree well to her left. *Id.* At least six people near Carmer had closed bags or backpacks, and three of them were on the sidewalk near her. *See* SUMF ¶ 143.

Video footage shows that the CDU officers remained in position across from Carmer and the crowd for at least thirty-three seconds. *See* SUMF ¶ 146. Carmer remained in her position and faced the officers. *See* SUMF ¶¶ 144, 147. The officers yelled: "Move! Move!" as they started another surge forward. *See* SUMF ¶ 146. Within two seconds, some members of the crowd in the street near Carmer started to run away from the CDU officers. *Id.* Others remained in place, and some moved toward the officers. *Id.* The man with the blue mask, who had been in front of Carmer, turned and moved past her away from the officers. *See* SUMF ¶ 148. Carmer stayed in place as CDU officers made contact with members of the crowd to her left who remained in the street. SUMF ¶ 147. The CDU officers continued their movement toward Carmer. *See* SUMF ¶ 148. After the man with the blue mask had passed Carmer but before the officers had reached her, members of the remaining crowd physically clashed with CDU officers at the northern edge of the sidewalk near the tree well. *See* SUMF ¶ 149.

Carmer saw people running away from the officers. *See* SUMF ¶ 147. She still did not move. *Id.* Carmer

chanted as the officers approached. *Id.*  Exhibit 38 (US00001035) depicts this scene and appears below.



According to video footage and photographs, as a group of CDU officers continued to

struggle with people on the street, Kellenberger and Sinacore reached Carmer. *See* SUMF ¶ 150. One

of those two officers had a shield out in front, and the shield made contact with Carmer, as her forearm

pressed against it. *Id.*[9] After the shield contacted her, Carmer ended up on the ground, while other

CDU officers were still struggling with the crowd at the northern edge of the sidewalk nearby. *See*

SUMF ¶ 151. Carmer's right thigh was hit with a baton twice. *Id.* In the midst of this encounter,

Carmer raised her right leg and foot upward toward the officers and kept her knee bent, and she raised

---

[9] Kellenberger testified that he did not recall interacting with Carmer. *See* SUMF ¶ 154. Sinacore invoked her Fifth Amendment rights when questioned about her interaction with Carmer. *See* SUMF ¶ 154.

her right arm and hand up. *See* SUMF ¶ 153.[10] Adamchik later testified that the manner in which Carmer raised her leg and foot was, according to Park Police, ground-fighting training, "a defensive position or a ground fighting position" and "a standard position where one would or could kick from the ground, kicking something away from you." *See* SUMF ¶ 155. An officer lifted Carmer off the ground and told her: "Go, go, you've got to go now." SUMF ¶ 156.[11] Carmer walked and jogged farther west on H Street, at least past the nearest tree well. *See* SUMF ¶ 158. At some point, two other people helped her move farther west down H Street. *Id.* An MSNBC reporter attempted to interview Carmer and she later made a statement to Darren Haynes, a local reporter from a CBS affiliate.  SUMF ¶ 159. Haynes helped her leave the area. *Id.* After Carmer left Haynes and reached 18th and G Streets, Carmer returned home on foot that night without assistance. *See* SUMF ¶ 160. After June 1, 2020, Carmer developed a bruise on her right thigh, and she claims to have nerve damage in her right thigh and an indentation in the thigh. *See* SUMF ¶ 161; ECF No. 19, Am. Compl. ("AC") ¶¶ 92, 94. Since June 2020, Carmer has been able to walk, hike, and swim, and has repeatedly traveled beyond her area of residence. *See* SUMF ¶ 161.

---

[10] Carmer has stated that she was hit twice with a baton, though the details of her account have varied. At her deposition, she testified that one officer pushed her down with a shield and the other officer hit her twice with a baton. *See* SUMF ¶ 151. In her complaint, she alleged that Kellenberger and Sinacore "bludgeoned Ms. Carmer with batons, each striking her with a downward motion on her right leg." *See* ECF No. 19, ¶ 74. In a social media post, Carmer attributed all of the alleged misconduct to a single officer. SUMF ¶ 159.  Finally, immediately after the incident, Carmer claimed that two female officers pushed her down with their shields and then one of the officers "smashed" her with a "club." SUMF ¶ 159.  In all events, Carmer has maintained that she was hit with a baton no more than twice. And the video and photographs of the incident show that she raised her leg in the manner described above after an instance in which the officers had batons low to the ground near her leg. *See* SUMF ¶ 152.

[11] The video evidence shows a second officer helping lift Carmer or keep her steady before she continues down H Street. *See* SUMF ¶ 156.

## VI. Claim Against the United States.

Carmer seeks to hold the United States liable under the FTCA, 28 U.S.C. §§ 1346(b), 2671 2680 (2012), on a claim of assault and battery based on the alleged actions of Kellenberger and Sinacore. *See* AC ¶¶ 95-97. Carmer's complaint asserts that the officers wrongfully pushed her down with a shield and hit her with a baton, causing her serious injury. *See id.* The complaint alleges that Carmer suffered bruises on her arms and right thigh, as well as a "dent" in her right thigh and nerve damage. *See* AC ¶¶ 88-92. The complaint also alleges that Adamchik, Kellenberger, and Sinacore are liable to Carmer under *Bivens*[12] for allegedly violating her First, Fourth, and Fifth Amendment rights. *See* AC ¶¶ 98-116. The Court has dismissed the *Bivens* claims. *See* ECF No. 50.

## LEGAL STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, a court asks if "there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can only be resolved by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Whether a fact is "material" is determined by the underlying substantive law. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). For a dispute over a material fact to be genuine, "there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant." *Herbert v. Architect of the Capitol*, 766 F. Supp. 2d 59, 72 (D.D.C. 2011); *Shah*, 638 F.3d at 308. A party alleging such a dispute must "cite to specific parts of the record" or demonstrate that the opponent's evidence is insufficient to show the absence of a genuine issue on that fact. *See* Fed. R. Civ. P. 56(c)(1).

---

[12] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

17

Conclusory statements that are not supported by citations to the record cannot create a genuine dispute. *See Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Jersey City Healthcare Providers, LLC*, 358 F. Supp. 3d 12, 18 (D.D.C. 2019); *see Ass'n of Flight Attendants-CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).  In contrast, a moving party may succeed on summary judgment by pointing to the absence of evidence proffered by the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 575 (1986).

## DISCUSSION

### I.   The Discretionary Function Exception Bars Carmer's Claim.

Carmer's assault and battery claim fails because she challenges conduct inextricably intertwined with a discretionary decision. She challenges the CDU's actions against her, which are inseparable from the government's policy-laden decision—in balancing the rights of the protesters against public and officer safety—to use that unit to clear H Street in order to install an anti-scale fence. Indeed, officials contemplated the type of force used—under the circumstances Carmer created—when deciding to deploy the CDU. As such, her claim falls within the discretionary function exception to the United States' waiver of sovereign immunity under the FTCA.

The FTCA is a limited waiver of sovereign immunity. Subject to several exceptions, it authorizes suits against the United States for damages "caused by the negligent or wrongful act or omission of any employee of the Government[.]" 28 U.S.C. § 1346(b)(1). Section 2680(a) of the FTCA provides that the United States cannot be held liable "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). As is true of all of the FTCA's exceptions, if the discretionary function exception applies, sovereign immunity is not waived and no subject matter jurisdiction exists. *See Loughlin v. United States*, 393 F.3d 155, 162, 172 (D.C. Cir. 2004). "A statute waiving the sovereign immunity of the United States," like

the FTCA, "must be construed strictly," *Brown v. Secretary of the Army*, 78 F.3d 645, 649 (D.C. Cir. 1996),

and this rule "strongly suggest[s] that any doubts about the scope of a waiver be resolved in favor of

the narrower governmental liability." *Nichols v. Pierce*, 740 F.2d 1249, 1257 (D.C. Cir. 1984).

The Supreme Court has articulated a two-part test to determine whether the discretionary

function exception applies to a claim. *See Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988). First,

a court must consider whether the conduct underlying the claim involved an "element of judgment or

choice." *Id.* at 536. Actions are discretionary in this sense unless they are "controlled by mandatory

statutes or regulations." *United States v. Gaubert*, 499 U.S. 315, 328 (1991).  Second, a court must assess

whether the judgment exercised was "of the kind that the discretionary function exception was

designed to shield"—that is, whether the challenged conduct involved considerations of public policy.

*Berkovitz*, 486 U.S. at 536-37. The key inquiry here is not the subjective intent of the decision maker,

but whether the conduct is "*susceptible* to policy analysis." *Gaubert*, 499 U.S. at 325 (emphasis added).

"In sum, the discretionary function exception insulates the Government from liability if the action

challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at

537.[13]

In addition, the discretionary function exception applies to actions that, while not

independently qualifying for the exception, are carried out in execution of a decision susceptible to

policy analysis and are inextricably intertwined with that policy-based decision. *See generally Gray*, 712

at 514-15; *see also Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013); *Gustave-Schmidt v. Chao*,

226 F. Supp. 2d 191, 199 (D.D.C. 2002); *Conset Corp. v. Cmty. Servs. Admin.*, 624 F. Supp. 601, 609-10

(D.D.C. 1985). Specifically, even if a government employee's conduct in isolation would not ordinarily

---

[13] In the D.C. Circuit, the discretionary function exception may apply to conduct falling within 28 U.S.C. § 2680(h), the "law enforcement proviso," which generally waives the government's immunity from intentional tort claims arising from the actions of law enforcement officers. *See Gray v. Bell*, 712 F.2d 490, 507 (D.C. Cir. 1983).

qualify as a discretionary act susceptible to policy analysis, the discretionary function exceptions still applies so long as that conduct is not "sufficiently separable from protected discretionary decisions." *Gray*, 712 F.2d at 515. Thus, in *Gray*, for example, the D.C. Circuit found that allegations of a botched investigation—which allegedly included the failure to interview numerous witnesses and false and misleading evidence presented to the grand jury—fell within the discretionary function exception because "the improper and tortious actions allegedly undertaken by the defendants are too intertwined with purely discretionary decisions of the prosecutors to be sufficiently separated from the initial decision to prosecute." *Id.* at 515-16.

Because the United States has asserted sovereign immunity, Carmer must, at a minimum, point to facts establishing that the discretionary function exception does not apply. *See Schuler v. United States*, 531 F.3d 930, 933-34 (D.C. Cir. 2008). "A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity." *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003); *see also Best v. United States*, 522 F. Supp. 2d 252, 256 (D.D.C. 2007) ("A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity for the type of claim involved," and "demonstrat[ing] that the claim asserted is the kind permitted by statute . . . .").

Here, Carmer cannot meet her burden. Officials made a discretionary, policy-based decision to install an anti-scale fence to protect law enforcement officers, the park, and the White House complex in response to violent protests that started the night of May 29. Relatedly, when considering the conduct of the crowd on June 1 and weighing their options, those officials made the policy-based decision to clear H Street using CDU officers. The CDU officers' actions to remove Carmer—particularly in light of her refusal to leave—was inextricably intertwined with the decision to use the CDU as the front line of the clearing operation.

20

### A. The Government's Decisions Regarding the Planning and Execution of the Clearing Operation Were Discretionary.

The government made discretionary decisions to install a security fence, to clear H Street for that purpose, and to select the CDU to perform the clearing. The CDU officers' use of a shield and baton to contact Carmer, which forms the basis of her claim, was inextricably intertwined with those decisions. Under *Berkovitz*'s first prong, the decisions to install a security fence and clear H Street were undoubtedly discretionary, as no policy dictated that the government had to choose any particular security measure for the protection of the park or any specific method of protecting contractors during fence installation. Indeed, the decisions to install an anti-scale fence, to clear H Street, and to select CDU officers to clear it, each involved an element of judgment or choice because no statute, regulation, or policy mandated a single type of operation in response to the kind of civil unrest facing the government. In her pleadings and in discovery, Carmer has failed to identify any statute or regulation specifically requiring the use of an exclusive method by which the government must disperse a crowd during civil unrest or a particular type of equipment or technique that must be used on individuals who acted as Carmer did under the circumstances here. Hence her claim falls within the first *Berkovitz* prong.

Indeed, the relevant authorities confirm the officers' discretion in these matters. Because Park Police had jurisdiction to enforce federal and local laws in the national capital region, including Lafayette Square Park and the surrounding area, *see* 18 U.S.C. § 13(a); 54 U.S.C. § 102701; 36 C.F.R. §§ 1.2(a)(4); 7.6(a); 7.6(f)(2), Park Police was authorized to disperse the protest on H Street once Adamchik, the ranking supervisor on the scene, determined "the event presents a clear and present danger to the public safety, good order, or health, or for any violation of applicable law or regulation," Park Police General Order (G.O.) 2301.03(C), or that a "significant number or percentage of the assembly participants are engaging in, or are about to engage in, unlawful disorderly conduct or violence toward persons or property." 52 D.C. REG. 2296 § 107(d)(2). Likewise, although the

government's decision to use the CDU to clear H Street authorized the use of certain types of force, no law or regulation precluded the government from adopting a plan that would involve the CDU's clearing tactics. Because Park Police's policies on demonstrations, use of force, and defensive equipment do not mandate an inflexible course of action with respect to crowd dispersal or uses of force in response to civil unrest, those policies did not eliminate the government's discretion to adopt a plan requiring CDU officers to remove the crowd from H Street using the specific types of force on which they were trained.[14] Thus, the government could choose among a variety of approaches to execute dispersal orders, warnings, fence placement, and deployment of officers to clear H Street. And it could choose which types of equipment and defensive techniques would be authorized. Consequently, the government's clearing plan featured the element of choice necessary to satisfy *Berkovitz*'s first prong. *See generally Macharia v. United State*s, 334 F.3d 61, 65-66 (D.C. Cir. 2003); *Fuller-Avent v. United States Prob. Office*, 226 F. App'x 1, 2-3 (D.C. Cir. 2006); *Sledge v. United States*, 883 F. Supp. 2d 71, 84-86 (D.D.C. 2012), aff'd (Dec. 13, 2013); *cf. Sloan v. Dep't of Hous. & Urb. Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2001) ("Although HUD rules require that certain conditions be met before a suspension may issue . . . that requirement does not convert the decision into a nondiscretionary act. Determining whether those broadly stated conditions exist involves substantial elements of judgment.").

---

[14] The policies relevant to the execution of the plan similarly lack any specific mandate. The defensive equipment policy permits an officer to use a baton when faced with someone "resist[ing] arrest" or "[a]n emergency situation"; when "physically assaulted"; or when "necessary for crowd control." G.O. 3605.05(B). The policy does not define "emergency situation" or when a baton would be "necessary for crowd control," leaving it to the officer's training and judgment. Park Police's use-of-force policy states that "[t]he type and level of force used must be reasonable, depending on the dynamics of the situation," G.O. 3615.02, allowing officers to use judgment and experience to assess the dynamics of the situation and determine a reasonable response. The policy further advises officers to use force at "the lowest level necessary to maintain control." G.O. 3615.04(A)-(E).

### B. The Decisions to Erect a Fence, Conduct a Clearing Operation, and Use the CDU Were Susceptible to Policy Judgment.

As a single interconnected effort to safeguard the park, the White House, and law enforcement officers, the decisions to install a fence, clear H Street, and deploy the CDU were susceptible to policy judgment and therefore satisfy *Berkovitz*'s second prong. To begin, because relevant laws and regulations authorized Park Police to address the crowds in the park and H Street without mandating a particular approach, it is presumed that the government's response featured an element of policy judgment. *See Sloan*, 236 F.3d at 761 ("'When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion,' *Gaubert* held, 'it must be presumed that the agency's acts are grounded in policy when exercising that discretion.'" (quoting *Gaubert*, 499 U.S. at 324)).

Presumption aside, the second *Berkovitz* prong is satisfied here. The unified command made three discretionary decisions—to erect an anti-scale fence, to clear H Street, and to use CDU officers trained in specific clearing tactics as the front line of the operation—that were susceptible to policy judgment. The planning of the clearing operation with those components required the sort of balancing of competing interests which is the hallmark of policymaking. After three days of unrest during which protestors injured federal law enforcement officers, damaged federal property, and destroyed private property, and faced on June 1 with a gathering of thousands who lacked a permit and some of whom were violent, the government balanced the need to prevent further assaults on officers, protect the park, and safeguard the White House complex on the one hand, with the protestors' interest in expression on the other by adopting a policy and plan to address those competing concerns. Given that the government had attempted bike racks as protection and had a finite number of officers and certain types of defensive equipment available to protect the park, the government necessarily had to choose an appropriate allocation of its limited resources to accomplish its goals, thereby engaging in the classic policy task of resource management.

Hence, the government's decision to install a fence, its choice to clear H Street, and its selection of a plan for the clearing were intrinsically susceptible to policy judgment, as *Berkovitz*'s second prong requires. *See United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 820 (1984) ("Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding."); *see also Lam v. United States*, 979 F.3d 665, 682 (9th Cir. 2020) ("Competing interests and policy concerns require balancing and weighing; balancing and weighing involve discretion; and policy discretion invokes the DFE."); *cf. Ayala v. United States*, 982 F.3d 209, 217-18 (4th Cir. 2020) (noting that resource allocation and foreign policy issues make immigration investigation and detention susceptible to policy judgment). That was especially so here, where the balance had to be struck in response to the days of unrest near a highly sensitive area of downtown—at the edge of the White House, "a unique situs for considerations of presidential and national security," *White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1533 (D.C. Cir. 1984)—thus presenting security questions committed to the political branches of government and within the intended scope of the discretionary function exception. *See Berkovitz*, 486 U.S. at 536-37 ("The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." (internal quotation marks and citations omitted)); *see generally Dalehite v. United States*, 346 U.S. 15, 35-36 (1952).[15]

---

[15] As the *Dalehite* Court explained, this kind of executive operational decision-making is often protected by the exception because a discretionary function:

> also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official

Furthermore, although conduct need only be *susceptible* to policy judgment to qualify for the exception, Park Police in fact exercised policy judgment here by considering several options to balance public safety and protestors' interests. In the days leading up to June 1, Park Police and Secret Service initially decided to use bike rack fences and the deployment of federal officers to protect the park without closing H Street to protestors. Once that option proved ineffective and assaults on officers continued, the unified command developed a plan to clear H Street and erect an anti-scale fence, making a new policy judgment to strike a different balance between competing interests in safety and expression. In addition, at the outset of the planning to install a larger fence, the unified command considered other policy issues—resource allocation, public safety, and officer safety—when it decided to clear H Street instead of attempting to arrest individual violent protestors, which would have been impossible with the available manpower and resources. This was not only a policy choice, but a wise one: As the United States' police practices expert Spencer Fomby concluded, "[t]he decision to disperse the crowd instead of arresting hundreds of protesters was consistent with generally accepted principles" because "conducting surgical arrests of individual suspects in a large riotous crowd is one of the most challenging tasks that a police unit can attempt, and it is rarely successful." SUMF ¶ 163. Consequently, adoption of the clearing plan was not only susceptible to policy judgment, but also formulated based on actual policy determinations.[16]

---

> directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Dalehite*, 346 U.S. at 35-36. And while *Dalehite* initially tried to draw a distinction between supposedly protected "planning" activities and unprotected "operational" activities, the Supreme Court later clarified that the discretionary function exception may apply to both. *See Gaubert*, 499 U.S. at 325-26.

[16] Given that the crowd numbered in the thousands, Park Police and its partner agencies would have needed thousands more officers to outnumber the protestors and safely carry out an arrest operation, rendering it impossible. Indeed, Adamchik testified that "it's not conceivable when you have

In addition, the unified command balanced policy concerns when it chose the CDU to clear the street. After first considering the use of only patrol officers to clear H Street, the unified command decided to use the CDU as the front line of the clearing operation, making a choice susceptible to policy judgment about which types of officers (in light of their equipment, training, and crowd-control methods) would be most appropriate to achieve the government's goals in light of the circumstances. Thus, the unified command's selection of the CDU as the lead clearing unit inherently involved policy considerations such as the allocation of personnel resources (purely federal patrol officers versus a mix of federal and local CDU officers), the allocation of physical resources (patrol officers' standard patrol equipment versus the CDU's round shields, straight batons, and heavy armor), and the selection of appropriate clearing tactics on which the officers were trained (standard patrol tactics versus the CDU's surges and shield and baton contacts with non-compliant protestors). The unified command's decision to rely on the CDU to clear H Street thus also involved the policy-based balancing of competing interests in public safety, officer safety, protection of federal property, and protestors' rights to expression.

## C. The Use of Force Against Carmer Was Inextricably Intertwined with the Discretionary Decision to Clear H Street Using the CDU.

In light of the foregoing policy-related discretionary decisions, the use of force against Carmer, which fell within the use of force contemplated by the clearing plan, was inextricably intertwined with and inseparable from the discretionary decision to use the CDU to clear H Street. *See Gray*, 712 F.2d at 515. As Adamchik was aware from viewing the CDU training and the May 31 nighttime clearing operation, the CDU was trained to conduct start-and-stop surges with shield pushes, to use batons on people who do not leave in response to those surges and after being warned to leave, and to keep their

_____

thousands of people in the street conducting riotous behavior—throwing things; you know, lighting things on fire—to arrest thousands of people," SUMF ¶ 51, and that arresting particular individuals "is not reasonable to even try to attempt to do" because "[i]t puts officers at harm and it puts members of the public at harm to try to do something like that at that size and scale of the thousands of people that were out there." SUMF ¶ 51.

batons and shields in their hands, which typically prevents them from using bare-hand techniques. Consequently, by choosing to deploy the CDU as the front line of the clearing operation and declining to authorize the use of CS gas, the unified command's plan required officers to use a narrow range of types of force on individuals who defied police orders to leave after being warned to do so, namely shield pushes, baton hits, and non-CS munitions rather than bare-hand techniques, physical detentions, or arrests.

Given that, in responding to Carmer's defiance of multiple lawful orders to disperse, Kellenberger and Sinacore used the very CDU tactics contemplated in the unified command's plan, their use of force was inextricably intertwined with and inseparable from the decision to clear H Street with the CDU. After Adamchik had repeatedly warned protestors to leave H Street, CDU officers followed their training as they cleared the street through surge movements with their shields. By the time the CDU line reached 16th and H Streets, it was reasonable for officers to believe that those who remained to the west on H Street had chosen to defy the dispersal orders. Indeed, those individuals remained despite receiving three amplified warnings,[17] witnessing officers clear eastern parts of H Street, and hearing officers yell: "Move! Move!" and rush west down the street. In that context, when Kellenberger and Sinacore encountered Carmer (kneeling, chanting, with her hands up), they used the very tactics their training and the unified command's plan contemplated. They rushed forward, with members of the line shouting: "Move! Move!" When that failed to convince Carmer to move, one of the officers pushed her with a shield—part of the CDU's standard tactics for moving non-compliant crowd members. *See* SUMF ¶ 20. When Carmer did not leave after the shield push, Kellenberger and

---

[17] Even assuming that some in the crowd did not hear the warnings, it is undisputed that the observation post officers in the Hay-Adams radioed that the warnings had been issued and heard, *see* SUMF ¶ 115, and video demonstrates that some people left immediately after the warnings because groups of people within the crowd started departing the area around the fence line. As a result, a reasonable officer in those circumstances could have believed that the individuals remaining on H Street were disregarding the warnings and defying an order to disperse.

Sinacore did what CDU officers were trained to do, and what the clearing plan anticipated they would do: they contacted Carmer with their batons, hitting her leg twice from a below-the-shoulder position.[18] *Id.*[19] Because the unified command opted to use CDU officers with the understanding that their training and methods included pushing non-compliant individuals with shields and contacting them with batons, and Kellenberger and Sinacore used exactly those measures to remove Carmer from H Street after she refused to leave, their use of force was inseparable from a policy-based, discretionary plan.

Case law confirms that the design of a pre-planned law enforcement operation, including the choice to enable the use of force, may fall within the discretionary function exception. For example, the Fifth Circuit has applied the exception to federal law enforcement's planning of an operation to use tear gas to clear protests. *See United States v. Faneca*, 332 F.2d 872, 874-75 (5th Cir. 1964). That circuit also found that the use of force and less-lethal munitions to carry out a pre-planned warrant execution operation, like the design of the operation itself, is subject to the discretionary function exception. *See Andrade v. United States*, 116 F. Supp. 2d 778, 788-89 (W.D. Tex. 2000), *aff'd*, *Andrade v. Chojnacki*, 338 F.3d 448 (5th Cir. 2003). The exception may also apply to the use of force in the activation of security measures on a military base, which were planned in advance. *See Colburn v. United States*, 617 F. Supp. 3d 377, 381-85 (E.D. Va. 2022). In these cases, the common thread is that, where federal law enforcement officials' conduct is consistent with an operation planned in advance based

---

[18] When using a baton to contact someone, Park Police officers are trained to target large muscle mass areas, such as the thigh, and to avoid vital areas like the head or spine. *See* SUMF ¶ 25.

[19] While Carmer has described being struck twice with a baton, SUMF ¶ 151, the video and photographic evidence demonstrates beyond dispute that the officers did not make the sort of strong overhead motion which a "strike" suggests, but rather a motion originating from no higher than shoulder level. *See* SUMF ¶ 152. And while the video and photographic evidence does not confirm whether the batons actually made contact, that evidence shows indisputably that any such contact would not have come from a baton raised above the head or even above the waist, and that it was consistent with accepted police practices. *See* SUMF ¶ 163.

on considerations of policy, that conduct is covered by the discretionary function exception.[20] It

follows that the exception applies to the planning of a clearing operation such as the one at issue here,

and that the use of force consistent with that plan is inextricably linked to the discretionary decisions

underlying the operation and also falls within the discretionary function exception.

### D.  The CDU Did Not Violate Carmer's Constitutional Rights.

Finally, Carmer's allegations that the officers' use of force violated the First, Fourth, and Fifth

Amendments do not overcome the discretionary function exception. To be sure, "the FTCA's

discretionary-function exception does not provide a blanket immunity against tortious conduct that a

Plaintiff plausibly alleges also flouts a constitutional prescription." *Loumiet v. United States*, 828 F.3d

935, 943 (D.C. Cir. 2016). But the undisputed evidence shows that the government's employees did

not violate Carmer's constitutional rights.

First, the Fourth Amendment does not apply because officers used force to disperse Carmer,

not seize her. *See Jackson-Moeser v. Armstrong*, 765 F. App'x 299, 299 (9th Cir. 2019). And even if the

Fourth Amendment applied, the officers did not violate it. "[R]easonableness is always the touchstone

of Fourth Amendment analysis[.]" *Birchfield v. North Dakota*, 579 U.S. 438, 477 (2016). To determine

---

[20] *See Faneca*, 332 F.2d at 874 (the exception "also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. . . . It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."); *Colburn*, 617 F. Supp. 3d at 384-85 (applying exception where "[a]t issue is the Navy's decision to control access to its base through use of an HACS barrier, and whether that discretion is exercised in furtherance of public policy goals . . . . Here, the Naval Base's Commanding Officer has used this broad authority to enlist security gate officers as the first line of defense to ensure that the base is protected from a variety of threats, to include civilians and other unauthorized persons. As part of this designation, the Navy has employed the use of numerous tools, including verbal commands and whistles, deployable HACS barriers, and even firearms capable of deadly force to aid in that defense. The evidence and authoritative case law before the Court establish that these decisions are grounded in the politically entrenched policy goal of ensuring the safety and security of the Naval Base, to which the Court now accords proper deference."); *Andrade*, 116 F. Supp. 2d at 788 ("The FBI had discretion as to the type of vehicles and equipment to use in attempting to achieve the goals of the operation which were grounded in law enforcement policy. Given that the discretion to use tear gas is protected, the decision as to the type of vehicles and equipment to use in insertion is necessarily protected as well." (citing *Faneca*, 332 F.2d at 874-75)).

whether an intrusion was reasonable courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). This "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citations omitted). Only then can courts account for the reality "that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

Here, as detailed more fully below in the analysis of the objective reasonableness of the officers' actions, *see infra* Section II.B., the balance of competing interests and relevant factors rendered the officers' use of force constitutional. The government had a compelling interest in dispersing a crowd that contained members who hurled projectiles at officers and defied dispersal orders, and Carmer's refusal to move in the midst of a "rapidly evolving," *Graham*, 490 U.S. at 397, and highly dangerous confrontation justified a shield push and, when she still refused to move, two baton hits to her thigh. Indeed, courts have upheld as constitutional comparable crowd-control measures in similar situations—even without the added concern here of ensuring the safety and security of protecting the White House. *See Felarca v. Birgeneau*, 891 F.3d 809, 816-19 (9th Cir. 2018); *White v. Jackson*, 865 F.3d 1064, 1079-80 (8th Cir. 2017); *Bernini v. City of St. Paul*, 665 F.3d 997, 1001-1006 (8th Cir. 2012).

Similarly, the undisputed material facts show that no substantive due process violation occurred under the Fifth Amendment. At the outset, Carmer's assertion regarding the Fifth Amendment relates to alleged "excessive force." AC at ¶ 106. Where "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide" to consider the claim. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Here, to the extent that the Court finds it applicable, that would be the Fourth Amendment. As discussed above, the

Fourth Amendment was not violated. *Cf. id.* at 843 (noting that so long as a claim is covered by a different Amendment, even if it may fail under that Amendment, substantive due process analysis is inappropriate).

Regardless, no Fifth Amendment violation occurred. To evaluate whether government action "shocks the conscience" so as to violate substantive due process, the D.C. Circuit looks at four "sensible guidelines." *Norris v. District of Columbia*, 737 F.2d 1148, 1150 (D.C. Cir. 1984). Those are: (1) "the need for the application of force"; (2) "the relationship between the need and the amount of force that was used"; (3) "the extent of injury inflicted"; and (4) "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* The undisputed material facts demonstrate that Carmer's refusal to leave H Street—while, as described below, she was close to violent protestors and after she received multiple warnings to leave—gave rise to the "need for the application of force"; that the amount of force was closely related to the need Carmer and other protestors created, and in fact was contemplated in the plan of the clearing operation; and that the force used was applied in good faith. Indeed, the push and two hits on the thigh accomplished their goal of causing Carmer to leave the area. Officers helped Carmer get up, and no force was applied once she began to leave. And, although Carmer suffered from bruising for an extended period of time and has a small divot in her upper thigh, in light of Carmer's ability to walk home from the protest unassisted and her ability to continue engaging in extensive travel and hiking after the encounter, "the extent of injury inflicted" does not render the force used unconstitutional.

And any restrictions on Carmer's First Amendment rights were "reasonable time, place and manner restrictions"; were "content-neutral"; and were "narrowly tailored to serve a significant governmental interest," *White House Vigil*, 746 F.2d at 1527, namely, to provide safety for contractors to install an anti-scale fence in order to protect federal property, law enforcement, and the White House complex after three days of unrest and violence around H Street and Lafayette Square Park.

31

Additionally, no facts show that officials approved and executed the clearing operation with any sort of viewpoint discrimination or retaliatory motive. No violation of Carmer's First Amendment rights occurred here. *See generally Lash v. Lemke*, 786 F.3d 1, 7-10 (D.C. Cir. 2015). Consequently, Carmer's allegations of constitutional violations do not render the discretionary function exception inapplicable. Her claim should be dismissed.[21]

## II. Carmer's Assault Claim Fails on the Merits Because the Officers Used Reasonable Force Under the Circumstances.

Even if this Court finds the discretionary function exception does not apply to Carmer's claim, which it does, the United States is nonetheless entitled to summary judgment. The CDU faced dangerous and volatile circumstances on H Street. Carmer failed to leave after many protestors did. And she persistently refused to obey officers' repeated commands to disperse as they approached her. Under these circumstances, any excessiveness of the force used on Carmer was not so apparent that every reasonable officer would have believed the officers' actions were unlawful. Furthermore, Carmer cannot demonstrate that Officers Kellenberger and Sinacore intended to use unreasonable force. The undisputed evidence establishes that the officers acted reasonably in using such force.

---

[21] If the Court determines that the officers' conduct was unconstitutional, it should nonetheless grant summary judgment because the conduct does not clearly run afoul of the constitutional limitations to the discretionary function exception. The D.C. Circuit has left open the "degree" to which "a constitutional mandate must be specific or clearly established to render the discretionary-function exception inapplicable." *Loumiet*, 828 F.3d at 946. Given that the exception applies unless "a federal statute, regulation, or policy *specifically* prescribes a course of action for an employee to follow," *Berkovitz*, 486 U.S. at 536 (emphasis added), it is logical for the exception to cover conduct which, though unconstitutional in hindsight, was not clearly and specifically established to be so at the time of the conduct. *Compare Berkovitz*, 486 U.S. at 536, *with Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Garza v. United States*, 161 F. App'x 341, 343 (5th Cir. 2005) (holding Eighth Amendment's prohibition against cruel and unusual punishment did not define course of action "specific enough to render the discretionary function exception inapplicable"); *see also Shivers v. United States*, 1 F.4th 924, 931 (11th Cir. 2021) (similar). Here, the officers did not violate Carmer's clearly established constitutional rights, and the discretionary function exception bars her claim.

### A.  Tort Liability Under the FTCA and Assault and Battery Under D.C. Law.

The FTCA, which normally excludes intentional torts such as assault and battery, includes a limited waiver of sovereign immunity for intentional torts attributable to law enforcement officers. 28 U.S.C. § 2680(h). "Tort liability under the FTCA is determined according to the law of the place where the alleged acts or omissions occurred—in this case, the District of Columbia." *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911 (D.C. Cir. 2015).

Under District of Columbia law, an "assault" is an intentional attempt or threat to do physical harm to another. *Harris*, 776 F.3d at 913. A "battery" is an intentional act that causes harmful or offensive bodily contact. *Id.* at 913; *see also Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007); *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993).

"District law provides a government actor with a privilege defense to such tort claims when (1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." *Doe v. District of Columbia*, 796 F.3d 96, 107 (D.C. Cir. 2015) (internal quotations and citations omitted).  "'The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Harris*, 776 F.3d at 913 (quoting *Graham*, 490 U.S. at 396); *see also Plumhoff v. Rickard*, 572 U.S. 765 (2014); *Rogala v. Dist. of Columbia*, 161 F.3d 44, 54 (D.C. Cir. 1998); *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," is deemed excessive.  *Graham*, 490 U.S. at 396.  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

The reasonableness of force is determined based on the totality of the circumstances. *See Bushrod v. District of Columbia*, 521 F. Supp. 3d 1, 24 (D.D.C. 2021) (citing *Graham*, 490 U.S. at 396). *Graham* included a non-exhaustive list of factors to be considered when determining whether force

33

was objectively reasonable. These include: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). Many courts recognize that the second of these factors is the most important. *See, e.g., Caraway v. City of Pineville*, 111 F.4th 369, 384 (4th Cir. 2024); *Baker v. Coburn*, 68 F.4th 240, 247-48 (5th Cir. 2023); *Estate of Valverde by & through Padilla v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020); *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). Judgment for the United States on an assault-and-battery claim should be granted unless a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his or her actions. *Harris*, 776 F.3d at 913 (quoting *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993), and applying *Wardlaw* to FTCA assault-and-battery case).

### B. The Use of Force Against Carmer Was Objectively Reasonable Under the Totality of the Circumstances.

#### 1. The facts known to a reasonable officer encountering Carmer.

Given the circumstances facing officers on H Street, and Carmer's own conduct, the use of force against her was not so excessive that no reasonable officer could have believed it was lawful. The undisputed material facts establish that officers participating in the clearing of H Street on June 1 were confronted with the following. In the days preceding the clearing operation, protestors vandalized streets, buildings, and landmarks. During that time, protestors lit on fire multiple buildings and at least one vehicle. Protestors injured dozens of federal law enforcement officers in the two preceding days. On June 1, members of the crowd threw punches and hurled projectiles at law enforcement officers. Projectiles protestors had launched at officers during the unrest since May 29 included frozen water bottles, eggs, containers filled with human waste, bricks, pieces of pavement, scooters, and fireworks. On June 1, some protestors launched projectiles from behind other protestors. Some protestors closer to the ground had grabbed at and kicked officers. Superior

officers specifically cautioned officers about the area near a comfort station on the south side of H and 16th Street, which protestors had burned out, because protestors staged weapons there throughout the day.

Adamchik had issued three dispersal orders using an LRAD. Many protestors had left after he issued those orders. Nonetheless, some protestors remained on H Street in violation of those orders. Protestors, some near Carmer, were wearing gas masks and eye protection, which officers understood as a precursor to resistance to law enforcement by attempting to undermine the efficacy of crowd control tools such as tear gas.

The clearing operation had been underway for more than four minutes and had covered an entire city block by the time officers crossed the intersection of H and 16th Streets and approached Carmer.  In addition to Adamchik's warnings and the show of force, the CDU officers progressing down the street repeatedly yelled "Move!" at the remaining protestors.

The nature of clearing operations, as well as the specific conditions on June 1, often prevented officers from determining the age and gender of protestors they encountered.  Officers instead assessed the actions of protestors around them for threats, and attempted to respond.  Carmer (crouched, wearing a mask and hat) faced the CDU officers from twenty feet away and continued chanting, rather than moving, as the officers reconstituted their line.  Objects that could have been used to attack the officers, including a bag at Carmer's hip that may have concealed a weapon, were within her reach. As the officers began their westward movement towards Carmer from twenty feet away, many protestors retreated, some protestors rushed towards the line and fought officers, and Carmer remained in place.

Carmer received a single push from a shield and two hits from a baton.  During the encounter, she ended up lying on her left side, with her legs bent at a 90-degree angle, and her arms blocking her face. She raised and extended her right leg towards the officers.  Those actions were consistent with ground fighting techniques taught during defensive tactics classes.

35

### 2. A reasonable officer would conclude that protestors were violating the law.

In terms of the "severity of the crime," a reasonable officer would have concluded that, after Adamchik issued the repeated dispersal orders, the CDU cleared a city block, and then proceeded past 16th Street, those protestors who remained on H Street as the CDU approached them were violating, and intended to violate, the law. *See Carr v. District of Columbia,* 587 F.3d 401, 409-10 (D.C. Cir. 2009) (recognizing that police may arrest individuals who fail to comply with a dispersal order after a reasonable opportunity to comply); *Wash. Mobilization Comm. v. Cullinane*, 566 F.2d 107, 120 (D.C. Cir. 1977) (same). A reasonable officer could also conclude that protestors who refused to disperse as the CDU contacted them may have committed a felony. *See* 18 U.S.C. § 231(a)(3) (obstructing, impeding, or interfering with law enforcement officer during commission of civil disorder); *id.* § 232(1) (defining "civil disorder" as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual"); *cf. White,* 865 F.3d at 1078 (failure to follow orders to disperse from area when orders were grounded in officers' safety provided basis to arrest for obstruction of justice). It was also reasonable to conclude they committed multiple misdemeanor offenses. *See* 18 U.S.C. § 1865, 36 C.F.R. §§ 1.3 (penalties), 1.5 (closures and public use permits), 2.32 (interfering with agency function; disobeying a lawful order), and D.C. Code § 22-1307 (crowding or obstructing).[22] Furthermore, protestors who grabbed officers' equipment, threw projectiles at them, or struck at them with their hands or feet violated additional laws. *See* 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers and employees); D.C. Code § 22-405 (assault on member of police force). It also was reasonable to conclude that the crowd that refused to leave H Street and

---

[22] Park Police officers are empowered to enforce D.C. law and may have considered whether conduct violated local law. *See Martin v. Malhoyt*, 830 F.2d 237, 251-52 (D.C. Cir. 1987).

instead confronted the CDU acted as a unit engaged in unlawful activity, even though some in the crowd were more blatantly aggressive than others. *See Bernini*, 665 F.3d at 1004.

Given the totality of the circumstances, this factor supports the conclusion that the officers' conduct fell within the qualified privilege because an objectively reasonable officer would conclude that Carmer (and the protestors near her) violated multiple laws.[23]

### 3. An objectively reasonable officer would conclude that Carmer posed an immediate threat to the safety of the officers or those around them.

The undisputed material facts confronting an objectively reasonable officer on H Street would have led him to conclude that Carmer threatened his safety and the safety of those around him, satisfying the most important *Graham* factor. First, in light of the far larger number of protestors than law enforcement officers, the repeated violence against law enforcement, and protestors' frequent non-compliance, a reasonable officer would have expected the situation to escalate. *See Oberwetter v. Hilliard*, 639 F.3d 545, 555 (D.C. Cir. 2011) (reasonable for officer to worry events "might get out of hand" when eighteen demonstrators outnumbered Park Police officers present); *Wardlaw*, 1 F.3d at 1303-1304 (reasonable officer warned of demonstration would expect confrontation, particularly with uncooperative individuals). Carmer's provocations—including her decision to face the officers down from her position near violent members of a crowd—would reasonably raise fears that she may also be violent. *See Wardlaw*, 1 F.3d at 1304; *Felarca*, 891 F.3d at 818; *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 87 (D.D.C. 2015) (Howell, J.) (concluding it would be reasonable to infer significant safety risk from plaintiff's active resistance to officer's commands and decision to remain "on the public sidewalk where [a] volatile struggle occurred").

Finally, Carmer's physical demeanor presented a threat: she restricted the officers' ability to proceed down the street, was positioned in a manner that could obscure threats positioned

---

[23] No arrests of protestors are recorded for June 1. That does not diminish a reasonable officer's perception of criminal activity among remaining protestors as the CDU approached Carmer.

behind her, and (from the perspective of a reasonable officer) positioned herself such that she could grab at the officers' legs and pull them to the ground.  On these facts, this factor supports the conclusion that the officers' conduct fell within the qualified privilege because an objectively reasonable officer would conclude that Carmer posed an immediate threat to the safety of the officers and others.

### 4. An objectively reasonable officer would conclude that Carmer was intentionally disobeying lawfully issued orders.

The third *Graham* factor—whether a suspect is evading or actively resisting arrest—also points towards the reasonableness of force. Although *Graham* did not consider the use of force in dispersal operations where arrests are often impractical, the Ninth Circuit faced a similar dispersal operation in *Felarca* and specifically weighed the protestors' compliance with dispersal orders in considering the reasonableness of the force applied.  891 F.3d at 817-18.  The third *Graham* factor and an individual's decision to disobey a dispersal order both address the individual's compliance with lawful authority. A reasonable officer would have concluded that Carmer—despite the three dispersal warnings, the officers steadily clearing H Street, and their repeated yelling at the protestors to move— chose not to comply. This would have reasonably been perceived as indicia of non-compliance.  This factor weighs in favor of the United States because an objectively reasonable officer would conclude that Carmer consciously and consistently chose not to comply.[24]

### 5. An objectively reasonable officer would conclude that the amount of force used was reasonable.

Under the circumstances established by the undisputed material facts detailed above, the three contacts Kellenberger and Sinacore made with Carmer were reasonable. Those contacts were: one officer pushed Carmer with a shield, followed by two baton hits to her right thigh.  According to

---

[24] As the record shows, such a conclusion was entirely reasonable. Even before the CDU began to clear H Street, Carmer's husband left the area, a decision she later described as one meant to avoid arrest. SUMF ¶ 104.

Haynes, the reporter whose video shows Carmer extending her leg towards the officers, at least one of the baton hits occurred during that segment of video. At no point in the video does any officer raise an arm and baton above the shoulder and then swing downwards (the manner of a more forceful baton strike). Ex. 50 ¶¶ 91-92. Courts have found similar quantities of force objectively reasonable under comparable circumstances. In *Hargraves*, this Court granted summary judgment to the law enforcement defendants where one officer hit the plaintiff's right leg twice with a baton and a second executed a "tactical takedown" after the plaintiff ignored instructions to lower himself to the ground and instead put his hand in his pants (which the officers interpreted as reaching for a weapon) and adopted a fighting stance. 134 F. Supp. 3d at 75, 87. In reaching that conclusion, this Court considered whether the amount of force used "may have forestalled the need for additional baton" by bringing the plaintiff into compliance. *See id.* at 87. *Hargraves* involved two officers chasing a single suspect who engaged in suspicious conduct in a high-crime area. *Id.* at 74-75. The present case concerns officers who, while responding to a mass of people following days of civil disturbance, encountered an individual who actively refused to leave despite three dispersal orders and the approaching line of CDU officers yelling "Move!" and where many protestors dispersed while some who remained physically struggled with officers.

Those circumstances were undoubtedly "tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 396. The force used to gain Carmer's compliance—a shield push and then the baton when resistance persisted and Carmer's leg movements "indicated a potential increased safety threat"—"not only worked effectively, but, in a short period during a volatile struggle on a public sidewalk." *See Hargraves*, 134 F. Supp. 3d at 87. This push and these hits forestalled the need for additional force— they caused Carmer to finally leave. *See id.* at 87; *see also Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373-74 (D.D.C. 2014) (reasonable to strike protestor multiple times with baton when officer and protestor were struggling and protestor was not yet passive or compliant); *Wardlaw*, 1 F.3d at 1304 (three to four punches in rapid succession were reasonable when they stopped after protestor

39

complied).  The officers' actions would be reasonable regardless of whether the baton hits occurred before or after Carmer raised her leg towards the officers as if to kick.

The Ninth Circuit's decision in *Felarca* is also illustrative. The court found that officers used reasonable force when they jabbed and hit three to six times with batons protestors who ignored repeat dispersal orders and prevented the officers from proceeding through the operational area. *Felarca*, 891 F.3d at 816-19.  And the Eighth Circuit found it objectively reasonable for officers to shoot rubber bullets and bean bag rounds at a protestor who refused to disperse and approached a skirmish line similar to the formation the CDU deployed here.  *White*, 865 F.3d at 1079-80.  It went on to find it objectively reasonable to push the same protestor to the ground and then place a knee on that protestor's back.  *Id.* at 1080-81.

Read together, these cases support the conclusion that a single push of Carmer with a shield followed by two hits with a baton was reasonable where the officers stopped once she began to comply.

**6.  The use of force was consistent with generally accepted police practices.**

The United States also offers the expert testimony of Spencer Fomby on the question of whether Kellenberger's and Sinacore's use of force was consistent with generally accepted police practices.[25]  Fomby reviewed videos and other evidence in the record and concluded that the officers' use of force was consistent with generally accepted police practices and procedures as measured by a reasonable police officer standard.   Fomby concluded, among other things, that "[o]fficers [engaged

---

[25] Fomby has extensive qualifications as an expert in the field of policing practices, to include proper use of force by law enforcement officers and their use of impact weapons, public order, weaponless defense, and ground fighting. Ex. 50 ¶¶ 2-10. His opinion concerns a matter of technical or specialized knowledge that will help the factfinder understand the evidence and determine a fact in issue. Because Fomby's testimony would be admissible at trial, the Court may properly consider his opinion at summary judgment. *See Okpara v. District of Columbia*, 174 F. Supp. 3d 6, 12 (D.D.C. 2016) (under D.C. law, report of arrestee's use-of-force expert and deposition testimony was sufficient to articulate standard of care by which police officers' actions could be measured at summary judgment stage of arrestee's negligence action against officers).

in the clearing operation] followed generally accepted policing practices when they used force to move protestors who refused to comply with a lawful order to disperse," and that "[t]he use of a shield to move a person who is obstructing officers who are trying to disperse a riotous crowd, and the use of a baton to stop a person from kicking are consistent with generally accepted policing practices." Ex. 50 ¶¶ 81, 95. Carmer, having opted not to designate an expert on the use of force, cannot rebut this testimony. Fomby's expert opinion therefore supports a finding that Kellenberger's and Sinacore's use of force was reasonable and consistent with generally accepted police practices.

### C. Plaintiff Cannot Meet Her Burden of Proving that the Use of Force was Subjectively Unreasonable.

As stated above, "the test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales*, 973 A.2d at 730.

Although the D.C. Court of Appeals has not explicitly ruled on who bears the burden of proving the subjective belief of the law enforcement officers, it has repeatedly endorsed the notion that the plaintiff must demonstrate the subjective bad faith. *See Jenkins v. District of Columbia*, 223 A.3d 884, 902-03 (D.C. 2020) (noting that plaintiff may not speculate as to bad faith of officer who allegedly assaulted or battered her but must instead cite specific facts); *Kotsch v. District of Columbia*, 924 A.2d 1040, 1048 (D.C. 2007) (recognizing that many states place burdens regarding excessive force on plaintiff). Courts in this district have acknowledged that burden of proof. *See also Kelly v. Gaton*, 2021 U.S. Dist. LEXIS 219614, *26-27, 2021 WL 5310566 (D.D.C. Nov. 15, 2021) (citing *Jenkins* while acknowledging plaintiff's failure to submit evidence demonstrating bad faith); *Arthur v. D.C. Housing Auth.*, 2020 U.S. Dist. LEXIS 64011, at *42, 2020 WL 1821111 (D.D.C. Apr. 11, 2020) (noting plaintiff's failure to allege defendants subjectively believed they used more force than necessary).

Carmer did not allege in her Amended Complaint that Kellenberger and Sinacore acted with the intent to use unreasonable force. She can cite to no portion of the record to support such a contention either. Moreover, the totality of the circumstances and numerous safeguards designed to obviate the need for any use of force—the dispersal orders, the show of force, the instructions to move, the shield push, and the lack of any hit above the waist—indicate progressive efforts designed to achieve compliance rather than indicia of an intent to use excessive force. Accordingly, this factor weighs in favor of a finding that the qualified privilege applies.

**CONCLUSION**

The Court should grant summary judgment in favor of the United States on the claim against it.

Dated:  April 4, 2025                                  Respectfully submitted,


                                                       YAAKOV M. ROTH
                                                       Acting Assistant Attorney General

                                                       C. SALVATORE D'ALESSIO, JR.
                                                       Director, Torts Branch

                                                       PAUL E. WERNER
                                                       Senior Trial Counsel


                                                       /s/ John B. F. Martin
                                                       JOHN B. F. MARTIN
                                                       NY Bar No. 4682928, under LCvR 83.2
                                                       Trial Attorney, Constitutional Torts Staff
                                                       Torts Branch, Civil Division
                                                       U.S. Department of Justice
                                                       Ben Franklin Station, P.O. Box 7146
                                                       Washington, D.C. 20044
                                                       T: (202) 616-4492; F: (202) 616-4314
                                                       John.B.Martin@usdoj.gov

                                                       /s/ Shmuel Bushwick
                                                       Shmuel Bushwick, NY Bar No. 5268271
                                                       Trial Attorney, Constitutional Torts Staff
                                                       Torts Branch, Civil Division
                                                       U.S. Department of Justice
                                                       Ben Franklin Station, P.O. Box 7146

Washington, D.C. 20044-7146
T: (202) 305-0401; F: (202) 616-4314
Shmuel.Bushwick@usdoj.gov

*Counsel for the United States*