## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ELIZABETH CARMER, | |
| Plaintiff, | Civil Action No. 22-1100 (BAH) |
| v. | Judge Beryl A. Howell |
| UNITED STATES OF AMERICA *et al.*, | |
| Defendants. | |

### MEMORANDUM OPINION

On June 1, 2020, 56-year-old plaintiff Elizabeth Carmer was pushed to the ground and beaten with batons by law enforcement while at a protest over the death of George Floyd, an unarmed Black man who was murdered by a Minneapolis police officer. As relevant here, plaintiff then sued the United States and various law enforcement officers for assault and battery under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.*, among other claims. The government has moved for summary judgment, arguing that the discretionary function exception to the FTCA preserves its sovereign immunity and precludes tort liability or, in the alternative, that the officers' use of force was reasonable as a matter of law. For the reasons explained below, the motion is DENIED.

## I.      BACKGROUND

### A.      Factual Background

Between May 29 and June 1, 2020, thousands of protesters marched through the streets of Washington, D.C. to protest the death of George Floyd, on May 25, 2020, at the hands of the Minneapolis police. Pl.'s Resp. to Def.'s Statement of Material Facts ("Pl.'s Resp. SMF") at

¶ 26, ECF No. 61-1.[1]  Large crowds gathered each day at Lafayette Square, a federally owned park near the White House.  *Id.*

On the first day of the protests, May 29, 2020, the demonstrations began peacefully but grew tense in the evening when some demonstrators threw objects and tried to breach bike barriers placed at the edge of the park.  *See* Def.'s Statement of Material Facts ("Def.'s SMF") ¶¶ 27, 29, 30, ECF No. 59-1.  In consequence, on the morning of May 30, the U.S. Park Police, led by Major Mark Adamchik, and the U.S. Secret Service, led by Deputy Chief Catrina Bonus, established a "unified command" to coordinate a response to the protests.  Def.'s SMF ¶ 36; Pl.'s Resp. SMF ¶ 36; *see also* Dep. of Mark Adamchik ("Adamchik Dep.") at 23:5-16, Ex. 4, ECF No. 59-5; Decl. of Catrina Bonus ("Bonus Decl.") ¶ 21, Ex. 18, ECF No. 59-19.  As part of the response, the Park Police and Secret Service agreed to procure an "anti-scale" fence for the perimeter of Lafayette Park "to protect federal park property from further damage, ensure the safety of the officers inside the park, and protect the White House."  Def.'s SMF ¶ 43; *see also* Pl.'s Resp. SMF ¶ 43.

While the Park Police and Secret Service worked to procure fencing, the protests continued in Lafayette Park.  According to plaintiff, the demonstrations on May 30 and 31 were "less eventful" and "mostly peaceful during the day," and only some clashes occurred in the evenings.  Pl.'s Counter-Statement of Disputed Issues ("Pl.'s CSDF") ¶ 6, ECF 61-2; *see also* Washington, D.C. Mayor News Conference at 2:40-5:18 (May 31, 2020), Ex. 46, ECF 61-48

---

[1]    Together, the parties submitted 109 exhibits, consisting of 36 videos, a few dozen pictures, 16 deposition excerpts, 14 declarations, 10 screenshots of text or online messages, 5 maps, and other documents related to the May 29 to June 1, 2020 demonstrations.  *See* Def.'s Exhibits 1-55, ECF Nos. 59-2 to 59-52, 62-1 to 62-4; Pl.'s Exhibits 1-54, ECF Nos. 61-3 to 61-56; *see also* Def.'s Statement of Material Facts ("Def.'s SMF"), ECF No. 59-1; Def.'s Not. of Supp. Auth., ECF Nos. 60, 60-1; Pl.'s Resp. to Def.'s SMF, ECF No. 61-1; Pl.'s Counter-Statement of Disputed Issues, ECF No. 61-2.  Although each exhibit and submission from the parties in support of and in opposition to the motion for summary judgment has been reviewed, only those exhibits necessary to provide context for resolution of the pending motion are cited herein.

(press statement from Metropolitan Police Department Chief that the demonstrations were "largely peaceful" and only a "small number" of "agitators" caused much of the damage and looting); Dep't of Interior Off. of Inspector Gen. Report (May 24, 2023) at 3, Ex. 14, ECF No. 61-16 ("The protests continued on May 30 and 31 and were mostly peaceful during the day."). The government, however, claims the violence was more pervasive, "start[ing] in the daytime and continu[ing] into the evening," Def.'s SMF ¶ 37, with "crowd members" throwing objects such as "bottles of frozen liquid, excrement filled balloons, cinder blocks, pieces of pavement, fireworks, and scooters," *id.* ¶ 39. *See, e.g.*, Adamchik Dep. 39:4-40:11; Bonus Decl. ¶¶ 23-27; Dep. of Sergent Carlton Robinson at 32:9-20, Ex. 17, ECF 59-18; Decl. of Sean Kellenberger ¶ 29, Ex. 9, ECF 59-10 ("There were . . . many projectiles being thrown at officers from the crowd. . . . I observed protestors physically assaulting fellow Park Police officers by punching and kicking them."). In response to these skirmishes, on May 31, Mayor Muriel Bowser announced that a citywide curfew would take effect that night at 11 p.m. Pl.'s CSDF ¶ 9-10; Def.'s SMF ¶ 46.

On June 1, 2020, the Secret Service directed a contractor to install the fence and received notice "early in the morning" that the fence would be delivered later that day. Pl.'s CSDF ¶ 14; *see also* Adamchik Dep. 69:19-70:1; Bonus Decl. ¶ 35; Decl. of Mark Adamchik ¶ 30, Ex. 16, ECF No. 59-17. Eager to install the fence promptly, Adamchik developed a plan to disperse protesters from H Street NW along the northern border of Lafayette Square to clear space for the contractor. Def.'s SMF ¶ 72; *see also* Pl.'s CSDF ¶ 42. Later that morning, Mayor Bowser held a press conference announcing a District-wide curfew of 7 p.m., four hours earlier than the day before. Washington D.C., Mayor News Conference (Jun. 1, 2020) at 2:30-2:52, Ex. 48, ECF 61-50. The Mayor's curfew order authorized police to arrest violators that remained after hours.

Mayor's Order 2020-069 (Jun. 1, 2020) at Section III, Ex. 30, ECF 61-32. Adamchik was aware of the 7 p.m. curfew, but the government concedes he decided "not . . . [to] wait for the curfew to take effect before clearing H Street" for the fence construction. Def.'s SMF ¶ 99.

At 12:10 p.m., Adamchik received a text message from a Park Police officer that read in part: "Keep up the good work my friend. You operate with the leadership skills of a seasoned military general." Pl.'s CSDF ¶ 18; *see also* Text Message to Adamchik (Jun. 1, 2020), Ex. 31, ECF No. 61-33. Adamchik considered several options for dispersing protestors, including "send[ing] just regular patrol officers out there [to] advise the crowd that H Street is closed and [they] need to move back," and "us[ing] horse-mounted offers in a nonspecific formation to communicate" to the crowd to move back. Pl.'s CSDF ¶ 19 (quoting Adamchik Dep. 74:4-14, 75:15-20). The record does not reflect consideration of another option—namely, to await the curfew deadline to produce at least some clearing of the area for curfew compliance and concomitant reduction of the risk of confrontation with protesters.

Rejecting the options that were considered, Adamchik settled on a more "tactical" option that required the civil disturbance units of the Park Police and the Arlington County Police Department (collectively, "CDUs")—armed with round shields and batons—to push demonstrators down H Street, with horse-mounted officers and other law enforcement personnel bringing up the rear to provide additional assistance. *Id.* ¶¶ 19, 37 (quoting Adamchik Dep. 76:2-6). CDU officers are trained to clear a crowd from an area by engaging in a start-and-stop surge technique: officers "rush[] forward a short distance towards the crowd, stop[] briefly to reform the line once they clear a small amount of territory, and then rush[] forward again to secure the next portion of territory." Def.'s SMF ¶ 15. Although Adamchik authorized the use of Pepper Balls and other "less lethal" weapons in the dispersal operation, he "did not issue any other

4

instructions on the use of force," Def.'s SMF ¶ 92 (citing Adamchik Dep. 84:15-17), such as when the use of shields and batons would be permissible and how much force, if any, could be used against nonviolent protestors engaged in passive resistance, *see* Pl.'s CSDF ¶ 30.

At the time of the incident, plaintiff was a 56-year-old resident of Washington D.C.  Pl.'s CSDF ¶ 1.  On June 1, 2020, plaintiff and her husband left their home around 5 p.m. to 5:30 p.m. to join the protesters in Lafayette Square, fully intending on returning home before the 7 p.m. curfew.  Pl.'s Dep. at 133:14-137-16, Ex. 18, ECF No. 62-20; Pl.'s CSDF ¶ 21.  As they walked towards Lafayette Square, "the sun was shining and the streets were calm and quiet."  Pl.'s CSDF ¶ 22.  Plaintiff and her husband did not see anyone engaging in violent activity.  *Id.* ¶ 23 (citing Pl.'s Dep. at 133:14-137-16; Dep. of Alan Carmer at 66:22-68:19, Ex. 17, ECF No. 61-19).  The crowd at H Street was intergenerational and included elderly individuals and parents with young children, some in strollers.  *Id.* ¶ 24; *see, e.g.*, Def.'s Carmer004049V Video at 0:00-0:25, Ex. 33, ECF 59-34 (video footage of protestors, including plaintiff, shortly before the incident at issue); Def.'s Carmer004034V Video at 1:52, 1:59, Ex. 22, ECF No. 59-23; Def.'s Carmer004035V Video at 4:34, Ex. 24, ECF No. 59-25; Decl. of Virginia Gerbasi ("Gerbasi Decl.") ¶ 8.  Protestors "milled about," occasionally kneeled, and chanted phrases such as "hands up, don't shoot" and "take a knee."  Pl.'s CSDF ¶¶ 25-26; *see, e.g.*, Gerbasi Decl. ¶¶ 6-9; Decl. of Julia Joyce-Miesse ("Joyce-Miesse Decl.") ¶ 8, Ex. 4, ECF No. 61-6.  With very few exceptions, protesters did not throw water bottles that afternoon.  Pl.'s CSDF ¶ 27; *see, e.g.*, Gerbasi Decl. ¶ 26; Decl. of William Urquhart ("Urquhart Decl.") ¶ 11, Ex. 5, ECF No. 61-7.  One attendee testified that when she saw a protestor throw a banana, other protestors immediately chided him, saying, "Hey, man, we're not doing that. We are doing the opposite."  Pl.'s CSDF ¶ 27 (citing Joyce-Miesse Decl. ¶ 9).

Around 5:30 p.m. to 6 p.m., plaintiff, joining the crowd at H Street, took a knee, raised her hands in the air, and began to chant.  *See* Pl.'s CSDF ¶ 48; Pl.'s Decl. ¶¶ 4, 6, Ex. 2, ECF No. 61-4; US00001033 (picture), Ex. 35, ECF No. 59-37; Carmer004049V at 0:12 (video).  At 6:16 p.m., law enforcement officers marched up to H Street without warning, wielding shields in one arm and batons in the other. Pl.'s CSDF ¶¶ 33, 37.  From 6:23 p.m. to 6:28 p.m., over a span of five minutes, Adamchik issued dispersal warnings directing the public to depart Lafayette Square immediately.  *Id.* ¶¶ 34-35.  Plaintiff claims that "many members of the crowd, including [herself], were unable to hear the warnings."  *Id.* ¶ 36 (citing, *inter alia*, testimony of other protestors at the scene).

At 6:28 p.m.—still about half an hour away from the 7 p.m. curfew—law enforcement officers surged down H street toward the protestors.  *Id.* ¶ 37.  The officers "pushed, shoved, hit, and sprayed liquid at the protesters," corralling protestors "westward down H Street in increments."  *Id.* ¶¶ 39-40; *see, e.g.*, Def.'s US00000278 Video at 9:40-11:09, Ex. 30, ECF No. 59-31; Def.'s US00000276 Video at 8:05-8:21, 13:07-13:25, Ex. 31, ECF No. 59-32.  After each incremental surge, the officers would form a line and "wait[] until receiving an instruction to rush forward again."  Pl.'s CSDF ¶ 40; *see, e.g.*, Def.'s US00001032 Video at 14:00-14:50, Ex. 32, ECF No. 59-33.

The line of officers, including Officers Stephanie Sinacore and Sean Kellenberger, soon reached the spot where plaintiff was kneeling.  Plaintiff believes, and the government does not dispute, that the officers were no more than twenty feet away from her.  *See* Def.'s SMF ¶ 139; Pl.'s Resp. SMF ¶ 139.  For at least one minute and eight seconds, the officers remained largely paused at the intersection of H and 16th Streets, facing plaintiff and the other protestors.  Pl.'s CSDF ¶ 50; *see also* Def.'s Carmer004075V Video at 2:17-3:25, Ex. 35, ECF No. 59-36;

US00001032 at 14:00-14:50.  During this time, protesters milled around with signs up or phones out, stood with their arms raised, or took a knee.  *See, e.g.*, Carmer004049V at 0:00-0:25; Carmer004075V at 2:17-3:25.  Some crowd members wore masks or protective goggles.  *See* Carmer004075V at 0:22-1:00.  No one threw anything.  *See* Carmer004075V at 0:22-1:00; Carmer004075V Video at 2:17-3:25.  All the while, plaintiff remained kneeling on the sidewalk with both hands in the air, facing the officers.  Pl.'s CSDF ¶ 48; *see also* Pl.'s Decl. ¶ 9; US00001033 (picture of plaintiff kneeling, with hands in the air, right before officers charged).  Plaintiff asserts that "[f]or much of the time they were paused at the intersection, Officers Kellenberger and Sinacore had an unobstructed view of [her]."  Pl.'s CSDF ¶ 52 (citing Pl.'s Decl. ¶ 10).

According to plaintiff, Officers Kellenberger and Sinacore suddenly charged at her without warning.  *See id.* ¶ 56.  Officer Sinacore "rammed [plaintiff] with a shield, knocking her to the ground."  Pl.'s CSDF ¶ 56.  Officers Sinacore and Kellenberger then "struck [plaintiff] with batons, delivering at least two blows to her right thigh."  *Id.*  While on the ground, plaintiff's "right leg moved up slightly," and she extended her right arm with her palm facing out, "as if to block the blow."  *Id.* ¶¶ 57-58.  Plaintiff never kicked or hit the officers during this confrontation.  *Id.* ¶ 57; Def.'s SMF ¶¶ 153-56.

Plaintiff alleges that she has never fully recovered from the attack.  Days after the incident, plaintiff's right thigh suffered "severe bruising."  Pl.'s CSDF ¶ 60; *see* Pl.'s Carmer004086V Video, Ex. 53, ECF No. 61-55 (video of plaintiff's leg after the attack, showing a large purplish-black bruise covering most of her upper right thigh).  Plaintiff also alleges she "sustained lasting nerve damage" and required "extensive medical treatment, including months of physical therapy."  Pl.'s CSDF ¶¶ 61-62.  She continues "to have trouble with her right leg."

*Id.* ¶ 62. Plaintiff, an "avid hiker," asserts she can no longer "count" on her right leg and has to "baby" the leg when she takes longer walks. *Id.* Five years later, "there remains a visible 'dent' in her right thigh." *Id.* ¶ 63.

**B.    Procedural Background**

On April 21, 2022, plaintiff brought this action against the United States and Officers Adamchik, Kellenberger, and Sinacore (collectively, "Officer Defendants"). *See* Compl., ECF No. 1. As amended, the complaint alleges four counts: assault and battery against the United States under the FTCA, *see* Am. Compl. ¶¶ 95-97, ECF No. 19 (Count 1); and three counts under *Bivens* against the Officer Defendants in their individual capacities alleging excessive force, deprivation of substantive due process, and restriction of speech (Counts 2-4), *see id.* ¶¶ 98-116. Plaintiff seeks money damages and attorneys' fees and costs. *Id.* (Prayer for Relief).

The Officer Defendants sought dismissal of the claims against them, which claims plaintiff conceded reflected an extension of *Bivens* to a new context not before recognized by the Supreme Court for alleged violations of the First, Fourth, and Fifth Amendments. *See Carmer v. United States*, No. 22-cv-1100 (BAH), 2024 U.S. Dist. LEXIS 67019, *13; 2024 WL 1603351, at *6 (D.D.C. Apr. 12, 2024). Under the binding reasoning of the D.C. Circuit in *Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023), which rejected identical *Bivens* claims arising from the same law enforcement action on the same day, close to the same location as alleged in the instant action, and against one of the same defendants named in the instant action, *see Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 29 (D.D.C. 2021), *aff'd sub nom. Buchanan*, 71 F.4th 1003, the Officer Defendants' dismissal motion was granted. *See Carmer,* 2024 U.S. Dist. LEXIS 67019, *30; 2024 WL 1603351, at *10. Thus, only plaintiff's FTCA claim against the United States remains.

The United States has now moved for summary judgment on the remaining claim, which is ripe to resolve.  *See* Def.'s Mot. Summ. J. ("Def.'s Mem."), ECF No. 59; Def.'s Not. Supp. Auth., ECF No. 60; Pl.'s Resp. in Opp'n to Def. Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 61; Def.'s Reply Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 62.

## II.    STANDARD OF REVIEW

Summary judgment may be granted only if "there is no genuine dispute as to any material fact."  FED. R. CIV. P. 56(a).  "Material" facts are those that "might affect the outcome of the suit under the governing law," and "genuine" issues are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party—here, the United States—bears the burden of "identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available."  *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (quoting *Kuo–Yun Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994)).

In determining whether there is a genuine dispute for trial, a court must "view the evidence in the light most favorable to [the nonmoving party], draw all reasonable inferences in [that party's] favor, and not 'make credibility determinations or weigh the evidence.'"  *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (quoting *DeJesus v. WP Co.*, 841 F.3d 527, 531 (D.C. Cir. 2016)).  While the nonmoving party cannot proffer mere allegations as proof of a genuine dispute, but must "cit[e] to particular parts of materials in the record," FED. R. CIV. P. 56(c)(1)(A), the nonmoving party's evidence at summary judgment "is to be believed," *Robinson v. Pezzat*, 818 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Anderson*, 477 U.S. at 255).

However, if "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III.    DISCUSSION

The government advances two arguments for summary judgment in its favor: first, that the discretionary function exception made explicit in the FTCA preserves its sovereign immunity and, as a jurisdictional matter, precludes tort liability, Def.'s Mem. at 18-32; and, second, if the merits are reached, that the officers' use of force against plaintiff was reasonably necessary and thus protected by qualified privilege, *id*. at 32-42.  For the reasons explained below, neither argument is persuasive.

### A.    Discretionary Function Exception

As a threshold matter, the government invokes the discretionary function exception to the waiver of sovereign immunity under the FTCA.  *Id*. at 18.  In the government's view, plaintiff "challenges the CDU's actions against her, which are inseparable from the government's policy-laden decision—in balancing the rights of the protesters against public and officer safety—to use [CDU officers] to clear H Street in order to install an anti-scale fence."  *Id*.  Thus, the government reasons, because the challenged conduct is "inextricably intertwined with a discretionary decision," "sovereign immunity is not waived and no subject matter jurisdiction exists."  *Id*.  This reasoning suffers several fatal flaws.

#### 1.    *Applicable legal principles*

The FTCA "broad[ly]" waives the government's sovereign immunity from claims "caused by the tortious actions of government employees acting within the scope of their employment under circumstances where a private person would be liable," with some

10

exceptions. *Gray v. Bell*, 712 F.2d 490, 506 (D.C. Cir. 1983). One such exception—the

discretionary function exception—preserves the United States' immunity from suit by excluding

from the FTCA liability based upon

> the exercise or performance or the failure to exercise or perform a discretionary function
> or duty on the part of a federal agency or an employee of the Government, whether or not
> the discretion be abused.

28 U.S.C. § 2680(a). The basis for the discretionary function exception is to "prevent judicial

second-guessing of legislative and administrative decisions grounded in social, economic, and

political policy through the medium of an action in tort." *Berkovitz by Berkovitz v. United

States*, 486 U.S. 531, 536 (1988) (internal quotation marks omitted). If the discretionary

function exception applies, no subject matter jurisdiction exists to review a claim against the

government. *Sloan v. U.S. Dep't of Hous. & Urb. Dev.*, 236 F.3d 756, 759 (D.C. Cir. 2001).

A two-part test, articulated by the Supreme Court in *Berkovitz*, governs whether the

FTCA's discretionary function exception applies. First, "there must be no 'federal statute,

regulation, or policy [that] specifically prescribes a course of action for an employee to follow.'"

*Usoyan v. Republic of Turkey*, 6 F.4th 31, 38 (D.C. Cir. 2021) (alteration in original) (emphasis

omitted) (quoting *Berkovitz*, 486 U.S. at 536). Second, "the employee's exercise of discretion

must be 'the kind that the discretionary function exception was designed to shield'—that is,

'based on considerations of public policy.'" *Id.* (quoting *Berkovitz*, 486 U.S. at 536-37).

The FTCA's discretionary function exception is generally read narrowly. *See, e.g.*,

*O'Toole v. United States*, 295 F.3d 1029, 1037 (9th Cir. 2002) ("[I]n order to effectuate

Congress's intent . . . , the FTCA, as a remedial statute, should be construed liberally, and its

exceptions should be read narrowly."); *Cestonaro v. United States*, 211 F.3d 749, 755 (3d Cir.

2000) (explaining that the discretionary function exception should not be a "toothless standard

that the government can satisfy merely by associating a decision with a regulatory concern");

*Usoyan v. Republic of Turkey*, 438 F. Supp. 3d 1, 16 (D.D.C. 2020), *aff'd*, 6 F.4th 31 (D.C. Cir. 2021) (noting that the "discretionary function exception should not be applied too broadly immunizing almost all governmental activity").  This narrow reach of the discretionary function exception is especially appropriate in the law enforcement context because of the interplay with another, related FTCA exception codified at 28 U.S.C. § 2680(h).

Section 2860(h) generally excludes from the FTCA's waiver of sovereign immunity liability for intentional torts, while carving out an exception within that exception for claims arising from wrongful conduct by law enforcement.  Known as the "law enforcement proviso," this provision in Section 2680(h) "extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the 'acts or omissions of investigative or law enforcement officers.'"  *Millbrook v. United States*, 569 U.S. 50, 52-53 (2013) (quoting 28 U.S.C. § 2680(h)).  Congress added the proviso in 1974—"triggered by the abusive tactics of federal narcotics agents who engaged in illegal, unconstitutional 'no-knock' raids"—with the intention of "provid[ing] a remedy against the Federal Government for innocent victims of Federal law enforcement abuses."  *Caban v. United States*, 671 F.2d 1230, 1234 (2d Cir. 1982) (citing S. Rep. No. 93-588, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S. Code Cong. & Ad. News 2789, 2792)).

Given this backdrop, courts have declined to adopt an "overly broad conception" of the discretionary function exception under 28 U.S.C. § 2680(a) as applied to law enforcement, as such a reading would "eviscerate" the law enforcement proviso under 28 U.S.C. § 2680(h). *Beran v. United States*, 759 F. Supp. 886, 892 (D.D.C. 1991) (citing *Sutton v. United States*, 819 F.2d 1289, 1292-97 (5th Cir.1987); *Caban*, 671 F.2d at 1234); *see also Martin v. United States*, 145 S. Ct. 1689, 1706 (2025) (Sotomayor, J., concurring) ("Courts . . . should not ignore the

existence of the law enforcement proviso, or the factual context that inspired its passage, when construing the discretionary-function exception. . . . [A]ny interpretation [of the discretionary function exception] should allow for liability in the very cases Congress amended the FTCA to remedy.").

### 2.    *Bar of the discretionary function exception for constitutional violations*

The government's jurisdictional argument stumbles out the gate before even reaching the two-part *Berkovitz* test, because unconstitutional conduct falls outside the sweep of the discretionary function exception.  The D.C. Circuit has unequivocally "h[eld] that the discretionary-function exception does not provide a blanket immunity against tortious conduct that a plaintiff plausibly alleges also flouts a constitutional prescription." *Loumiet v. United States*, 828 F.3d 935, 943 (D.C. Cir. 2016).  In so deciding, the Court joined "[a]t least seven circuits, including the First, Second, Third, Fourth, Fifth, Eighth, and Ninth, [which] have either held or stated in dictum that the discretionary-function exception does not shield government officials from FTCA liability when they exceed the scope of their constitutional authority." *Id.* at 943-44 (collecting cases); *see also Owen v. City of Independence*, 445 U.S. 622, 649 (1980) ("[The government] has no 'discretion' to violate the Federal Constitution; its dictates are absolute and imperative.").  To be clear, successfully alleging constitutionally *ultra vires* conduct does not "convert an FTCA claim into a constitutional damages claim against the government; state law is necessarily still the source of the substantive standard of FTCA liability." *Loumiet*, 828 F.3d at 945-46; *see infra* Part III.B (discussing the merits of plaintiff's battery claim). Evidence of unconstitutionality that could support a reasonable jury's verdict, however, does "negat[e] the discretionary function defense." *Loumiet*, 828 F.3d at 946.

Plaintiff alleges violations of her Fourth, First, and Fifth Amendment rights, but she need only succeed on one of her constitutional claims to render the discretionary function exception inapplicable. The constitutional analysis here begins and ends with the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures," U.S. Const. amend. IV, which protection includes claims that law enforcement officers "used excessive force" in effecting the seizure, *Graham v. Connor*, 490 U.S. 386, 395 (1989).  To assert a Fourth Amendment excessive-force claim, a plaintiff must plead, first, that she was seized, and second, that the use of force applied in the seizure was unreasonable.  *See Scott*, 550 U.S. at 381.

The evidence, viewed in a light most favorable to plaintiff, supports a finding of seizure. A Fourth Amendment seizure occurs "when there is a governmental termination of freedom of movement through means intentionally applied."  *Id.* (internal quotation marks omitted).  Even "brief seizures are seizures all the same."  *Torres v. Madrid*, 592 U.S. 306, 318 (2021).  Here, the seizure occurred when the officers "knocked [plaintiff] to the ground, stood over her, raised their batons, and smashed the batons down on her leg," leaving plaintiff lying on the ground for several seconds, "terminating her freedom of movement."  Pl.'s Opp'n at 13-14.

The government presents no serious arguments to the contrary, arguing, in one sentence in its opening brief, only that "the Fourth Amendment does not apply because officers used force to disperse Carmer, not seize her."  Def.'s Mem. at 29; *see also* Def.'s Reply at 14.  This utterly fails to grapple with persuasive legal precedent that an officer's use of force against a protester during dispersal efforts can nevertheless constitute a seizure in situations, like here, where the protestor is physically touched by officers and not free to leave.  *See, e.g.*, *Sanderlin v. Dwyer*, 116 F.4th 905, 913 (9th Cir. 2024) (firing a foam projectile at protester "manifested an intent to

restrain [protestor] and prevent [protestor] from freely walking away"); *Sernoffsky v. Novak*, 773 F. Supp. 3d 988, 1017 n.14 (S.D. Cal. 2025) (assuming a seizure "because at least one [p]laintiff contend[ed] she was physically touched by an . . . officer's baton during the dispersal efforts"); *Baca v. Anderson*, No. 22-cv-02461, 2024 WL 2868145, at *8 (N.D. Cal. Jun. 6, 2024) (denying summary judgment because the officer's initial baton strike against plaintiff-protestor, who was warned to "back up," could constitute unreasonable seizure). Further, the government's own brief belies its assertion that the officers intended only to disperse plaintiff, and not to restrict her movement. *See* Def.'s Mem. at 37-38 (justifying the officers' attack by claiming that "an objectively reasonable officer would conclude that Carmer posed an immediate threat to the safety of the officers and others"); *id.* at 16 (recounting officer testimony that plaintiff posed a threat because "the manner in which Carmer raised her leg and foot" reflected "ground-fighting training").

The evidence could also lead a reasonable jury to find that the force was unreasonable. As an initial matter, the parties dispute whether a constitutional mandate must be "clearly established"—similar to principles undergirding the qualified immunity doctrine—to render the discretionary function exception inapplicable. *See* Def.'s Mem. at 32 n.21 (advocating for the more stringent "clearly established" standard); Pl.'s Opp'n at 12 (contending that the "clearly established" standard as applied in the discretionary-function context "has no basis in law," and "the court need only find that 'a reasonable jury could conclude' that the challenged conduct violated the Constitution"). The D.C. Circuit has not resolved this question. *Loumiet*, 828 F.3d at 946 (leaving for another day the question of whether the FTCA immunizes exercises of policy discretion in violation of constitutional constraints that are not already clear). In any event, the issue need not be addressed here, because even under the government's proposed standard, a

finder of fact could conclude that plaintiff's Fourth Amendment right *was* clearly established at the time of the alleged violation.

"Although the D.C. Circuit has never directly ruled on the matter, other courts of appeal have 'clearly established that force is least justified against nonviolent [individuals] who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public.'" *Goodwin v. District of Columbia*, No. 21-cv-806 (BAH), 2025 WL 637467, at *12 (D.D.C. Feb. 27, 2025) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009)) (collecting cases). A reasonable jury could find that such is the case here.

Plaintiff joined the crowd at Lafayette Square around 5:30 p.m. to 6 p.m., Pl.'s CSDF ¶ 48, fully intending on returning home before the 7 p.m. curfew, *id.* ¶ 49. In plaintiff's view, she was "a peaceful protester," "[q]uietly kneeling with her arms in the air" and "pos[ing] no threat to anyone's safety." Pl.'s Opp'n at 16-17. She proffers "[v]ideo and testimonial evidence show[ing] that the demonstration had been peaceful all day," which "[a]ttendees included elderly people and parents with children, some young enough to be in strollers." *Id.* at 17. The officers marched up H Street at 6:16 p.m., with three-quarters of an hour left before the 7 p.m. curfew. Pl.'s CSDF ¶ 35. When officers reached the protestors, "[m]any kneeled, as Ms. Carmer did," and "[o]ne repeatedly shouted, 'We are not a threat.'" *Id.*

On these facts, a reasonable jury could find that charging forward without warning, "knocking Ms. Carmer" down, and "beat[ing] her with batons as she lay on the ground, unarmed and highly vulnerable," was unreasonable under the Fourth Amendment, and thus not shielded by the discretionary function exception. *Id.*; *see, e.g.*, *Buck v. City of Albuquerque*, 549 F.3d 1269, 1289 (10th Cir. 2008) (denying qualified immunity where officers fired pepper balls at a protester who was lying on the ground in defiance of a dispersal order, as "the severity of [the

16

protestor's] purported infractions and the degree of potential threat that she posed to an officer's and to others' safety appeared to be nil"); *Collins v. City of Chicago*, No. 21-cv-02913, 2024 WL 5007836, at *5, 13 (N.D. Ill. Dec. 6, 2024) (denying summary judgment where an officer allegedly threw a protestor to the ground and hit him with a baton for failing to comply with an order to "get back"); *Khan v. City of Los Angeles*, 753 F. Supp. 3d 997, 1012 (C.D. Cal. 2024) (same, where an officer jabbed his baton at a protester's abdomen during a dispersal operation, when the protestor "was not resisting arrest or attempting to flee when she was hit"); *James v. City of Los Angeles*, No. 2:21-cv-04525, 2023 WL 9234935, at *5 (C.D. Cal. Dec. 5, 2023) (same, where a police sergeant pushed a protester with a baton after the protestor's leg allegedly inadvertently struck another officer).

### 3.    *The two-part Berkovitz test for discretionary functions*

Even assuming the government's actions fell within constitutional bounds, the discretionary function exception would still be inapplicable because Officer Sinacore's and Kellenberger's decision to "ram[] [Carmer] with a shield" and "bludgeon[] her with batons," Pl.'s Opp'n at 1, was not driven by policy considerations.

### a)    *The conduct at issue*

As a preliminary issue, the parties dispute the precise conduct being challenged, a question that precedes the two-step *Berkovitz* test. *See Mynatt v. United States*, 45 F.4th 889, 896 (6th Cir. 2022) ("Determining exactly what conduct is at issue and identifying which specific policies or regulations the plaintiff alleges were violated is paramount." (alterations and internal quotation marks omitted)). Plaintiff views her challenge as one limited to the moment of her battery by Officer Sinacore and Kellenberger. The government instead takes an expansive view, framing the action as the officers' overarching "decision to install an anti-scale fence . . . in

response to violent protests," and their related decision after "weighing their options" to "clear H Street using CDU officers." Def.'s Mem. at 20. According to the government, Officer Sinacore's and Kellenberger's subsequent actions to remove plaintiff by force cannot be viewed in isolation, because those removal actions were "inextricably intertwined with the [high-level] decision to use the CDU as the front line of the clearing operation." *Id.*

*Usoyan v. Republic of Turkey*, 6 F.4th 31 (D.C. Cir. 2021), is directly on point and supports plaintiff's position. In that case, a group of protesters sued Turkey when they were "violently physically attacked" by Turkish security forces outside the Turkish ambassador's residence, while the Turkish President "remained sitting in his vehicle near the entrance to the residence." *Usoyan*, 6 F.4th at 36-37. Invoking the discretionary function exception under the Foreign Sovereign Immunities Act ("FSIA"), Turkey argued that "all decisions about how to protect [the Turkish President were] susceptible to policy analysis, given that those decisions required its employees to weigh varying security risk levels against the cost of specific countermeasures." *Id.* at 46. The D.C. Circuit—recognizing that the FSIA's discretionary function exception was "modeled after a similarly worded exception" in the FTCA—"look[ed] to what [the Supreme Court] has said about the FTCA's analogous provisions" and, as relevant here, concluded that the exception did not apply. *Id.*

The Court explained that "although certain Turkish security officers may be responsible for weighing varying security risk levels, those [were] not the decisions giving rise to the plaintiffs' suit," which involved assault and battery claims arising from the Turkish guards' clash with the protestors. *Id.* (internal quotation marks and alteration omitted). Those attacks on protestors were identified as "[d]iscrete injury-causing actions" that were "sufficiently separable from protected discretionary decisions." *Id.* After all, "[v]iewed from 50,000 feet, virtually any

18

action can be characterized as discretionary." *Id.* at 47  (quoting *Limone v. United States*, 579 F.3d 79, 101 (1st Cir. 2009)).  Yet "the discretionary function exception requires that an inquiring court focus on the *specific conduct* at issue." *Id.* (emphasis added) (quoting *Limone*, 579 F.3d at 101); *see also Berkovitz*, 486 U.S. at 536 (1988) ("In examining the nature of the challenged conduct, a court must first consider whether the action is a matter of choice for the *acting employee*." (emphasis added)); *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1142-43 (D.C. Cir. 2015) ("The district court must parse [plaintiff's] allegations at a finer level of specificity in order to address those claims of prohibited action and resolve [the government's] claim of immunity."); *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1995) ("[T]he proper level of inquiry must be act by act . . . Each separate action must be examined to determine whether the *specific actor* had discretion of a type Congress intended to shield." (emphasis added)).

Similarly, here, since plaintiff "seeks damages under the FTCA for battery, the conduct at issue is obvious: it is Officer Sinacore and Kellenberger's use of force against [her]."  Pl.'s Opp'n at 22-23.  Although other higher-ranking officers made "decisions to install a security fence, to clear H Street for that purpose, and to select the CDU to perform the clearing," Def.'s Mem. at 21, the government's proposed framing sits at "too high a level of generality," *Banneker Ventures*, 798 F.3d at 1142-43.   Those other officers' planning decisions "are not the decisions giving rise to the plaintiffs' suit." *Usoyan*, 6 F.4th at 46.  "The correct analysis is whether the alleged *tortious conduct* is discretionary," *id.* (internal quotation marks omitted) (emphasis in original), and the specific tortious conduct that plaintiff challenges in support of her battery claim is Officer Sinacore's and Kellenberger's act of "ramm[ing] her with a shield" and "bludgeon[ing] her with batons,"  Pl.'s Opp'n at 1.

b)    *The first Berkovitz condition*

At *Berkovitz* step one, a court must "first determine whether the challenged conduct 'involves an element of judgment or choice.'"  *Usoyan*, 6 F.4th at 38 (quoting *Berkovitz*, 486 U.S. at 536).  "An action is not discretionary if an employee is 'bound to act in a particular way.'"  *Id.* (quoting *United States v. Gaubert*, 499 U.S. 315, 329 (1991)).  "If a specific directive exists," then "the employee had no 'choice,'" and "[t]he only issue is whether the employee followed the directive, and is thus exempt," or, alternatively, "whether the employee did not follow the directive, thus opening the government to suit."  *Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995).  "In essence, *Berkovitz's* first condition asks whether the challenged conduct is rightfully the product of independent judgment."  *Usoyan*, 6 F.4th at 39.

Plaintiff contends that Officers Sinacore and Kellenberger "did not have discretion to use a degree of force that clearly exceeded" the threshold set forth by the Park Police.  In support, plaintiff cites two policies: U.S. Park Police General Order No. 3605, governing officers' use of defensive equipment, *see* U.S. Ex. 3, ECF No. 59-4; and U.S. Park Police General Order No. 3615, governing officers' use of force, *see* U.S. Ex. 2, ECF No. 59-3.  Though plaintiff may be correct that the officers' challenged conduct towards plaintiff is not clearly sanctioned under these policy orders, the problem is that neither policy eliminates officers' discretion or creates specific mandatory duties with respect to the use of shields and batons on passive protestors.

General Order No. 3605.01 authorizes the use of defensive equipment "to gain control of an individual or group of individuals, or to effect an arrest to ensure the protection of the public, the officer, and any arrestees."  U.S. Ex. 3 at 1.  As to when the use of defensive equipment is appropriate, the order offers no specifics but rather couches the guidance in general terms.  For example, with respect to batons, General Order No. 3605.05 provides that batons "*may* be used"

in the following situations: (1) "[a] subject resists arrest"; (2) "[t]he officer is physically assaulted by an assailant"; (3) [i]t is necessary for crowd control"; and (4) "[a]n emergency situation." U.S. Ex. 3 at 5 (emphasis added); *see also* G.O. No. 3605.02(C), U.S. Ex. 3 at 1 ("An officer shall use only Forced-approved methods and only that force *necessary* to subdue an individual." (emphasis added)).

Similarly, General Order No. 3615 lacks specific directives to officers that would remove room for independent judgment. The order requires the "type and level of force used" to "be reasonable, *depending on the dynamics* of the situation." G.O. 3615.02, Ex. 2 (emphasis added). "[O]nly the minimum level of *reasonable* force *necessary* to control a situation" can be used. *Id.* (emphasis added). "This force *may* take the form" of a range of control methods, from verbal commands, to "use of baton or other nonlethal weapon[s]," to "deadly force." *Id.* (emphasis added); *see also id.* ("The type and level of force used must be *reasonable.* . . . " (emphasis added)); G.O. 3615.04, Ex. 2, ECF 59-3 ("An officer shall, *if possible*, first attempt to defuse a situation . . . ." (emphasis added)).

These "broadly stated conditions" involve "substantial elements of judgment." *Sloan v. U.S. Dep't of Hous. & Urb. Dev.*, 236 F.3d 756, 760 (D.C. Cir. 2001); *see also Campos v. United States*, 888 F.3d 724, 733-35 (5th Cir. 2018) (holding that an officer had discretion to act under a statute that permitted arrest if the officer "ha[d] *reason to believe* that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest" (emphasis added)). Neither order clearly delineates what it means for force to be "necessary" or "reasonable," what constitutes an "emergency situation," or when defusing a situation is "possible." In short, while these general directives offer officers

guidance on the appropriate use of force, they do not give officers "no choice" but to act in a particular way. *See Cope*, 45 F.3d at 448.

Nevertheless, "[e]ven where a federal employee retains an element of choice," "the exception does not apply reflexively." *Martin v. United States*, 145 S. Ct. 1689, 1704 (2025). After all, statutes and regulations "rare[ly]" "prescribe an official's required course of conduct down to the very last detail, so some degree of choice will almost invariably remain." *Id.* The following section proceeds to analyze the second condition of *Berkovitz's* two-part test.

### c)    *The second Berkovitz condition*

At *Berkovitz* step two, a court must ask whether the "judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. Given that the purpose of the discretionary function exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy," the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537.

For similar reasons relied upon by the *Usoyan* court, Officer Sinacore's and Kellenberger's alleged use of force against plaintiff is not covered by the exception. Recall that in *Usoyan*, *see supra* Part III.A.3(a), the D.C. Circuit held that the Turkish security forces' "violent[]" attack of protesters outside of the Turkish ambassador's residence failed *Berkovitz* step two. 6 F.4th at 35. "When viewed up close," the Court explained, "the decisions by the Turkish security detail giving rise to the plaintiffs' suit were not the kind of security-related decisions that are 'fraught with economic, political, or social judgments.'" *Id.* at 47 (quoting *Cope*, 45 F.3d at 450). Although "nearly every government action is, at least to some extent, subject to 'policy analysis,'" the Court cautioned against applying the discretionary function

exception to "shield actions implicating only 'the faintest hint of policy concern.'" *Id.* at 45 (quoting *Cope*, 45 F.3d at 448-49). While acknowledging that the Turkish security detail's protective mission was discretionary as a general matter, the Court explained that the specific decisions giving rise to the plaintiffs' suit did not involve "archetypical public policy considerations," *id.* at 46, such as "how much safety equipment should be provided to a particular embassy, how much training should be given to guards and embassy employees, and the amount of security-related guidance that should be provided," *id.* (quoting *Macharia v. United States*, 334 F.3d 61, 66 (D.C. Cir. 2003)). "Mere 'garden-variety' discretion receives no protection," *id.* (quoting *Cope*, 45 F.3d at 448), nor can "blatantly careless or malicious conduct" be "recast in the language of cost-benefit analysis," *id.*

Likewise, although the CDU's general mission to clear H street was a discretionary decision, Officer Kellenberger's and Sinacore's *specific* decision to shove and hit plaintiff was not grounded in policy considerations because that decision did not "entail[ ] balancing competing demands for funds and resources." *Id.* (quoting *Macharia*, 334 F.3d at 67). Rather, plaintiff's claims arise from "a mere scuffle with [officers]" for which the government typically enjoys no immunity. *Morgan v. Int'l Bank for Reconstruction & Dev.*, 752 F. Supp. 492, 495 (D.D.C. 1990); *see also Garcia v. United States*, 826 F.2d 806, 809 (9th Cir. 1987) ("While law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability."); *Caban v. United States*, 671 F.2d 1230 (2d Cir.1982) ("[T]he activities of the [Immigration and Naturalization Service] agents who detained appellant do not fall within the purview of [the discretionary function exception] because the activities are not the kind that involve weighing important policy choices."); *Beran*,

759 F. Supp. at 892 (holding that plaintiff's claims against a Secret Service agent for assault, battery, false arrest, and false imprisonment was not barred by the discretionary function exception).

The government attempts to distinguish *Usoyan* in two ways. First, the government contends that the officers' use of force against plaintiff in this case "stemmed from a policy-laden, pre-planned clearing operation, not the sort of *ad hoc* action at issue in *Usoyan*." *Id.* This reasoning, however, ignores clear precedent instructing courts to "parse [plaintiff's] allegations at a finer level of specificity" than the birds-eye view taken by the government here. *See Banneker Ventures*, 798 F.3d at 1142-43. As the D.C. Circuit held in *Usoyan*, a general mission to protect important government officials does not immunize all execution in furtherance of that protective undertaking. *See* 6 F.4th at 46 ("Although the Turkish security detail's protective mission was discretionary as a general matter, that does not mean that every action a Turkish officer may take is an immunized exercise of that discretion."). Just as the *Usoyan* Court held the specific actions taken against the plaintiff protesters by the Turkish security detail were "not the kind of security-related decisions that are fraught with economic, political, or social judgments," 6 F.4th at 47 (internal quotation marks omitted), so, too, the two officers' physical contacts against plaintiff were not at the level or of the kind to qualify for protection under the discretionary function exception.

Second, the government argues that "the security detail's use of force in *Usoyan* had no plausible relationship to national security, like the need to protect a high-ranking official (in that case, [the Turkish President])." Def.'s Reply at 3. If anything, however, the security concerns in *Usoyan* surpass those present here. In *Usoyan*, Turkish security guards attacked protestors stationed outside the Turkish ambassador's residence while the Turkish President "s[at] in his

vehicle *near the entrance of the residence.*"  6 F.4th at 36 (emphasis added).  The D.C. Circuit nevertheless held that the security guards' attack of the protestors was "not plausibly related to protecting [the] President," who remained in his vehicle during the confrontation, *id.* at 47, given the Circuit's review of the "video of the altercation [them]selves" and finding no error in the district court's description that "the protesters were merely standing on the [] sidewalk," "did not rush to meet the attack" but instead "either fell to the ground . . . or ran away," and thus there was "no indication that an attack by the protesters was imminent," *id*. at 37.  Likewise, here, nothing suggests that Officers Sinacore and Kellenberger faced a specific "need to protect a high-ranking official" when they attacked plaintiff.  *See* Def.'s Reply at 3.  To the extent the government makes the even broader claim that plaintiff's actions implicate national security simply because Lafayette Square is "at the edge of the White House," Def.'s Mem. at 24, that contention would also fail.  Plaintiff's right to recover on injuries sustained during a demonstration cannot hinge on the location of her protest.  To hold otherwise would effectively confer on law enforcement blanket immunity for any use of force connected to dispersal operations at Lafayette Square—a major site of First Amendment activity with a storied history of political demonstrations.

The government's heavy reliance on *Gray v. Bell*, 712 F.2d 490 (D.C. Cir. 1983)—cited 30 times across its two briefs—is also misguided.  *See* Def.'s Mem.; Def.'s Reply.  The government notes that *Gray* applied the discretionary function exception to actions that, while not independently qualifying for the exception, are "inextricably intertwined with [a] policy-based decision."  Def.'s Mem. at 19.  This ignores the vastly different facts at issue in *Gray*. There, Acting FBI Director L. Patrick Gray III sued prosecutors, who had investigated and obtained an indictment against him for allegedly authorizing warrantless searches, claiming that

the prosecutors conducted a grossly negligent pre-indictment investigation. *Gray*, 712 F.2d at 492. The D.C. Circuit found the discretionary function exception applicable, holding that Gray's allegations of improper investigatory techniques were "inextricably tied" to the ultimate "decision to prosecute," a purely discretionary decision. *Id.* at 516.

Unlike in *Gray*, here, the government's general decision to mobilize the CDU officers stands separate from Officer Sinacore's and Kellenberger's individual decisions to push plaintiff to the ground and hit her with a baton. Although Major Adamchik oversaw the dispersal operations and may have weighed policy considerations, such as which unit to deploy and what equipment to provide, *see* Def.'s Mem. at 26, the two line officers' violent confrontation with plaintiff does not implicate these high-level decisions, *see Morgan*, 752 F. Supp. at 495. Indeed, *Gray* itself recognized that the job duties of police officers are more ministerial in nature and does not "typically include" discretionary functions. 712 F.2d at 508. This conclusion is bolstered by the fact that *Usoyan*, decided after *Gray*, did not treat *Gray* as controlling and cited *Gray* only for the proposition that "police officers' work does not 'typically include' immunized discretionary functions." *Usoyan*, 6 F.4th at 46 (citing *Gray*, 712 F.2d at 508, and reasoning that the Turkish guards' clash with protestors was not "inextricably tied" to the security detail's overarching protective mission because the specific attacks themselves were "[d]iscrete injury-causing actions").

* * *

In sum, the discretionary function exception does not apply to shield the government from liability for plaintiff's battery claim.

## B.    Qualified Privilege

Under District of Columbia law, "[a]n individual who has been injured by [an officer] may sue under one or more common law theories of legal liability such as assault and battery," as plaintiff did here.  *D.C. v. Chinn*, 839 A.2d 701, 705 (D.C. 2003).  "Usually [the] technical requirements of assault and battery are satisfied" in use-of-force claims against law enforcement, as "there is no question that a battery occurred," and so "the outcome of the case turns on the defense of privilege."  *Id.* at 705-06; *see* U.S. SMF ¶ 151 (stating, as undisputed fact, that two officers "pushed [plaintiff] down with a shield" and "struck her right thigh twice with a baton").

Law enforcement officers enjoy a "qualified privilege" to use force that is "reasonably necessary" to accomplish a legitimate law enforcement objective.  *Chinn*, 839 A.2d at 707.  Yet, if the force used is "excessive," the officer "has no defense to the battery."  *Id.*  "The test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Williams v. District of Columbia*, 268 F. Supp. 3d 178, 194 (D.D.C. 2017) (quoting *Scales v. District of Columbia*, 973 A.2d 722, 730 (D.C. 2009)).[2]

A review of the record—including video footage of Officer Sinacore's and Kellenberger's confrontation with plaintiff and of the protest more broadly—reveal material disputed facts, which, if resolved in plaintiff's favor, could result in a reasonable jury returning a verdict for plaintiff.  *See Anderson*, 477 U.S. at 248.  Viewing the evidence in a light most

---

[2]    The party bearing the burden of proving that privilege protects an officer's use of force is an unsettled legal issue, *see Jenkins v. District of Columbia*, 223 A.3d 884, 902 (D.C. 2020), although another Judge on this Court has held that the party asserting the privilege "must overcome this uncertainty by showing that it would be entitled to summary judgment even if it was saddled with the burden of proof," *Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 82 (D.D.C. 2012) (Contreras, J.).  This issue need not be resolved here because even if plaintiff bore the burden, the conclusion reached would be the same.

favorable to plaintiff, *see Iyoha*, 927 F.3d at 565, the video and testimonial evidence show "a sunny afternoon, with people of all ages and genders peacefully exercising their First Amendment rights." Pl.'s Opp'n at 32 (citing Pl.'s CSDF ¶¶ 22-28). Plaintiff submitted evidence from numerous witnesses testifying that the protest at H Street NW was peaceful: protesters "milled about," "occasionally took a knee," and repeated chants such as "hands up, don't shoot" and "take a knee." Pl.'s CSDF ¶¶ 25-26; *see, e.g.*, Gerbasi Decl. ¶¶ 6-9; Joyce-Miesse Decl. ¶ 8. The record evidence could also lead a reasonable jury to conclude that, "[w]ith very few exceptions, protesters did not throw water bottles in the hours before law enforcement officers entered H Street NW" on June 1, 2020. Pl.'s CSDF ¶ 27; *see, e.g.*, Carmer004049V at 0:00-0:25 (video footage of protestors, including plaintiff, showing no objects were thrown before the officers charged); Gerbasi Decl. ¶ 26 ("I did not see anyone throw anything before law enforcement entered H Street to begin dispersing the crowd"); Urquhart Decl. ¶ 11 ("After the officers' initial attack, I observed a few plastic water bottles thrown. I did not observe instances of objects being thrown prior to the officers' attack."). One attendee further testified that, when she saw a protestor at H Street NW throw a banana, other protestors immediately chided him, saying, "Hey, man, we're not doing that. We are doing the opposite." Pl.'s CSDF ¶ 27 (citing Joyce-Miesse Decl. ¶ 9).

A reasonable jury could also find that before Officers Sinacore and Kellenberger charged toward plaintiff, they had "a direct, unobstructed view of Ms. Carmer, for roughly one minute and eight seconds," during which plaintiff "remained on her knees the entire time" with her hands "up over her head," "right until the moment Officer Sinacore knocked her to the ground" with a shield. Pl.'s Opp'n at 33-34 (citing Pl.'s CSDF ¶¶ 48, 51, 56); *see also* Carmer004049V at 0:20-0:35. A reasonable jury could also credit plaintiff's explanation that, after the officers

beat her with a baton, she "raised her right thigh and right hand by perhaps a few inches" not for

the purpose of "attack[ing] the officers," "but in response to being hit, and to shield herself from

further violence."  Pl.'s Opp'n at 34.

The government resists plaintiff's perspective, pushing for summary judgment on the

ground that the officers' use of force was reasonable as a matter of law.  *See* Def.'s Mem. at

34-42.  As support, the government offers, as a use-of-force subject matter expert, the opinions

of Spencer Fomby—a retired police captain from the Boise Police Department Training,

Education, and Development Division in Boise, Idaho—who claims in his submitted report, for

which he was compensated, that the officers "followed generally accepted policing practices

when they used force to move protestors who refused to comply with a lawful order to disperse."

Report of Spencer Fomby ¶¶ 1, 3, 81, Ex. 50, ECF 59-51.  Further, the government cites officers'

observations of vandalism and violence in the period leading up to the clearing operation,

protestors wearing gas masks and eye protection "to undermine the efficacy of crowd control

tools such as tear gas," and their difficulty in "determining the age and gender of protestors they

encountered."  Def.'s Mem. at 34-35.  To be clear, however, the government does not claim that

*plaintiff* acted violently or wore such protective gear, or that the officers could not determine her

age and gender from where they stood.  Rather, the government faults plaintiff for "remain[ing]

in place" when ordered to move, and for having objects "within her reach" that "could have been

used to attack the officers," such as the purse at her hip which, the government asserts, "may

have concealed a weapon."  *Id.* at 35; *see also* US00001033, Ex. 36, ECF No. 59-37 (picture

showing plaintiff with a small, tan crossbody bag).  The government also describes plaintiff,

after being struck and "end[ing] up lying on her left side," with "her legs bent at a 90-degree

angle" and "raised and extended towards the officers" with "her arms blocking her face," as her adopting the position of a "ground fighting technique[]." *Id.*

Wherever the truth may lie, what is crystal clear is that the government's reframing of the incident reflects a material dispute over whether the degree of resistance and threat posed by plaintiff, if any, warranted the kind of force used by Officers Sinacore and Kellenberger. The record evidence from both parties does not lead to a single inference that the officers' use of force against plaintiff was "reasonably necessary," or that the force used was not "excessive." *See Chinn*, 839 A.2d at 707. Under the circumstances alleged by plaintiff, at least, "[a] jury could certainly find that no 'reasonable officer' would believe that the brutality here [was] necessary." *Arrington v. United States*, 473 F.3d 329, 336 (D.C. Cir. 2006). Since "it is the jury's role, not [the Court's], to decide whose version of facts is correct," *Smith v. Ray*, 781 F.3d 95, 106 (4th Cir. 2015), summary judgment must be denied. *See also Sanderlin v. Dwyer*, 116 F.4th 905, 915 (9th Cir. 2024) ("Ultimately, on this record, the reasonableness of the force used by [the officer] thus turns on how the jury interprets the video footage, and whether the jury credits [the officer's] testimony [about the plaintiff's conduct]."); *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994) ("[W]hether a particular use of force was reasonable is rarely determinable as a matter of law.").

## IV.    CONCLUSION

For the foregoing reasons, the motion for summary judgment by the United States is DENIED.

As to next steps in this action, the parties will be directed to confer and jointly submit, by September 25, 2025, a report indicating whether they request another referral to the D.C. Circuit Mediation Program or to a Magistrate Judge for purposes of engaging again in settlement

discussions, *see* parties' Joint Motion For Referral To Mediation and Temporary Stay, ECF No. 13; Minute Order (Aug. 5, 2022) (granting motion for referral to mediation and staying action through Oct. 4, 2022), or proposing three dates for a pretrial conference and trial of plaintiff's remaining claim.

      An Order consistent with this Memorandum Opinion will be filed contemporaneously.

      Date:  September 18, 2025

_____

**BERYL A. HOWELL**
United States District Judge